| | |
|---|---|
| TRANSAMERICA LIFE INSURANCE COMPANY,<br>                Plaintiff<br><br>vs.<br><br>JOSEPH CARAMADRE, RAYMOUR RADHAKRISHNAN, ESTATE PLANNING RESOURCES, INC., ESTELLA RODRIGUES, EDWARD MAGGIACOMO, JR., LIFEMARK SECURITIES CORP., and PATRICK GARVEY,<br>                Defendants. | C.A. No. 09-471-S |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OF DEFENDANT EDWARD L. MAGGIACOMO, JR.

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant Edward L. Maggiacomo, Jr. ("Mr. Maggiacomo") has moved to dismiss plaintiff's Amended Complaint ("A.C."), and submits the following memorandum in support thereof.

Other Defendants, including Joseph A. Caramadre ("Mr. Caramadre"), Raymour Radhakrishnan ("Mr. Radhakrishnan"), Estate Planning Resources, Inc. ("EPR"), and Estella Rodrigues ("Ms. Rodrigues"), have collectively also moved, with a supporting memorandum (the "Caramadre Memorandum" [ECF Document No. 26], hereinafter designated as "CM"), to dismiss Plaintiff's  Amended Complaint.  Mr. Maggiacomo hereby joins in and adopts the Factual Background (CM pp. 2-5) and Standard of Review and Reasons for Dismissal (CM pp.

5-6) sections of the Caramadre Memorandum, and will not restate those matters.[1]  He further

adopts and joins in each and every argument made in the Caramadre Memorandum, specifically

including without limitation the arguments that the annuity contract's incontestability clause bars

the claims made in Counts I-III and VII-IX of the Amended Complaint (CM pp. 6-8);  that the

same counts should be dismissed because plaintiff has failed to sufficiently allege fraud (CM pp.

9-19) or to comply with the particularized fraud pleading requirements of F.R.Civ.P. 9(b) (CM

pp. 19-24); and the failure of plaintiff's alleged "insurable interest" requirement (CM pp. 24-28).

Mr. Maggiacomo adds the following arguments to those already made as to the Amended

Complaint generally and as to the claims made against him in particular, including without

limitation in Counts IX and X, and submits that, in the first instance, the Amended Complaint

fails to state a claim within the meaning of Rule 12(b)(6) and should be dismissed for all the

reasons developed in the Caramadre Memorandum and supplemented here.  However, in the

event that the Court determines that dismissal under Rule 12(b) is not warranted, there are

jurisdictional reasons to partially dismiss and/or stay the proceedings in this court because of the

inextricably interwoven state law issues that control the outcome of this litigation.

## I.    THE INCONTESTABILITY CLAUSE

A further word is offered in support of the arguments made in the Caramadre

Memorandum concerning the application of the incontestability clause (CM at pp. 6-8).  As

noted there, the clause that appears in this annuity contract—drafted entirely by Transamerica—

states simply that "This policy shall be incontestable from the policy date."  (see Exhibit 1 at p.

---

[1]As to the standard of review, Mr. Maggiacomo notes its recent reiteration by the First Circuit in Cunningham v. National City Bank, 2009 WL 4068791, *2 (1st Cir. 11/25/09):

> To survive a motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

22.) Furthermore, there is no language in the clause that creates any exemption, exception, qualification or other basis for non-application related in any way to fraud, and in fact as the cases cited in the Caramadre Memorandum point out, fraud is ordinarily covered by the incontestability clause.[2] Like the other issues in this case, this one is also a matter of interpretation of state law.  In <u>Klanian v. New York Life Insurance Company</u>, 26 A.2d 608 (1942), the Rhode Island Supreme Court held that an insurance policy incontestability clause barred an action by an insurer based in part on misrepresentations made by the insured in the application for the policy.  Because the issue was raised in the context of the trial judge's refusal to allow the insurance company to introduce evidence of the misrepresentations at trial, the insurance company sought reargument before the Supreme Court in order to make it crystal clear that its position was that fraud should be an exception to the incontestability clause.  <u>Klanian v. New York Life Insurance Co.</u>, 27 A.2d 338 (1942) (on reargument).  The company provided the court in its request for reargument with additional authorities from other courts that purportedly supported its position regarding the fraud issue, and also suggested that either the insurance company failed to fully argue the issue or that the court overlooked it the first time.  In the decision on the reargument petition—when faced squarely with the question of whether fraud was an exception to an incontestability clause—the court said:

> Neither reason furnishes a sufficient warrant for granting a reargument under our practice. The first is merely an assertion that there are other additional authorities, one of which has been recently decided and which defendant claims may be of special interest, contrary to the view which we took of the incontestability clause. <u>New York Life Ins. Co. v. Rotman, Iowa, 3 N.W.2d 603.</u> We have examined that case and it does not appear to us to advance, in support of its conclusion, any

---

[2]This has long been the law.  In <u>National Annuity Association v. Carter</u>, 132 S.W. 633, 634 (Ark. 1910), the court considered an insurance company's argument against a policy claim that it should have been allowed to plead that the statements in the policy application were "knowingly false and made for the purpose of defrauding [the insurance company], and should have been considered warranties rather than mere representations.   The court dismissed this argument summarily:  "Even if such defense had been pleaded, it would have been of no avail, for the language of the contract would defeat such a defense, as it declares that 'the benefits herein shall be incontestable from this date.'"

reason that was not urged by the defendant before us, or that was not inherent in those decisions in which the Iowa court was in agreement and with which we disagreed. Such reasons and decisions were considered by us in reaching our opinion in the instant case. Therefore nothing has been shown here to warrant a reargument of this point.

The second reason advanced for reargument is, if anything, less persuasive. The defendant has fully argued the substance of the point which it now makes; and it does not appear that we overlooked or failed to consider any of the arguments which it made in support of such point. We simply disagreed with them. A reargument which would merely enable the defendant to traverse that ground again would accomplish nothing and is manifestly not a sufficient reason for granting its motion.

Additionally, lest the court hear an argument that notwithstanding the fact that the incontestability clause is a portion of an adhesion contract drafted by Transamerica, it should be against public policy to fail to except fraud from its control, the Rhode Island Supreme Court long ago heard and rejected this plaint. Murray v. State Mutual Life Insurance Company, 48 A. 800, 801 (1901).[3]

Two more recent decisions of other courts are also significant. In the first, Provident Life and Accident Company v. Altman, 795 F.Supp 216 (E.D.Mich. 1992), an insurance company sought to rescind an insurance contract based on misrepresentation and fraud. The policy contained a two-year incontestability clause that did not except fraud. The federal court decided

---

[3]It is noteworthy that the Rhode Island General Assembly recently enacted an incontestability statute for insurance policies. See, R.I.G.L. §27-4-6.2. The new statute (which applies to all insurance policies issued in Rhode Island after January 1, 2008) is similar to many others in force in other jurisdictions in that it (a) provides a two-year limitation period and (b) excepts only non-payment of premiums from its reach. Obviously, the Legislature could have enacted a statute that excepted fraud, as some jurisdictions, notably New Jersey, have done [see, N.J.S.A. 17B:26-5]; but it did not, presumably intentionally.

In addition, the Rhode Island Supreme Court, also in Murray v. State Mutual (id., at 800), held that it was "entirely reasonable" and the "well-settled rule of law" that by stipulation in the policy itself, the parties could agree on a shorter period of time. The insurance company may—and did here—determine that the incontestability period should begin on the contract's issuance date. See, e.g., Lauer v. American Family Life Insurance Company, 769 N.E.2d 924, 927 (Ill. 2002). There is no doubt that in those states requiring by statute the inclusion of an incontestability clause, insurers may provide in the policy for terms more generous than required by the statute; but when they do, they are bound by their own generosity. See, e.g., Provident Life and Casualty Insurance Company v. Ginther, 2000 WL 432847, *2 (W.D.N.Y. 03/31/2000)(applying New York law). In any event, insurance companies have known for a long time that they may also exempt fraud from an immediately effective incontestability clause by simply writing the exception into the contract. See, e.g., Independent Life Insurance Company v. Carroll, 130 So. 402 (Ala. 1930).

this diversity case under Michigan law (id., at 219), which by statute required the following incontestability provision in all policies:

> TIME LIMIT ON CERTAIN DEFENSES: (a) After [2] years from the date of issue of this policy no misstatements, <u>except fraudulent misstatements,</u> made by the applicant in the application for such policy shall be used to void the policy or to deny a claim for loss incurred or disability (as defined by the policy) commencing after the expiration of such [2]-year period.

Mich.Comp.Laws Ann. § 500.3408(b). [Emphasis supplied]

The policy itself, however, contained the following incontestability clause (which, the court pointed out [id., at 218], was drafted by the insurance company):

> After this policy has been in force for two years during your lifetime, we cannot contest the statements in the application.

The insurance company based its claim for rescission on material misstatements made by the insured on the application. In denying the insurance company's [Provident's] motion for summary judgment and granting the insured's [Altman's] motion for the same relief, the court held:

> However, the statutory language of section 500.3408 includes a provision to safeguard against abuse by insureds who fraudulently misrepresent their medical statuses in the policy application. As documented above, Mich.Comp.Laws Ann. § 500.3408, provides
>
>> After [2] years from the date of issue of this policy no misstatements, *except fraudulent misstatements,* made by the applicant in the application for such policy shall be used to void the policy or to deny a claim.... (Emphasis added).
>
> <u>In the policy at issue, Provident failed to include the crucial phrase "except fraudulent misstatements." By failing to include the phrase in its policy, Provident has contracted not to contest statements in the application, even if those statements were fraudulently made. In other words, Provident has agreed to extend the same degree of protection to insureds who fraudulently misrepresent their medical statuses as it does to those who innocently misrepresent their statuses. Because Provident failed to include the provision as provided in the statute, it cannot have this court now include in the policy either the specific language or the public policy behind the language.</u>

In addition, when the court inquired during oral argument why Provident had omitted the phrase from its policy, Provident's attorney explained that the omission made the policy "more marketable." Obviously, the policy is easier to sell if the insurer agrees not to contest fraudulently made statements in the policy application. Provident, however, argues that it is not contesting benefits based on Altman's fraudulent misstatements in the policy application. Again, it contends the denial is based on the prior manifestation of Altman's chronic uveitis. However, the court finds that the public policy reasoning of the two grounds is inextricably linked. Denial of benefits based on prior manifestation, rather than mere existence, protects only insureds who have innocently misrepresented their medical statuses on policy applications. By definition, those who innocently misrepresent their statuses would not have had a prior manifestation of the disease. Conversely, those who have fraudulently misrepresented their statuses would have had a prior manifestation of the disease.

The insurer, as drafter of the policy, having failed to protect itself from fraudulent misstatements in the applications, cannot circumvent its deliberate omission, through a different yet equivalent argument, in order to deny benefits. . . .

795 F.Supp. at 222. (Emphasis supplied)

See also, Yumukoglu v. Provident Life & Accident Insurance Company, 131 F.Supp.2d 1215, 1221-1222 (D.N.M. 2001), aff'd., 36 Fed.Appx. 378 (10th Cir. 2002).

In the second case, Allstate Life Insurance Company v. Miller, 424 F.3d 1113 (11th Cir. 2005), an insurance company sought a declaratory judgment that a life insurance policy was void ab initio because the insured not only made fraudulent misrepresentations in the application, but actually had an imposter attend the medical examination required for issuance of the policy. Id., at 1114. The policy contained its own two-year incontestability clause, which essentially mirrored the provisions of Florida's incontestability statute (which excepted only non-payment of premiums). The insurance company made two arguments, both of which were rejected by the Eleventh Circuit (deciding this diversity case under Florida law [id., at 1116]), and therefore worth noting here.

First, Allstate argued that for "public policy reasons" and because of the "weight of authority in other jurisdictions" the court should read an "imposter exception" into the statutory

incontestability clause and Allstate should get the benefit of that exception. The court recommended that Allstate take that matter up with the Florida Legislature, noting that the statutory construction doctrine of "*expressio unis est exclusion alterius* counsels against judicial recognition of additional exceptions [citation omitted]" (id., at 1116, fn. 3). Allstate's second argument was that it was not contesting the policy within the meaning of the incontestability clause because its position really was that the policy was void ab initio as a result of the fraudulent misstatements and use of the imposter: i.e., that there was never any meeting of the minds, and therefore no contract in the first place. The court rebuffed this argument as well, noting that

> Florida courts have already rejected claims by an insurer who sought to rescind an insurance policy because it would not have agreed to issue the policy had it known the true facts of the insured's medical history. *See [Prudential Insurance Company of America v.] Rhodriquez,* 285 So.2d [689] at 689-90 [Fla.Dist.Ct.App. 1973]; *see also, Home Life Ins. Co. v. Regueira,* 313 So.2d 438, 439 (Fla.Dist.Ct. App.1975) (explaining that where an insurer's claim relates to the validity of the insurance policy, that claim is barred by an incontestability clause).

The operation of Transamerica's own incontestability clause—clearly drafted to make the annuity "more marketable" [Altman, 795 F.Supp. at 222]—makes its complaint here not marketable at all.

## II.     FAILURE OF UNDERLYING PREMISES

All the allegations made against Mr. Maggiacomo share one of two common defects: either they are predicated upon duties that do not exist and/or are not alleged to exist, or their viability is premised on an incorrect interpretation or misapplication of Rhode Island law. The legal arguments concerning the existence and breach of any duty are made at length in the Caramadre memorandum (at pp. 10-15) and are adopted here. It is helpful, however, to place these arguments in the context of the allegations of the Amended Complaint.

For example, Plaintiff alleges that "as of the time the [annuity] application was signed or submitted" the annuitant, Mr. Garvey, "did not know, and had never met Maggiacomo" [A.C. ¶35] and that "he had never had any dealings with Lifemark or any of its agents" [A.C. ¶36]. There are also allegations that Transamerica was not aware prior to the issuance of the annuity that Mr. Garvey was terminally ill, that he had allegedly received money to sign the annuity application, that he had never met the annuity Owner [Ms. Rodrigues] and had no relationship with her, and that Ms. Rodrigues had no insurable interest in Mr. Garvey [A.C. ¶¶39, 43, 44].

Similarly, plaintiff's claims are premised upon incorrect interpretations of Rhode Island law or statutory provisions that simply do not apply. For example, the Amended Complaint flatly states that Ms. Rodrigues, the Owner and beneficiary of the annuity, was required to have an insurable interest in the annuitant, Mr. Garvey [A.C. ¶¶48 and 49].[4] This is simply not the law in Rhode Island.[5] Likewise, it alleges that a payment purportedly made to Mr. Garvey to sign the application was in violation of R.I.G.L. §27-4-6. That statute, however, does not

_____

[4]Although there is no statutory or other legal citation, this allegation appears to be a conclusion of law, or at least a statement of a legal proposition because there is no suggestion that such a requirement is found anywhere in the annuity contract (Exhibit 1), and a review of that document discloses none.

[5]Only two states—Alaska and Nebraska—require an insurable interest in connection with the issuance of an annuity. There is no such law in Rhode Island. Transamerica states the rather "formal" proposition that "Rodrigues is required to have an insurable interest in Garvey." (A.C. ¶48), ostensibly because Ms. Rodrigues is the beneficiary of the annuity and because the annuity contains a death benefit. (Id.). To the extent that Transamerica is somehow seeking to apply the "insurable interest" provision of R.I.G.L. §27-4-27—presently applicable only to insurance policies—to annuities, it asks the Court to transform annuity contracts into insurance policies—something the Court cannot do. This argument is developed at length in the Caramadre Memorandum (at pp. 24-27) and will not be repeated here. More to the point, however, is that in its annuity contract, Transamerica could easily have defined "Beneficiary", just as it could have defined "Owner" as a person who has an insurable interest in the annuitant. It did not; however, it did take pains to point out two very important "non-insurance" features of the contract. One is that the contract "is intended to qualify as an annuity contract for federal income tax purposes. The provisions of this policy are to be interpreted to maintain such qualification, notwithstanding any other provisions to the contrary." Exhibit 1, at p. 22. Transamerica also reserved the right "to amend the policy to reflect any clarifications that may be needed or are appropriate to maintain such tax qualification or to conform this policy to any applicable changes in the tax qualification requirements." Id. Insurance policies are treated differently than annuities for tax purposes.
  The other is that the determination, calculation, explanation and description of "death proceeds" in this annuity contract is not only devoid of any reference to "insurance", but is based entirely upon the "value" of the annuity contract as determined in the investment marketplace. Exhibit 1, Section 9, at pp. 12-13; Additional Death Benefit Rider (following the Amendatory Endorsement following page 23); and Enhanced Death Benefit Rider (following Additional Death Benefit Rider). This is hardly an "insurance type" death benefit which requires an "insurable interest."

prohibit payments to an annuitant in connection with the issuance of annuity. It prohibits certain payments by an insurance producer or its representative in connection with the issuance of an insurance policy.[6]

In assessing the viability of Transamerica's pleading in the fraud context, only certain allegations are material. The core of the Amended Complaint consists of the allegations in Paragraphs 42 through 50, which are realleged by reference throughout the remainder of the pleading. These allegations describe several acts of omission and several others of commission.

First, plaintiff submits that by failing to disclose to Transamerica (a) Mr. Garvey's terminal illness (A.C. ¶43); (b) the lack of any relationship between Ms. Rodrigues and Mr. Garvey (A.C. ¶44); (c) the lack of any contact between Mr. Garvey and Mr. Maggiacomo or Lifemark; and (d) that Mr. Garvey was paid to sign the application (A.C. ¶46), the defendants committed fraud because these omissions were material to Transamerica's decision to issue the annuity, and further that Transamerica would not have issued the annuity had these disclosures been made (¶50). And second, that (a) Mr. Garvey's "misrepresentation", allegedly made by signing the annuity application, that he understood the transaction (A.C. ¶42), and (b) Mr. Maggiacomo's "misrepresentation", allegedly made by signing the annuity application, that he was the agent who sold the annuity (A.C. ¶45), induced Transamerica to issue the contract. Finally, Paragraph 45 alleges that these misrepresentations and omissions contributed to the contingency that triggered the annuity's death benefit, while Paragraphs 48 and 49 allege that

---

[6]On this point, the allegation fails for another reason. Not only is the statute inapplicable, it is without consequence to the transaction. The language of the statute prohibits insurance corporations or their representatives from taking a specific action. It does not, however, provide any consequence for its violation. Presumably, the Legislature could have provided that any insurance policy issued as a result of the prohibited action would be considered void or voidable; however, it did not. The Legislature also did not criminalize the action prohibited by the statute. The law simply says that an insurance company cannot pay an inducement to someone to enter into an insurance contract.

Ms. Rodrigues was required to have an insurable interest in Mr. Garvey and did not, and that this circumstance voided the annuity contract.

Fatally lacking in the Amended Complaint is an allegation that any "duties" existed, or that any of the persons—especially Mr. Maggiacomo—who allegedly breached "duties", actually owed any duty to Transamerica. Moreover, none of the "requirements" alleged by Transamerica to be unfulfilled is in fact a requirement at all. Each and every one of Transamerica's material allegations is a straw man.

For example, as to Paragraph 42, there is no requirement, either in the annuity documents or in the law, that Mr. Garvey (or any annuitant) understand the annuity transaction. Mr. Garvey was not—and was not represented to be—anything more than the measuring life. He was not the owner of the annuity and therefore not the investor whose investment strategy would be integral to the investment nature of the annuity. Not only did Mr. Garvey not have any duty to Transamerica, he occupied a position such that Transamerica had no duty to him. The same is true of the allegation in paragraph 44 that Mr. Garvey had no relationship with Ms. Rodrigues. While it may be that in many—even most—instances, the Owner or beneficiary will have some relationship to the annuitant, or that the Owner and the annuitant will be the same person, there is no requirement that this be the case.[7] Yet Transamerica alleges that the failure of this "non-requirement" was material to its decision to issue the contract.

More important in the context to Rule 12(b)(6), however, is the fact that Transamerica alleges only, for example, that Mr. Garvey had no relationship with Ms. Rodrigues or that he

---

[7]The annuity contract (Exhibit 1 at p. 2A) provides in Section 1, in defining the terms "you" and "your", that these terms refer to "the owner of this policy." Significantly, the definition goes on to state that "[u]nless otherwise specified, the Annuitant and the owner shall be one and the same person." Two things are unmistakably clear from this language. First is that Transamerica specifically and expressly allowed and acknowledged the annuitant and the owner to be different people (as is the case in this annuity). And second, all the remaining provisions of the contract in which the terms "you" and "your" are applicable clearly apply only to Ms. Rodrigues. These provisions include those in portions of the contract like sections 4 and 5 that delineate the policy value, the cash value, and payments to be made to the owner.

misrepresented that he understood the annuity transaction.  There is no allegation of any kind that these requirements existed.  Simply stated, there is nothing in the Amended Complaint that says Mr. Garvey was required to understand the transaction.  Therefore, the bald assertion that he did not is clearly not material.

Similarly, with respect to Mr. Maggiacomo's conduct, there are no allegations that he had a duty to learn of Mr. Garvey's terminal illness, to report it to Transamerica if and when he did learn of it, nor are there any allegations that he had any duty to learn what relationship, if any, may have existed between Mr. Garvey and Ms. Rodrigues, or to report that there was none if that turned out to be the case and he became aware of it.[8]  Again, Transamerica's own documents belie the allegation of materiality.

In Section 1 of the annuity contract (<u>Exhibit 1</u>), at page 2(A), is found a definition of the term "Terminal Condition" as "[a] condition resulting from an accident or illness which, as determined by a Physician, has reduced life expectancy to not more than 12 months, despite appropriate medical care."  Clearly, Transamerica knows what constitutes a "terminal condition" and knows how to include that term in its operative documents.  Yet the only other references to this term are found in Section 5 on page 7 wherein there is a provision for the <u>Owner</u> [Ms. Rodrigues] to withdraw funds from the annuity without penalty in the event of the onset of a "terminal condition."  There is, however, no other reference anywhere in the contract to "terminal condition", particularly in the context of prohibiting the selection of a terminally ill annuitant or requiring anyone—the representative, the Owner or the annuitant himself or herself—to notify Transamerica of the existence of a terminal condition.

Finally—and not insignificantly—Transamerica makes two allegations, both of which it claims were material inducements to its issuance of the annuity, that are simply not true.  First, it

---

[8] <u>See</u> Section IV, below, at pp. 18-20.

alleges that "[t]he application misrepresented that Garvey signed the application for the Annuity with knowledge and understanding of the transaction." (A.C. ¶42). This is absolutely not true and not supported by the document to which it refers. There is nothing in the application (Exhibit 2) that avers that Mr. Garvey, by signing it, represented that he understood the transaction (or anything else). And there is nothing in either of the documents (the application or the contract) that says that he was required to understand it.[9] For example (to the extent that it even applies to Mr. Garvey), page 11 (the signature page) of the application (Exhibit 2) contains the statement "I am in receipt of a current prospectus for this variable annuity." Although the application could easily have said so, it does not say "I have received and read and understand the prospectus for this annuity." Nor does it say "I have reviewed this application with a registered representative of the company and the transaction has been explained to me to my satisfaction." The application does not even contain the simple statement "I have read and understand this application." In fact, the only portion of the documents that even remotely suggests that some explanation is being made and that it is intended that there be an understanding of any facet of this transaction is in the document entitled "IMPORTANT NOTICE: REPLACEMENT OF LIFE INSURANCE OR ANNUITIES", which is a 2-page document attached to the very end of the Application (see Exhibit 2). This document is

---

[9] Transamerica complains simultaneously that Mr. Garvey did not understand the annuity transaction and that it has suffered a loss because Mr. Garvey's terminal illness was not disclosed to it. It suggests that the longevity of the annuitant is key to the viability of the annuity (at least from Transamerica's investment strategy point of view). Presumably, then, a child (who may be unrelated to any of the parties), whose life expectancy would likely be the longest available, would be the perfect annuitant, although clearly incapable of understanding one word of the transaction. Interestingly, there is no prohibition in the application or in the annuity contract itself, against either a child or a terminally ill person being an annuitant. Likewise, there are no other restrictions preventing any person from being an annuitant, such as mentally disabled individuals, those with dementia, those with other severe physical disabilities, such as Parkinson's disease, or any other disability. In fact, such a restriction might be discriminatory and unenforceable. In the annuity contract (Exhibit 2, at p. 2), "Annuitant" is defined simply as "[t] person whose life annuity payments will be based on."

(appropriately) directed to and required to be signed by ONLY the Owner (Ms. Rodrigues) and the Representative (Mr. Maggiacomo).

The second false claim appears in Paragraph 45, wherein it is alleged that "Mr. Maggiacomo represented on the application that he was the agent who sold the annuity. This representation was false. Neither Maggiacomo nor anyone else from Lifemark had any substantive involvement in selling the Annuity." The statements made in this paragraph are simply not true, and are belied by Transamerica's own documents. The application itself, if it does anything, ascribes the sale to Mr. Maggiacomo. By signing it, Mr. Maggiacomo acknowledges that he provided the applicant (Ms. Rodrigues) with "sales material" ([Exhibit 2] at p. 10, Section 15). He also is acknowledged by that document to be the Owner's (Ms. Rodrigues') agent of record and authorized to make transfer requests (id., Section 16). He also provided all the information called for in Section 18 [at p. 12 (Representative/Agent Information)], all of which is relevant to his communications with only Ms. Rodrigues, the Owner of the annuity. And, as noted above, he also signed the Replacement of Life Insurance or Annuities notice appended to the application (immediately following page 12).[10] The documents drafted by Transamerica itself placed upon Mr. Maggiacomo the duty to represent Ms. Rodrigues, and by so doing waived any right it may have had to expect any duty from Mr. Maggiacomo.

In short, what the documents do demonstrate is that Mr. Maggiacomo carried out the only duties he had to the only person to whom he had them—Ms. Rodrigues. Transamerica's false allegations in Paragraph 45 are based on its fabricated-duty assumption that Mr. Maggiacomo

---

[10]In addition, there is nothing in the application or in the contract that avers that by signing the application the agent is representing that s/he sold the annuity, nor is there any requirement set forth in the documents that the agent make such a representation. Moreover, Transamerica's argument on this point undercuts its own position that Mr. Maggiacomo owed it some (unpled) duty.

was required to have some relationship with Mr. Garvey and that Mr. Garvey was required to have some relationship with Ms. Rodrigues and to be involved in the purchase of the annuity.

As Transamerica's own documents make clear, there are several people identified in annuity transactions. One is the annuitant and another is the Owner. These are not always the same people. The very first page of the annuity application (<u>Exhibit 2</u>, Section 2) acknowledges that fact. The first question under the "Ownership" section provides a check box advising whether the Owner is the same person as the annuitant.[11]

Most important, however, is the reason why these allegations are not made in the pleading. As noted, Transamerica has identified and provided the court with what it believes to be the key documents that support its various claims—the application for the annuity and the annuity contract itself. Reading every word of these documents reveals none of the duties Transamerica says has been breached. There is not a sentence—not even a word—in the controlling documents that supports any allegation made in the Amended Complaint based upon a duty that could be breached, or a requirement that could be unmet. In the context of Rule 12(b)(6), this is doubly important because reference to the documents—and what is not contained in them—makes it clear that the Amended Complaint should be dismissed with prejudice. There is no basis to dismiss it without prejudice and allow the plaintiff to replead, as there are no allegations that can be made that will support a claim within the meaning of <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).

For example, there can be no allegation of a requirement that there be a relationship between the annuitant and the owner because there is no such requirement in the documents themselves (or in the law, for that matter). The same is true of each and every one of the allegations said to be "material" to the determination to issue the annuity. This includes the so-

---

[11] <u>See footnote 7</u>, above.

called "insurable interest" requirement, the necessity of interaction between the annuitant and the representative, the need for the annuitant to understand the transaction, and the requirement that the annuitant's health condition (whatever it might have been) be disclosed.

It is worth pointing out to the Court that there is something more to Transamerica's complaint than meets the eye. Faced with an Amended Complaint attacked by motions to dismiss raising such starkly clear deficiencies, it is not unusual to consider how such a complaint would have been filed, presuming, as the court must, that the filing was preceded by due diligence and a review of the operative documents. Paragraphs 12-40 of the Amended Complaint conjure up more than simply an image of an unattractive business practice. They paint a picture that a jury would likely find more than a little distasteful and easily inflammatory. But, as the late Paul Harvey was fond of saying, "and now…the rest of the story."

In its Amended Complaint, Transamerica focuses on an alleged lack of insurable interest—or any other relationship—between the owner of the annuity and the annuitant, and suggests a level of greed that required a rather ghoulish fraudulent scheme to keep satisfied. Voraciousness, however, begins at home.

In reality, Transamerica, like similar companies in the investment marketplace, sought by the use of adhesion contracts to capture a significant share of the investment market in vehicles such as annuities. In fact, in this complaint, Transamerica seeks damages for "market losses" it has allegedly suffered.

Transamerica refers in some detail to its prospectus[12] to identify the objectives of the annuity in question here (A.C. ¶22), explaining that "variable annuities are long-term investment vehicles designed for retirement purposes." While that may be Transamerica's suggestion for how the annuity is used, perhaps by an annuitant/owner, it may not be the way it is most

---

[12]This document is Exhibit B to Transamerica's original Complaint in this matter.

effectively used by a non-annuitant/owner, particularly one who is also planning for retirement. For instance, while Transamerica may intend that its variable annuities be long term investments, others may intend different results. Transamerica is only one party to the contract. There is another party—the Owner. Their interests obviously conflict. It is not at all unusual that the intent of one party to a contract does not mirror that of the other. Both parties obviously intend to make money. This is a financial contract for the purchase of an investment vehicle. It may be a consequence of this contract that one party makes money at the expense of the other. It is not the responsibility of the Owner to protect the issuer's investment or to facilitate the issuer's intent. To the extent that their interests converge, they converge. To the extent they do not, they do not.

More importantly, while this would be true in the case of any contract, it is more compelling in the case of adhesion contracts, such as this annuity contract. It cannot be overemphasized that any market loss or other damage suffered by Transamerica is born of the documents themselves, all of which were created by Transamerica, are not subject to change or modification by the other party to the contract (the Owner), or by the Representative, and which are presumed to be designed and used by Transamerica for its benefit.

The fact that Transamerica—clearly the more investment-savvy and financially sophisticated party—does not plan for the exigency of early death of a non-owner annuitant is not the fault of anyone but Transamerica. Neither the Owner nor the Representative controls the actuarial assumptions used by Transamerica to set its costs, which in turn affect its "market losses." And most importantly, whether or not there is an insurable interest present does not change the risk factors, the assumptions, the costs, or the payments. Transamerica's "loss" would be the same whether the Owner (or beneficiary) had an insurable interest in the annuitant

or not.  The defects in Transamerica's documents and internal structure are costly to Transamerica not because the Owner (or beneficiary) had no insurable interest in the annuitant, but because the annuitant dies before Transamerica's actuarial calculations say s/he should have died.  At bottom, Transamerica's "insurable interest requirement" fails not only because it is not required by law or by the contract, but because it is immaterial in any event.

Likewise, the annuity's features are completely determined by Transamerica.  Owners, annuitants, Representatives, and others have no input, control or influence over what features or options Transamerica builds into its annuity contracts or what benefits the other party may receive.  Again, it is presumed that Transamerica, like any other retailer in a competitive marketplace, offers product features that enhance and distinguish its lines from those of its competitors in order to lure business to its door.  And again, whether or not an insurable interest exists has nothing to do with any of them.[13]

### III.    COUNT IX (UNJUST ENRICHMENT)

In Count IX of the Amended Complaint, Transamerica claims unjust enrichment by Mr. Maggiacomo and Landmark in their receipt of commissions (A.C. ¶¶83-85) and seeks restitution of all sums paid on the annuity "including sales commissions" (A.C. at p. 16).

The payment of commissions is determined not by the Representative but by Transamerica.  Transamerica sets the rate of the commission and the Representative either accepts that rate and writes the contract through Transamerica or goes elsewhere.  The Representative cannot negotiate the rate (or, for that matter, any other term of the annuity

---

[13]For example, Transamerica does not offer some additional payment, benefit or enhancement to anyone if there is an insurable interest present; nor does it restrict, eliminate or degrade product features when there is not.

contract), nor can he bargain for a higher commission.[14]  Presumably, Transamerica sets its commissions at rates that make it attractive for Representatives to write contracts with Transamerica rather than with other issuers.  And Transamerica, if it chose, could provide for commission chargebacks in the event that an annuitant dies, for example, within the first year (or some other arbitrary period) of the contract.

Although not argued specifically in the Caramadre memorandum, the vitality of the unjust enrichment claim rests entirely on the fraud claims that are the subject of the arguments contained therein.  Mr. Maggiacomo submits, therefore, that the plaintiff's claims in Count IX should fail as a matter of law with the claims made in the Counts alleging fraud.

### IV.    COUNT X (NEGLIGENCE)

The Court should also dismiss Count X (negligence), which Transamerica brings against Mr. Maggiacomo only, for two reasons in addition to those argued in the Caramadre Memorandum:  Transamerica does not allege that Mr. Maggiacomo breached any legal duty; relatedly, the losses it alleges are purely economic and therefore not recoverable under a negligence theory.

First, Transamerica fails to sufficiently allege that Mr. Maggiacomo owes it any duty. Benaski v. Weinberg, 899 A.2d 499, 502 (R.I. 2006) ("A fundamental principle of tort law . . . is that '[a] defendant cannot be liable under a negligence theory unless the defendant owes a duty to the plaintiff.'" [quoting Lucier v. Impact Recreation, Ltd., 864 A.2d 635, 638 (R.I. 2005)

---

[14]Again the insurable interest is of no consequence, unless Transamerica is prepared to agree that a Representative could, in fact, bargain for a higher commission by writing contracts only in circumstances where there is an insurable interest between the Owner (or the beneficiary) and the annuitant.  Transamerica would likely refuse to do so.  Likewise, Transamerica could agree to the payment of higher commissions to Representatives who agree to write contracts only in circumstances where the annuitant has been medically certified to be inside the range of his actuarially projected life expectancy.  Examples like these would be obviated, of course, if Transamerica simply required, as part of its contract, a medical examination of the annuitant.  It is not unfamiliar with this process, since it requires medical examinations before issuing life insurance policies.

(internal quotations and citations omitted)]). Transamerica makes a "bald assertion" [In re Citigroup, 535 F.3d 45, 52 (1st Cir. 2008) (courts are free to disregard "bald assertions" in reviewing a complaint pursuant to a motion to dismiss)], that Mr. Maggiacomo "owed" a "duty" to Transamerica to "learn and obtain information material to [Transamerica's] review of the application for the Annuity," specifically information regarding the *annuitant*, including his health condition and life expectancy, his relationship to the owner-beneficiary, and his compensation for signing the Application. (A.C. ¶87.) But Transamerica points to no provision, contractual or otherwise, giving rise to any such duty running from Mr. Maggiacomo to Transamerica that required him to "learn and obtain" information about the *annuitant*. Mr. Maggiacomo's relevant relationship, if any, was to the *customer* (the owner-beneficiary, Ms. Rodrigues), not to the annuitant, and as Transamerica's Application form indicates, Mr. Maggiacomo was required to and did represent to Transamerica only that the *customer*'s financial status and investment objectives rendered the annuity suitable for the investment. See Exhibit 2 (p. 12, and the following 2-page Notice).

The Court should also dismiss the negligence count because these are precisely the types of risks and losses [Transamerica alleges it has been "financially harmed" (A.C. ¶89)], that parties to a business relationship must allocate by contract, not via subsequent law suits for negligence. Thus, Transamerica's claim fails under the "well established . . . economic loss doctrine" which "precludes recovery for 'purely economic losses in a negligence cause of action.'" Triton Realty Ltd. Partnership v. Almeida, 2006 WL 2089255, *2-4 (R.I. Super. 07/25/06) (applying economic loss doctrine to grant motion to dismiss negligence claim based on defendant insurance company's alleged failure to add plaintiff as insured in response to request allegedly made to insurance agent [quoting Boston Investment Property No. 1 State v. E.W.

Burman, Inc., 658 A.2d 515, 517 (R.I. 1995)].  The doctrine's application in commercial

contexts has recently been reaffirmed by the Rhode Island Supreme Court in Franklin Grove

Corp. v. Drexel, 936 A.2d 1272, 1275-78 (R.I. 2007).  Finally, this court itself has recently

examined this issue and followed the same path.  Robertson Stephens, Inc. v. Chubb

Corporation, 473 F.Supp.2d 265, 276-281 (D.R.I. 2007).

**V.      ISSUES RELATING TO ABSTENTION, PRIMARY JURISDICTION,**
**AND CERTIFICATION TO THE RHODE ISLAND SUPREME COURT**

Mr. Maggiacomo submits that for all the reasons stated above as well as those argued in

the Caramadre Memorandum, this Amended Complaint should be dismissed.  He further submits

that if the Court, having considered these arguments nevertheless believes that the Amended

Complaint should survive a Rule 12(b)(6) dismissal, the Court should then consider the

jurisdictional, abstention, and certification issues raised below and treat the Amended Complaint

in accordance therewith.

Plaintiff asserts only diversity jurisdiction pursuant to 28 U.S.C. §1332.  While the Court

may have such jurisdiction, it is not always required to exercise it.  This case is amenable to the

exercise of the Burford[15] abstention doctrine, referral to the Rhode Island Department of

Business Regulation pursuant to the primary jurisdiction doctrine[16], or certification of certain

questions to the Rhode Island Supreme Court[17] (or some combination of the three).

First, there are no federal questions or claims presented in this case.  Every allegation in

the Amended Complaint is predicated on matters unique to Rhode Island law and which would

---

[15]Burford v. Sun Oil Co., 319 U.S. 315 (1943).

[16]See, e.g., United States v. Western Pacific Railroad Co., 352 U.S. 59, 63-64 (1956); Pejepscot Industrial Park, Inc. v. Maine Central Railroad Co., 215 F.3d 195, 205-206 (1st Cir. 2000).

[17]See and compare, e.g., Fontes v. City of Central Falls, 2009 WL 3230779, *4 (D.R.I. October 8, 2009).  There is no similar time constraint present here.

otherwise be controlled, in the final analysis, by decisions of the Rhode Island Supreme Court or Rhode Island regulatory agencies. And second, the critical issues raised here relate exclusively to state regulation of the annuity industry and are presently the subject of an ongoing investigation by the Rhode Island Department of Business Regulation (hereinafter "RIDBR").

Specifically, the Amended Complaint is grounded upon several state law claims:

1. The allegation of a requirement of an insurable interest in the annuitant by the annuity owner. Since this was not a requirement of the annuity contract, it depends entirely on whether Rhode Island law requires such an interest in the case of an annuity.[18] Not only is there no statutory or other legislative authority for this proposition, this very question (and others related to it) are presently pending before RIDBR in a matter involving circumstances and parties nearly identical to those in this case.[19]

2. Whether or not the provisions of R.I.G.L. §27-4-6 prohibiting the payments to certain individuals in connection with insurance policies is applicable to annuity contracts is also a matter of state law.[20]

3. The questions concerning the sufficiency of the fraud allegations, the requirements of duties on the part of the Defendants to Transamerica, specifically duties of

[18]Transamerica implies that the state law requirement of an insurable interest in the insured by the beneficiary of a life insurance policy, which is provided for by R.I.G.L. §27-4-27, is applicable to annuities as well. A.C. ¶¶40, 48, 49, 50, 53. To the extent the application of this statute must be interpreted, it is again a matter of state law.

[19]The exceptions are that the annuity contracts there were issued by Nationwide Insurance Company rather than Transamerica and the matter does not specifically identify Mr. Radhakrishnan. As in this case, the matter before DBR concerns the insurable interest requirement, potential insurance fraud in the failure to disclose the lack of relationship between the annuitant and the owner of the annuity, improper payment of the death benefit feature of the annuity, and finally, that stranger owned annuity transactions (the equivalent of Stranger Initiated Annuity Transactions ["STATS"] A.C. ¶¶17, 18 ) are against public policy.

[20]This issue is raised only to the extent that the question is at all material to motion to dismiss. Mr. Maggiacomo submits that whether or not Mr. Garvey was paid to sign the annuity application or to be a measuring life, as alleged in the Amended Complaint (at ¶¶27, 46) is immaterial to the issues presented for review and to Transamerica's claims in this action.

disclosure, and what constitutes fraud in this case are all matters exclusively of state law. More specifically, Transamerica has alleged insurance fraud in Count VII of the Amended Complaint and made that claim based entirely upon the allegation that "[t]he annuity is an insurance policy within the contemplation of R.I.G.L. § 11-41-29" (A.C. ¶77). This Count depends completely on whether this is a correct statement of Rhode Island law.[21]

It is also possible that with respect to any or all of these issues, the court may consider certifying those questions to the Rhode Island Supreme Court.

On the federal side, there is nothing that requires or even invites the attention of a federal court. The operation of companies such as Transamerica, and others like it, in connection with both insurance policies and annuities, is governed and regulated in nearly all respects by state law.[22] The annuity application, for example, has various provisions that identify state requirements that impact the application. See, e.g., Exhibit 2, Section 12 at p. 9 ("*Washington applicants, DCA cannot exceed twelve months or four quarters"); Section 17 at p. 11 (Fixed Account restrictions for residents of all except 9 identified states; special attention to Connecticut applicants); Section 18 at p. 12 ("For Connecticut Applicants").

---

[21]The statute [ R.I.G.L. §11-41-29] specifically references only "insurance policies." This exercise will undoubtedly involve interpretations of R.I.G.L. §27-4-0.1(a), which defines annuities, and R.I.G.L. §27-4-0.1(c), which separately defines life insurance. The interplay of the various relevant state statutes, particularly in the context of the framework regulating the insurance and annuity industry, is appropriately within the ambit of RIDBR, and interpretations of these particular statutory provisions may, for policy reasons, better be left to the state courts. These include, for example, R.I.G.L. §7-11-101 (defining variable annuities as securities under Rhode Island Uniform Securities Act; §27-4-6.1 (establishing free-look period and distinguishing between life insurance policy and annuity contract; various other specific provisions of Rhode Island law which apply only to life insurance, such as §§27-4-1, 27-4-6.2, 27-4-10, 27-4-11, 27-4-13, 27-4-27, and 27-4-25.

[22]Although annuities are securities, and as such are regulated to a certain extent by the SEC and federal law, the Amended Complaint raises no questions of federal regulatory authority or interpretation of federal law in this connection. The case depends entirely on whether—as Plaintiff avers [A.C. ¶77]—an annuity is an insurance policy under Rhode Island law. See and compare, Riley v. Simmons, 45 F.3d 764, 771-780 (3d Cir. 1995), a case in which fraud action brought by annuitants against an insurer pursuant to Section 10b-5 was held not subject to Burford abstention only because of the implications of federal securities law.

A.    Abstention.

The First Circuit has very recently acknowledged that abstention under

Burford v. Sun Oil Co., 319 U.S. 315 (1943), should be the exception, rather than the rule.

Vaquería Tres Monjitas, Inc. v. Irizarry, 2009 WL 4021367, *6 (1st Cir. 11/23/09).   There, the

court held that

> The district court declined [to abstain], stating that *Burford* does not apply "when
> the effect of an entire regulatory scheme is challenged as unconstitutional."
> *Vaquería Tres Monjitas,* No. 04-1840, at *56 (quoting *Tenoco Oil Co. v. Dep't. of
> Consumer Affairs,* 876 F.2d 1013, 1029 n. 23 (1st Cir.1989)). We agree.

Irizarry, 2009 WL 4021367 at *5.

The Court discussed the "reformulation" of Burford in New Orleans Public Service, Inc.

v. Council of New Orleans (NOPSI), 491 U.S. 350, 361 (1989) (extending Burford's reach in

cases involving "difficult questions of state law bearing on policy problems of substantial public

import"), which the First Circuit has characterized as "ultimately ambiguous",  Public Service

Co. of New Hampshire v. Patch, 167 F.3d 15, 27 (1st Cir. 1998), preferring a less expansive

interpretation of NOPSI.   In so doing, the Court noted

> A narrow reading of *NOPSI,* on the other hand, best comports with not only
> Supreme Court, but also this Circuit's precedent. In *Bath Mem'l Hosp. v. Maine
> Health Care Fin. Comm'n,* we recognized that *Burford* abstention must only apply
> in "unusual circumstances," when federal review risks having the district court
> become the "regulatory decision-making center." 853 F.2d 1007, 1012-13 (1st
> Cir.1988). Thus, when a federal court's interference would effectively create a
> dual review structure for adjudicating a state's specific regulatory actions,
> abstention under *Burford* may be appropriate. *Id.* We observed in *Patch* that
> "[t]he fundamental concern in *Burford* [was] to prevent federal courts from
> bypassing a state administrative scheme and resolving issues of state law and
> policy that are committed in the first instance to expert administrative resolution."
> 167 F.3d at 24 (citing *NOPSI,* 491 U.S. at 361-64; *Bath,* 853 F.2d at 1014-15).
> Abstention is not warranted, however, when a claim requires the federal court to
> decide "predominating federal issues that do not require resolution of doubtful
> questions of local law and policy." *Id.*

Irizarry, 2009 WL 4021367 at *6.

Here, there are no federal issues to be determined.  <u>Compare</u>, <u>Corvello v. New England Gas Co.</u>, 532 F.Supp.2d 396, 401-403 (D.R.I. 2008) ("no difficult questions of state law to be answered", in a case originally brought by plaintiffs in state court and removed by defendants to federal court).  Everything at issue is a matter of state law or regulation.[23]

The insurance industry is one context in which application of <u>Burford</u> has found some favor.[24]  In <u>Allstate Insurance Company v. Sabbagh</u>, 603 F.2d 228 (1st Cir. 1979), the district court dismissed, on <u>Burford</u> grounds, an action brought by an insurer against the Massachusetts Commissioner of Insurance, challenging the Commissioner's setting of insurance rates.  In affirming the dismissal, the First Circuit, holding that while "the district court's discretion is tightly circumscribed, . . . there remains some room for the exercise of judgment" (<u>id.</u>, at 230), followed the analysis of <u>Burford</u> and <u>Alabama Public Service Commission v. Southern Railway Co.</u>, 341 U.S. 341 (1951) explicated by the Supreme Court in <u>Colorado River Water Conservation District v. United States</u>, 424 U.S. 800 (1976):

> Justice Brennan, writing for the Court, classified <u>Burford</u> and <u>Alabama Public Service</u> in a subcategory of the doctrine permitting abstention "where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar. <u>Louisiana Power & Light Co. v. City of Thibodaux</u>, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959) . . . .", 424 U.S. at 814, 96 S.Ct. at 1244.

<u>Id.</u>, at 230, n. 2.[25]

---

[23]<u>Cf.</u>, <u>Guillemard-Ginorio v. Contreras-Gómez</u>, 2009 WL 3466021, pp. 10-12 (1st Cir. 10/29/09).

[24]This may be due, in part, to the presumptive preference for state control provided by the McCarran-Ferguson Act [15 U.S.C. §§1511, <u>et seq.</u>], long exempting the insurance industry from federal pre-emption doctrine.  <u>See</u>, <u>United States Department of the Treasury v. Fabe</u>, 508 U.S. 491, 507-508 (1993).

[25]In <u>American Deposit Corporation  v. Schacht</u>, 887 F.Supp. 1066 (N.D.Ill. 1995), <u>aff'd.</u>, 84 F.3d 834 (7th Cir.), <u>cert.denied</u>, 519 U.S. 870 (1996), a case involving a bank's marketing of certain instruments considered by the state regulatory agency to be insurance products, abstention principles were applied and the action was dismissed.  The case is particularly interesting because it involved the creation by a bank of an instrument called a "Retirement CD" which the Illinois Acting Director for Insurance deemed to be an annuity, and the court's discussion of annuity products versus insurance products in the context of state regulation affected by the abstention principles of both

The present case is even more amenable to <u>Burford</u> abstention because, unlike

<u>Sabbagh</u>—in which there actually was a federal constitutional question (concerning the

confiscatory nature of the Commissioner's rates)—there is nothing here but diversity

jurisdiction.  The same result was reached, for the same reason, by Judge Torres in <u>Liberty</u>

<u>Mutual Insurance Company v. Paradis</u>, 764 F.Supp. 13, *17 (D.R.I. 1991):

> This Court need not and should not determine the propriety of allowing Liberty to
> include that cost in its rate filings or the likelihood that it may succeed in any such
> effort.  That is a matter that should be determined, at least in the first instance, by
> the Director of Business Regulation.  This Court is not the proper forum for
> resolving unsettled questions of state law involving vital state interests.  Nor is
> this Court an alternative forum in which what are essentially regulatory matters
> properly entrusted to duly constituted state agencies may be litigated.

> In these respects, the principles of abstention enunciated by the United States
> Supreme Court in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed.
> 1424 (1943) and *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61
> S.Ct. 643, 85 L.Ed. 971 (1941), counsel that this Court take no action until the
> state proceedings have run their course, which should be relatively soon.  Like
> *Burford,* this case involves a complex matter in a highly regulated industry in
> which there is a predominant state interest and where there is available an
> adequate and expeditious means for state review.

> <u>Burford</u> concerned the [non] exercise of only equity jurisdiction.  In <u>Quackenbush v.</u>

<u>Allstate Insurance Co.</u>, 517 U.S. 706, 716-722 (1966), the Court, discussing <u>Burford</u> principles at

length, more definitively stated that abstention was not available in actions for damages only.

However, the Amended Complaint here seeks equitable relief in the form of the rescission of the

annuity contract (Count I) and a declaratory judgment (Count II).  Moreover, <u>Quackenbush</u> made

it clear that although outright dismissal may not be an appropriate abstention remedy in a non-

equity case, a stay pending a definitive state court determination of an integral issue would be.

The appropriate avenue, then, would appear to be for the Court to dismiss Counts I (rescission)

---

<u>Burford</u> and <u>Younger v. Harris</u>, 401 U.S. 37 (1971).  <u>See also</u>, <u>Armistead v. C & M Transport, Inc.</u>, 49 F.3d 43, 48, fn. 4 (1st Cir. 1995).

and II (declaratory judgment)[26], and stay the remainder of the proceedings until there is a final determination of the integral state issues by an appropriate state authority.[27] See, Neary v. Miltronics Manufacturing Services, Inc., 534 F.Supp.2d 227, 232 (D.N.H. 2008) (discussing abstention and Quackenbush at length [id., at 231-233].

It has also been noted that to whatever extent the issues presented in this action would not be determined by state regulation or specific reference to insurance industry factors, they revolve around breaches of duties that do not—and are not even alleged to—exist on the part of Mr. Maggiacomo in favor of Transamerica. Despite the lack of any specific insurance characteristic, these matters of state law, including negligence, breach of duty, and breach of contract, are likewise subject to Burford and Quackenbush abstention principles, as was the case in Dunn v. Cometa, 238 F.3d 38 (1st Cir. 2001).

B.     Primary Jurisdiction Doctrine.

The Supreme Court set out the parameters of the primary jurisdiction doctrine in United States v. Western Pacific Railroad Co., 352 U.S. 59, 63-64 (1956):

> The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. 'Exhaustion' applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. 'Primary jurisdiction,' on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an

---

[26]Count V of the Amended Complaint is also captioned "Declaratory Judgment" and seeks a "declaration" that Transamerica is entitled to indemnification from Lifemark only [A.C. at p. 17, sub.par. (e)]. Therefore, this count would also be subject to dismissal.

[27]In Bath Memorial Hospital v. Maine Health Care Finance Commission, 853 F.2d 1007, 1012 (1st Cir. 1988)(cited in Vaquería), the Court noted that instead of an outright dismissal, it is sometimes appropriate for the federal court to stay its proceedings pending the resolution of state issues by other tribunals. Ordinarily, this occurs when the state action may moot the federal question or make it easier to decide. Here, there really is no federal question (such as the constitutionality of the entire state regulatory scheme as was at issue in Vaquería).

administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. <u>General American Tank Car Corp. v. El Dorado Terminal Co.</u>, 308 U.S. 422, 433, 60 S.Ct. 325, 331, 84 L.Ed. 361.

No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation.

As Judge Torres noted in <u>Corvello</u>,

The twin purposes of the primary jurisdiction doctrine are "to 'serve [ ] as a means of coordinating administrative and judicial machinery' and to 'promote uniformity and take advantage of agencies' special expertise.' " *Pejepscot Industrial Park, Inc. v. Maine Central Railroad Co.,* 215 F.3d 195, 205 (1st Cir.2000) (quoting *Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575, 580 (1st Cir.1979)); *see B.H. v. Gold Fields Mining Corp.,* 506 F.Supp.2d 792, 803 (N.D.Okla.2007) (the two policy goals underlying the doctrine are: (1) to ensure "uniformity in determinations of certain administrative questions" and (2) to "promote resort to agency experience and expertise where the court is presented with a question outside its conventional experience.") Whereas *Burford* abstention rests on considerations of federalism and comity between federal courts and the states, primary jurisdiction rests on considerations of efficiency and comity between federal courts and administrative agencies.

<u>Corvello</u>, 532 F.Supp.2d at 403.

Here, the administrative agency, RIDBR, is already involved and is the Rhode Island regulatory agency charged with the responsibility of determining precisely the questions raised in the Amended Complaint.   There is no doubt that this court also has the authority to stay the current proceedings and refer certain questions to the appropriate regulatory agency.

<u>Narragansett Electric Company v. United States Environmental Protection Agency</u>, 407 F.3d 1, *3 (1st Cir. 2005).

      C.    <u>Certification of Questions</u>.

Certain of the questions that require answers in this case may also be certified to the Rhode Island Supreme Court.  R.I. Sup. Ct. Rules, Article I, Rule 6.  <u>See</u>, <u>e.g.</u>,

Wigginton v. Centracchio, 205 F.3d 504, 518-519 (2000). This may prove the most expeditious manner of determining exclusively state law issues that are necessary to the final determination of this case. Those questions would include, for example, whether any annuity is in fact an insurance policy within the meaning of R.I.G.L. §11-41-29; whether Transamerica, when issuing annuity contracts, is an insurer within the meaning of R.I.G.L. §11-41-29(a)(1); whether Rhode Island law requires an annuity owner to have an insurable interest in the annuitant (or "measuring life"); whether R.I.G.L. §27-4-6 (the anti-kickback statute) applies at all to annuities in Rhode Island, and if so, whether it applies to any payment made to an annuitant; and ultimately, whether the annuity contract was void ab initio, voidable at the will of Transamerica, and/or properly rescinded. Definitive answers to all these questions—all of which are central to the regulation of the annuity industry in Rhode Island—are necessary to any determination of whether and to what extent Transamerica is entitled to any damages under the remaining counts of the Amended Complaint. Regardless of whether the Court dismissed the Counts seeking equitable relief, the proceedings may still be stayed pending the receipt of a response from the Supreme Court. This tool is available to this Court whether or not state law independently provides for it, see, Clay v. Sun Insurance Office Limited, 363 U.S. 207, 212 (1960), and whether or not the parties request it. See, Elkins v. Moreno, 435 U.S. 647, 662 (1978). While not obligatory, pursuit of the certification process "does, of course, in the long run, save time, energy and resources and helps build a cooperative judicial federalism [footnote omitted]." Lehman Bros. v. Schein, 416 U.S. 386, 391 (1974). See also, Buchanan v. Doody, 571 F.Supp. 1206, 1207-1208 (D.Mass. 1983); Savig v. First National Bank of Omaha, 2009 WL 1955476, *7 (07/06/09).[28]

---

[28]In an extension of the certification process, in United Services Life Insurance Co. v. Delaney, 328 F.2d 483, 484-485 (5th Cir.), cert.denied, sub nom. Paul Revere Life Insurance Company v. First National Bank in Dallas, 377 U.S.

## CONCLUSION

For the foregoing reasons, and for all the reasons argued at length in the Caramadre memorandum, Defendant Edward L. Maggiacomo, Jr., respectfully requests that this Court dismiss all counts against him in Plaintiff's Amended Complaint. Failing that, he requests that the Court dismiss the counts seeking equitable relief and stay any further proceedings pending referral to the Rhode Island Department of Business regulation, or the certification of certain questions to the Rhode Island Supreme Court.

EDWARD L. MAGGIACOMO, JR.
By his Attorney,

*/s/ Anthony M. Traini*
Anthony M. Traini (#4793)
Anthony M. Traini, P.C.
56 Pine Street, Suite 200
Providence, RI 02903
Tel. (401) 621-4700
Fax. (401) 621-5888
amt@trainilaw.com

Dated: December 4, 2009

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2009, a copy of the within document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Anthony M. Traini*

---

935, reh. denied, 377 U.S. 973 (1964), the court of appeals stayed proceedings in two consolidated case involving the correct interpretation of certain provisions of a life insurance contract under state law, and advised the appellants to bring declaratory judgment actions in the state court to interpret the pertinent contract provisions, and to subject that determination to review by the state court of last resort.