# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| TRANSAMERICA LIFE INSURANCE COMPANY )<br>            Plaintiff, )<br>)<br>    v. )<br>)<br>JOSEPH CARAMADRE, RAYMOUR )<br>RADHAKRISHNAN, ESTATE PLANNING )<br>RESOURCES, INC, ESTELLA RODRIGUES, )<br>EDWARD MAGGIACOMO, JR., LIFEMARK )<br>SECURITIES CORP., and PATRICK GARVEY )<br>            Defendants. ) | C.A. No. 09-471/S |

## PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTIONS TO DISMISS

Plaintiff Transamerica Life Insurance Company objects to the motions to dismiss filed by

Defendants Joseph A. Caramadre, Raymour Radhakrishnan, Estate Planning Resources, Inc.,

Estella Rodrigues, Edward Maggiacomo, Jr. and Lifemark Securities Corp.

Respectfully submitted,

/s/ Brooks R. Magratten
Brooks R. Magratten, Esq., No. 3585
David E. Barry, Esq., *pro hac vice admitted*
Michael J. Daly, Esq. No. 6729
PIERCE ATWOOD LLP
  Attorneys for Plaintiff
10 Weybosset St., Suite 400
Providence, RI 02903
(401) 588-5113 [Tel.]
(401) 588-5166 [Fax]
bmagratten@pierceatwood.com
dbarry@pierceatwood.com
mdaly@pierceatwood.com

February 1, 2010

**CERTIFICATE OF SERVICE**

I certify that the within Objection To Defendants' Motion to Dismiss was electronically filed with the clerk of the court on February 1, 2010 and that such document is available for viewing and downloading from the Court's ECF system.  Service by electronic means has been effectuated on all counsel of record:

/s/ Michael J. Daly

# UNITED STATES DISTRICT COURT
# DISTRICT OF RHODE ISLAND

TRANSAMERICA LIFE INSURANCE )
COMPANY )
     Plaintiff, )
       )  C.A. No. 09-471/S
  v.      )
       )
JOSEPH CARAMADRE, RAYMOUR )
RADHAKRISHNAN, ESTATE PLANNING )
RESOURCES, INC, ESTELLA RODRIGUES, )
EDWARD MAGGIACOMO, JR., LIFEMARK )
SECURITIES CORP., and PATRICK GARVEY )
     Defendants. )

## CONSOLIDATED MEMORANDUM IN RESPONSE TO
## DEFENDANTS' MOTIONS TO DISMISS

Plaintiff Transamerica Life Insurance Company ("Transamerica") objects to the motions

to dismiss filed by Defendants Joseph A. Caramadre, Raymour Radhakrishnan, Estate Planning

Resources, Inc., Estella Rodrigues, Edward Maggiacomo, Jr. and Lifemark Securities Corp.

("Lifemark").[1]

## Table of Contents

I. Facts……………………………………………………………………………..2

II. Argument………………………………………………………………………….5

  A. The Standard of Review on a Motion to Dismiss……………………....5

  B. The Annuity Policy is Void *Ab Initio* For Lack of an Insurable Interest………6

  C. The Incontestability Clause does not Bar this Action…………………………17

  D. Transamerica's Allegations of Fraud are Sufficiently Specific………………..21

  E. The Annuitant's Lack of Understanding Voids the Annuity…………………35

---

[1] Defendant Patrick Garvey has been served with process but has not appeared or otherwise responded to the amended complaint.

F. Transamerica's Allegations of Breach of Contract are Sufficiently Specific…………………………………………………………………………………39

G. Maggiacomo and Lifemark Breached Duties Owed to Transamerica…………42

H. Transamerica has Adequately Alleged a Breach of the Duty of Good Faith and Fair Dealing…………………………………………………………48

I. The Amended Complaint States a Claim for Unjust Enrichment………………49

J. The Economic Loss Doctrine Does Not Bar The Tort Claims Alleged………50

K. Transamerica Adequately Alleged that the Defendants Committed Criminal Insurance Fraud in Violation of R.I. Gen. Laws § 11-41-29…………57

L. Transamerica has Alleged Sufficient Facts to Support its Claim of Civil Conspiracy…………………………………………………………………57

M. Neither Abstention nor Certified Questions are Appropriate in this Case……..58

Conclusion…………………………………………………………………………………62

## I. <u>Facts</u>

Transamerica brings this action to end a heinous scheme employed by Defendants Caramadre, Radhakrishnan and Estate Planning Resources to profit from the shortened lifespans and dire financial needs of the terminally ill. Their acts are nothing short of blatant wagering on the lives of strangers – a practice laws forbid and courts for centuries have condemned. This Court should not be the first to condone such conduct.

The amended complaint, ¶¶ 12-40, describes the Defendants' scheme generally. They looked for individuals who were seriously ill and needed money. Through advertisements, flyers and/or a network of hospice workers (*id.*, ¶19, 25), Caramadre and Radhakrishnan sought out strangers meeting these criteria and lured them with cash offers to sign applications for annuity policies or investment accounts. In one known instance, Defendants forged a terminally ill man's signature on an annuity application, he having no knowledge that his identity was being

used in connection with a $2 million annuity policy. *See Western Reserve Life Assur. Co. of Ohio v. Caramadre*, C.A. No. 09-470/S.[2]

Caramadre would typically orchestrate a relatively low initial premium with an annuity application, invested conservatively, so as not to generate questions or raise suspicions by the insurer. Later, after the policy was issued, Caramadre's investors would supplement the investment with a substantially higher premium and transfer funds into higher-yielding, and riskier, investments. (Amended Complaint, ¶ 21).

Caramadre's investors would also elect, for an additional premium, a "Double Enhanced Death Benefit" or "Annual Step-Up Death Benefit."[3] (*Id.* ¶¶ 21, 31; *see* Garvey Application at 7 of 12, Exhibit E ("Garvey Policy")). The Double Enhanced Death Benefit guarantees the beneficiary the greater of either 1) the "amount equal to your total premiums, less any adjusted partial withdrawals, accumulated at an effective annual rate of 6%," or 2) the "amount equal to the highest policy value on the policy date or any monthly anniversary, plus premiums and less any adjusted partial withdrawals that occur after the monthly anniversary with the highest policy value." (Prospectus, attached to Complaint as Exhibit B (hereafter, "Prospectus"), at 4). The Annual Step-Up Death Benefit "guarantees a death benefit equal to the largest policy value on the policy date or any other policy anniversary, plus premiums and less any adjusted partial withdrawals that occur after the highest policy anniversary." *Id.* These benefits create a hedge for the annuity owner and beneficiary to protect their investment against market downturns and ensure a minimum rate of return.

---

[2] The amended complaint in C.A. No. 09-470/S does not refer to Caramadre or the larger STAT scheme. Western Reserve has since confirmed that the annuity at issue in C.A. No. 09-470/S is the product of Caramadre's scheme and intends to amend the pleadings accordingly.

[3] Transamerica's policies came standard with a "Return of Premium Death benefit," which guarantees "the total of all premiums paid, less any adjusted withdrawals." Amended Complaint ¶ 21; Prospectus at 4.

By using: 1) terminally ill annuitants with short lifespans, 2) the enhanced death benefits, and 3) aggressive investment strategies, the annuity contract becomes a vehicle for a short-term investment in the equity markets. When the annuitant dies (ideally not too long or short after contract formation), the owner/beneficiary locks in any market gains during that period.[4] Should the markets yield losses, the enhanced death benefits guarantee, at a minimum, a return of the investment premium. *Id.*

Because neither Caramadre, nor Radhakrishnan had the credentials to actually solicit annuity applications, they enlisted a team of authorized brokers to sign and submit the applications that they obtained. *Id., ¶ 28.* Maggiacomo was one such broker. *Id.* As an agent for Lifemark, Maggiacomo was able to submit applications for Lifemark's annuities and, thus, held a key role in Caramadre's STAT scheme. *Id.*

Mr. Garvey fit Defendants' needs perfectly. He has a serious heart condition. (Complaint, Exhibit C ("Garvey Declaration")). Mr. Garvey accepted $5,000 and signed documents he thought were related to a financial assistance program. *Id.* He did not know he was signing an application for an annuity policy. *Id.* He did not know the owner or beneficiary of the annuity. *Id.* No one explained his role in the annuity contract. *Id.* He never met the purported agent, Edward Maggiacomo. *Id.*

In March, 2008 Transamerica received an application for an annuity policy signed by Mr. Garvey as the proposed annuitant (Complaint, Exhibit D ("Garvey Application")), together with an initial premium payment of $290,000. Amended Complaint, ¶33. The Application, which was submitted by Maggiacomo and Lifemark, listed Estella Rodrigues, a client of Estate

---

[4] Another benefit (to Defendants) of recruiting the terminally ill is that they are not expected to survive long enough to discuss Caramadre's investment scheme, which may explain why Defendants have so vigorously opposed depositions of the few surviving annuitants.

Planning Resources' and Joseph Caramadre's, as the primary owner and beneficiary. Garvey Application, p. 5 of 12. The Application also requested a Double Enhanced Death Benefit with an Additional Death Distribution. *Id.* at 7 of 12.

Based on the Application, Transamerica issued the Garvey Policy (with the requested death benefits), with an effective date of March 27, 2008. *See* Amended Complaint, ¶ 37; Annuity Policy, attached as Exhibit E to Complaint (hereafter "Policy" or "Annuity").

Within the months following the issuance of the Garvey Policy, Transamerica learned of: i.) Mr. Garvey's previously undisclosed health condition; ii.) Mr. Garvey's lack of knowledge that he would be a party to an annuity contract, how the Annuity worked, or what his role in the Annuity would be; iii.) the absence of any relationship between Mr. Garvey and Ms. Rodrigues or Maggiacomo; iv.) the payment of money to Mr. Garvey to sign the application; and v.) the circumstances surrounding the application, including the material misrepresentations and omissions described herein made in connection with the application. Amended Complaint, ¶ 39. Transamerica immediately rescinded the Garvey Policy and commenced this action to declare the policy void and/or rescinded and to recover damages. *Id.,* ¶ 40.

## II. <u>Argument</u>

### A. The Standard of Review on a Motion to Dismiss

The complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted); *see Erickson v. Pardus,* 551 U.S. 89, 93 (2007). "To survive a motion to dismiss, the complaint must allege 'a plausible entitlement to relief,'" *Fitzgerald v. Harris*, 549 F.3d 46, 52 (1st Cir.

2008) (quoting *Twombly*, 550 U.S. at 559), by pleading facts that "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("The plausibility standard is not akin to a 'probability requirement.'"). While mere "labels and conclusions" will not suffice to state a claim, the complaint need not include "detailed factual allegations." *Twombly*, 550 U.S. at 555; *see Erickson*, 551 U.S. at 93 (stating that "[s]pecific facts are not necessary").

Accordingly, a complaint will survive a motion to dismiss if it "contain[s] 'enough facts to raise a reasonable expectation that discovery will reveal evidence' supporting the claims." *Fantini v. Salem State College*, 557 F.3d 22, 26 (1st Cir. 2009) (quoting *Twombly*, 550 U.S. at 556); *see Iqbal*, 129 S. Ct. at 1949 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). In applying this standard, the court must accept as true all well-pleaded facts and draw all reasonable inferences in favor of the plaintiffs. *Gargano v. Liberty Intern. Underwriters, Inc.*, 572 F.3d 45, 48 (1st Cir. 2009); *Vernet v. Serrano-Torres*, 566 F.3d 254, 258 (1st Cir. 2009). If "the facts, evaluated in that plaintiff-friendly manner, contain enough meat to support a reasonable expectation that an actionable claim may exist," then the complaint must survive a motion to dismiss. *Andrew Robinson Intern., Inc. v. Hartford Fire Ins. Co.*, 547 F.3d 48, 51 (1st Cir. 2008).

## B. The Annuity Policy Is Void *Ab Initio* For Lack of an Insurable Interest

Rhode Island law prohibits the making of any contract that involves a wager on a person's life. Over a century ago, the Rhode Island Supreme Court held that "a purely speculative contract on the life of another is as objectionable on the grounds of public policy . . . and such a contract may properly be held to be void." *Cronin v. Vermont Life Ins. Co.*, 40 A.

497, 497 (R.I. 1898). Although the insurable interest doctrine entered Rhode Island jurisprudence by way of decisional law in the 1800's, *see Clark v. Allen*, 11 R.I. 439 (1877), the General Assembly supplemented[5] the doctrine in 1992 when it enacted § 27-4-27(a). This section makes it illegal for any person to procure "any insurance contract upon the life or body of another individual…" without having an insurable interest in the person insured. *Id.*

An "insurable interest" refers to the relationship that a beneficiary of an insurance contract must have with the insured. *See* § 27-4-27(c); *Mohr v. Prudential Ins. Co. of America*, 78 A. 554, 557 (R.I. 1911); *Cronin*, 40 A. at 497; *see also*, *Delk v. Markel American Ins. Co.*, 81 P.3d 629, 633-34 (Okla. 2003). In order to satisfy the "insurable interest" requirement, the beneficiary of an insurance contract must have a sufficient familial, affectionate or financial relationship with the insured such that the beneficiary has a strong interest in the continuance of the insured's life, notwithstanding the payment of benefits upon the insured's death. § 27-4-27(c); *Cronin*, 40 A. at 497.

The insurable interest requirement is grounded in public policy. The "doctrine developed over the course of several centuries in response to certain public policy concerns related to insurance. The foremost historical justification for the insurable interest requirement was to prohibit wagering contracts in the guise of insurance." *Delk*, 81 P.3d at 633-37. As compared to other types of contracts, the insurable interest requirement is of paramount concern in the context of life insurance contracts. "[P]olicies without interest, upon lives, are more pernicious and dangerous than any other class of wager policies; because temptations to tamper with life are

---

[5] The General Assembly has not expressed any intention to limit the common law insurable interest requirements. Thus, the enactment of § 27-4-27 neither implicitly nor explicitly preempted the common law doctrine. *Knowles v. Ponton*, 190 A.2d 4, 6 (R.I. 1963) ("It is a well-settled rule in the construction of statutes that legislative enactments will be construed to alter the common law only to the extent that the legislature has made that purpose clear.").

more mischievous than incitements to mere pecuniary frauds." *Ruse v. Mutual Ben. Life Ins. Co.*, 23 N.Y. 516, 526 (1861). "It is assumed that the existence of such an insurable interest will counterbalance any temptation that might otherwise exist for a beneficiary to murder the insured for the insurance proceeds." *Lopez v. Life Ins. Co. of Am.*, 406 So.2d 1155, 1158 (Fla. Dist. Ct. App. 1981); *see Grigsby v. Russell,* 222 U.S. 149, 154-155 (1911) ("A contract of insurance upon a life in which the insured has no interest is a pure wager that gives the insured a sinister counter interest in having the life come to an end. And although that counter interest always exists …, the chance that in some cases it may prove a sufficient motive for crime is greatly enhanced if the whole world of the unscrupulous are free to bet on what life they choose."); *Vereen v. Liberty Life Ins. Co.*, 412 S.E.2d 425, 427 (S.C. Ct. App. 1991) ("A life insurance policy issued in favor of a beneficiary who has no relationship to the insured places the life of the insured at risk; it gives the beneficiary a pecuniary interest in seeing that the innocent insured dies.").

In the case of the Garvey Policy, Ms. Rodrigues has no connection to Mr. Garvey except that she stands to receive the "Double Enhanced Death Benefit" and an "Additional Death Distribution" when he dies. As such, Ms. Rodrigues has no insurable interest in Mr. Garvey. *See* Amended Complaint ¶¶ 12-36; § 27-4-27(c); *Cronin*, 40 A. at 497. Defendants, however, contend that no such interest is required because the benefits are provided pursuant to an annuity with death benefit riders, rather than a traditional life insurance policy. As discussed below, Defendants' contention is predicated on a fundamental misunderstanding of Rhode Island's statutory and common law rules regarding insurable interest.

1. <u>The Garvey Policy is Subject to, and Violates, Rhode Island's Insurable Interest Statute</u>

i. Annuity policies that provide a "Double Enhanced Death Benefit" and other death benefits constitute "Insurance Contract[s] Upon the Life or Body of Another Individual" as contemplated by § 27-4-27.

Rhode Island's insurable interest statute, § 27-4-27(a), applies to "any insurance contract upon the life or body of another individual. . . ." *Id.* There is no dispute that the death benefits of the Garvey Policy are based "upon the life or body" of Mr. Garvey. Thus, the applicability of the statutory insurable interest requirement depends solely upon whether the Garvey Policy constitutes "any insurance contract" as the phrase is contemplated under § 27-4-27.

The phrase "any insurance contract" is not defined in Chapter 4 of Title 27. In the absence of a statutory definition, the term "insurance" has a broad meaning under Rhode Island law. A contract is deemed to be life insurance if it is supported by legal consideration and provides for a monetary benefit based upon the death of a person. *Sisson v. Prata Undertaking Co*, 141 A. 76 (R.I. 1928); *Clark v. Allen*, 11 R.I. 439, 1877 WL 4932, *2 (1877). The death benefits of the Garvey Policy command payment to the beneficiary, for a premium charged, in the event of the death of the annuitant. *See* Prospectus, p. 4; Garvey Policy, "Additional Death Benefit Rider."

A contract may constitute "insurance" even if it is not labeled as such. *Sisson*, 141 A. at 77. In *Sisson,* the defendant ("Prata") offered various burial contracts to Rhode Island residents, under which the purchaser would pay a monthly fee for a certain period of time in return for a funeral and burial upon the person's death. If the person died before the final payment was made, Prata would provide the funeral and burial without additional charge to the decedent's heirs. The State brought enforcement proceedings against Prata for operating an unlicensed insurance business in Rhode Island. The issue before the court was whether Prata's burial contracts constituted insurance. In answering the question, the court noted that Prata's burial

contracts provided for benefits upon the death of a person, in return for monetary payments.  *Id.* at 77.  Thus, the burial contracts were a form of "insurance."  *Id.*

Rhode Island's common-sense test for an "insurance" contract is consistent with other jurisdictions' treatment of the issue.  *See, e.g., Atty. Gen. v. C. E. Osgood Co.*, 144 N. E. 371, 371-72) (Mass. 1924) (holding that contract for the sale of furniture pursuant to a "lease" containing a discharge of outstanding balance due upon the death of lessor constitutes "insurance"); *Lerner v. Lerner*, 508 N.Y.S.2d 191, 194-96 (N.Y. App. Div. 1986) (holding that a death benefit available under a retirement investment plan constitutes a form of "life insurance"). "'[T]he mere calling of a contract of insurance by any particular appellation that may be adopted for business or conventional uses or classification cannot make a policy containing an agreement to pay another a sum of money upon the happening of an unknown or contingent event, dependent upon the existence of a life, other than one of life insurance, and **that is none the less so because coupled with an investment or bond feature**.'"  *Id.* at 194 (emphasis added) (quoting Couch on Insurance 2D § 1.76, p. 242).  In the words of Judge Cardozo:  "The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal."  *Wood v. Duff-Gordon*, 118 N.E. 214, 214 (N.Y. 1917).

There are compelling policy reasons for applying the insurable interest requirement to annuity policies providing death benefits.  The purposes supporting the insurable interest requirement are to prevent illegal gambling contracts and murder and to protect human life and welfare.  These purposes "must stand at the center of any analysis of the doctrine's application."  *Delk*, 81 P.3d at 637.

The beneficiary of death benefits associated with an annuity has even more incentive to cause harm to an annuitant than does a beneficiary under a standard life insurance policy.  Unlike

a traditional life insurance contract, where a set death benefit will be payable upon the inevitable death of an insured, the Double Enhanced Death Benefit provided under the Garvey Policy may never be realized if Mr. Garvey lives too long. Under the structure of the Garvey Policy, if Mr. Garvey survives past the point when underlying annuity payments begin to be paid out, then the available death benefit is reduced. And if he is fortunate to live long enough for all of the annuity payments to be disbursed during his lifetime, then **no** death benefit is payable. This would result in Ms. Rodrigues's inability to recover the guaranteed minimum return that is available only through the death benefit riders she purchased. Moreover, as long as Mr. Garvey is alive, Ms. Rodrigues is not able to receive a lump sum distribution of its entire investment without incurring a financial penalty. Thus, regardless of market performance or the amount of the death benefit, the entire corpus of Ms. Rodrigues's investment is unavailable as long as Mr. Garvey is living. This is precisely why Caramadre and his associates targeted the terminally ill, so as not to tie up investment dollars too long and avoid living witnesses who can testify about the transaction.[6] Given the structure of the Garvey Policy, the reasons for applying the insurable interest requirement to the death benefit features are particularly compelling.

Considering the purposes of the insurable interest requirement and applying the common sense definition of "insurance," it is apparent that the death benefits of the Garvey Policy constitute a form of insurance within the contemplation of § 27-4-27. By purchasing the death

---

[6]   A weakness of the Caramadre scheme is the difficulty accurately predicting the lifespan of the terminally ill. In the case of Maureen Buckman (*see* C.A. No. 09-502/S), she died one day after her policy issued. In the case of Mr. Garvey, he is still alive twenty two months after the Policy issued.

benefit, Ms. Rodrigues assured herself that it would receive a positive return (or, at least, no loss) on its investment upon Mr. Garvey's death.[7]

The fact that a market peak coinciding with Mr. Garvey's death may negate the Death Benefit does not render it something other than a form of insurance. Indeed, in *Sisson*, the burial contracts that were deemed to be insurance did not provide benefits if the insured paid the entire burial fee before dying. *Sisson,* 141 A. at 77. The contingent benefit (potential discharge of any outstanding balance) provided a sufficient basis to categorize the contracts as insurance. Similarly, term life insurance provides benefits only if the insured dies before a certain age is reached. Despite the fact that no benefit may ever be realized under a term life insurance policy, there is no question that such a contract is "insurance."

Like the burial contract at issue in *Sisson*, in return for separate consideration, the Garvey Policy provides a benefit based upon Mr. Garvey's death. Thus, the death benefit is a form of insurance. Accordingly, § 27-4-27(a) applies and renders the Garvey Policy void because Ms. Rodrigues lacks an insurable interest in Mr. Garvey.

ii. The insurable interest requirement of § 27-4-27(a) is not limited to "Life Insurance" contracts as that term is defined in § 27-4-0.1.

Defendants contend the Garvey Policy does not fall within the ambit of § 27-4-27(a) because it does not constitute "life insurance" as that phrase is defined in § 27-4-0.1. This argument is wrong for several reasons.

---

[7] Not only does the date of Mr. Garvey's death dictate when the death benefit is available, it potentially dictates the value of the benefit. Under the terms of the death benefit riders, the amount of benefits will depend on market performance prior to Mr. Garvey's death. If he dies at a point when the market value of the annuity has never exceeded the guaranteed minimum death benefit, then the benefits will be limited accordingly. If, on the other hand, the market value of Ms. Rodrigues's investment surpasses the minimum death benefit during Mr. Garvey's lifetime, then Ms. Rodrigues will be able to capture the market spike.

First, the § 27-4-27(a) insurable interest requirement is not limited to "life insurance." Rather, the statute specifically applies to "*any insurance contract* upon the life or body of another individual. . . ." *Id.* (emphasis added). The breadth of this language is apparent throughout the remaining subparts of § 27-4-27. For example, § 27-4-27(b) reflects that the insurable interest requirement applies to every insurance contract that pays "any benefits . . . upon the *death, disablement or injury* of the insured." *Id.* (emphasis added). Thus, § 27-4-27(a) applies to "*any insurance contract*" related to the life or physical welfare of a person, including traditional life insurance contracts, disability insurance policies and any other form of insurance that provides benefits when a person dies or is injured.

Second, § 27-4-27(c)(2) reflects that the insurable interest requirement applies when benefits "would arise only by, **or would be enhanced in value** by the death, disablement, or injury of the individual insured…." (emphasis added). Conventional life insurance policies traditionally provide for fixed death benefits, not **enhanced** benefits. This reference to enhanced benefits further undermines Defendants' argument that § 27-4-27 applies only to typical life insurance contracts.

Based on the language and structure of § 27-4-27, it is apparent that the statutory insurable interest requirement is not limited to "life insurance" policies as defined in § 27-4-0.1.

iii.     The Garvey Policy constitutes "Life Insurance" as that term is defined in § 27-4-0.1.

Even if § 27-4-27 were limited to "life insurance" as the phrase is defined under § 27-4-0.1, the Garvey Policy with its death benefit riders fits that statutory definition. Section 27-4-0.1(c) defines "life insurance" as

> *every insurance* upon the lives of human beings and *every insurance* appertaining to that life, *including* the granting of endowment benefits, *additional benefits* in the event of death by

> accident, additional benefits to safeguard the contract from lapse, accelerated payments of part or all of the death benefit, or a special surrender value upon diagnosis of terminal illness . . . . and optional modes of settlement of proceeds.

(emphasis added). This statutory definition of "life insurance" is broad and inclusive. There is no exclusion for contracts that provide death benefits as a discrete component of the agreement. As long as an insurance contract is predicated "upon the lives of human beings" or relates to a human being, then it constitutes "life insurance" under § 27-4-0.1. As described in Section II(B)(1)(i), *supra*, the death benefit is a form of "insurance" that is based upon Mr. Garvey's life. Thus, the annuity with the death benefit fits comfortably within the statutory definition of "life insurance."

It is inconsequential that § 27-4-0.1(a) also defines "Annuities." Contrary to Defendants' contention, the terms "Annuities" and "Life Insurance" are not mutually exclusive. The fact that "*payments* made in connection with a life insurance policy" are not deemed annuity payments, *id.* (emphasis added), does not imply that an *annuity contract* can never have components that constitute *life insurance*. An annuity that also provides death benefits as contemplated under § 27-4-0.1(c) is a form of "life insurance." Indeed, § 27-4-0.1(a) refers to recipients of certain annuity benefits as "insured."

Here, the death benefits available under the Garvey Policy, which were specifically purchased for an additional premium as a discrete component of the contract, are based "upon" and "appertain to" Mr. Garvey's life. §27-4-0.1(c). Thus, the death benefit aspect of the Garvey Policy constitutes "life insurance."

2.    <u>The Garvey Policy Violates Rhode Island's Common Law Insurable Interest Requirement</u>

Although the insurable interest doctrine is codified in Rhode Island's statutes, the doctrine has its roots in the common law. *Cronin*, 40 A. at 497. Since the 1800's, Rhode Island's common law has proscribed contracts that constitute wagers on human life. *Id.* Thus, Defendants' exclusive focus on § 27-4-27 is not comprehensive. Regardless of any limitations on the applicability of § 27-4-27, the common law renders the Garvey Policy void.

Because the applicability of the common law insurable interest requirement depends on the purpose supporting the doctrine, *Delk v. Markel American Ins. Co.*, 81 P.3d 629, 638 (Okla. 2003), it is helpful to trace its evolution. It is accepted that the doctrine first worked its way into the English common law in response to concerns about the use of insurance policies as wagering devices. *Id.* and n. 18. Policies used for gambling purposes, "if valid, not only afford facilities for a demoralizing system of gaming, but furnish strong temptations to the party interested to bring about, if possible, the event insured against." *Ruse v. The Mutual Benefit Life Ins. Co.*, 23 N.Y. 516, 523 (1861). These concerns first led to application of the insurable interest requirements to fire insurance policies. *Delk*, 81 P.3d at 638, n.18 (citing *Sadlers Co. v. Badcock*, 2 Atk. 554, 26 Eng. Rep. 733 (1743)). "In respect to insurances against fire, the obvious temptation presented by a wagering policy to the commission of the crime of arson has generally led the courts to hold such policies void, even at common law." *Ruse*, 23 N.Y. at 523. Over time, it was settled that the insurable interest requirement also extended to marine insurance and life insurance policies. *Id.*

> While the historical anti-wagering foundation of the insurable interest doctrine remains valid, other public policy objectives have greater resonance today. The distinction between wagering and insurance is now so firmly established in public perception, that the justification for the insurable interest doctrine is more readily apprehended today as the prevention of unproductive and wasteful commercial transactions, the limitation of insurance to true

> indemnity, and the deterrence of the fraudulent destruction of
> insured property.

*Delk*, 81 P.3d at 635.

In the context of life insurance policies issued in the absence of an insurable interest, it has been said that such policies could not be "tolerated" under English common law. *Ruse*, 23 N.Y. at 526. Indeed, the concept of gambling on human life through the use of stranger owned life insurance policies is "obviously repugnant to the plainest principles of public policy…." *Id.*

Rhode Island's common law approach to the insurable interest requirement is derived from, and consistent with, the English common law. *Cronin*, 40 A. at 497. On public policy grounds, contracts that provide payments based upon the death of a human life are void in the absence of an insurable interest. *Id.*

Defendants' attempt to label the Garvey Policy as a mere annuity as opposed to a form of insurance for which an insurable interest is required is unavailing.[8] Unlike § 27-4-27, which applies only to "insurance" contracts, the common law is not so constrained. The public policy considerations that support the common law insurable interest requirement compel its application to any form of contract that provides a financial incentive for a beneficiary to prematurely terminate a person's life. *Delk*, 81 P.3d at 637 ("The purpose of the insurable interest requirement must stand at the center of any analysis of the doctrine's application.").[9] As

---

[8] To the extent Defendants contend that the insurable interest requirement does not apply to traditional annuities, such a position may be reasonable. After all, in the absence of a death benefit, the beneficiary of a traditional annuity stands to gain continued annuity payments **as long as the measuring life is alive**. The essential annuity arrangement does not provide the same incentive for mischief that a separately purchased Double Enhanced Death Benefit provides.

[9] Although a contract granting a life estate may provide a remainderman with "temptation to shorten life, in order to hasten the possession of" real estate, the common law does not consider such agreements to be contrary to public policy. *Cronin*, 40 A. at 497. The distinction between

described in Section B(1)(i), *supra*, a beneficiary under an annuity policy with a Double Enhanced Death Benefit and an "Additional Death Distribution" has a compelling financial interest in the early demise of the annuitant.[10]

### C. The Incontestability Clause Does Not Bar This Action

The Garvey Policy states, in part: "This policy shall be incontestable from the Policy Date." Garvey Policy, p. 22. The Policy Date of the Garvey Policy is March 27, 2008 – nearly nineteen months before Transamerica commenced this action. *Id.*, p.1. Defendants now seek to use the incontestability clause to shelter their scheme from judicial scrutiny. Their contentions fail for several reasons.

1.  The "Incontestability Clause" Does Not Apply to Contracts Void A*b Initio.*

The incontestability clause, which purports to bar a plaintiff from challenging the validity of the contract from its inception presupposes a valid contract. However, a contract that is void *ab initio* is never in force and its terms cannot be enforced. *See Guarantee Trust Life Ins. Co. v. Wood*, 631 F. Supp. 15, 19-20 (N.D. Ga 1984)("the Court concludes that the policies are void *ab initio* as against public policy… [T]he incontestability clause in this case is simply not applicable…"); *Amex Life Assur. Co. v. Superior Court,* 930 P.2d 1264, 1271 (Cal. 1997)("Incontestability does not apply to a policy which is void *ab initio*."); *Beard v. Am.*

---

insurance contracts and life estates in this regard arises out of the fact that freedom of alienation is an indispensable property right. Edwin W. Patterson, *Insurable Interest in Life*, 18 Colum. L. Rev. 381, 391 (1918). This alienation concept is not applicable to contracts such as this because the annuitant/insured did not have a right to the benefit at the outset. *Id.* Thus, application of the insurable interest doctrine would not inhibit Mr. Garvey's ability to alienate property. Therefore, here, the Court need not compare the public policy in favor of the right to alienate property with the public policy against contracts constituting wagers on human life.

[10] The proof lies in the facts. Of the seven lawsuits commenced by Transamerica and its affiliate Western Reserve Life Assurance Co. of Ohio (*see* C.A. No. 09-470, 471, 472, 473, 502, 549 and 564) involving fourteen annuity policies orchestrated by Caramadre and his associates in the past three years, only four of the fourteen named annuitants survive today.

*Agency Life Ins. Co.*, 550 A.2d 677, 689 (Md. 1988)("The invocation of an [i]ncontestability provision presupposes a basically valid contract and thus incontestability does not apply to a contract which is void *ab initio*." (internal citations and quotations omitted)); *Wood v. New York Life Ins. Co*., 255 Ga. 300, 307, 336 S.E. 2d 806, 811-12 (1985)("The incontestability clauses…presuppose the existence of a contract 'in force.' However, an insurance contract that is void *ab initio* as against public policy is never 'in force', cannot be ratified or affirmed, and is not subject to being enforced by the courts."); *Kemper v. Equitable Life Ins. Co. of Iowa*, 171 N.E. 2d 536,537 (Ohio Ct. App. 1960)("[I]f the policy is invalid in its inception…the Insurance Company is not liable, notwithstanding the incontestability clause.");  *Tulipano v. U.S. Life Ins. Co. in the City of New York*, 57 N.J. Super. 269, 277, 154 A.2d 645, 650 (1959)("[I]t is generally been held that an insurance policy violative of public policy or good morals cannot be enforced simply because the incontestability period has run."); *Henderson v. Life Ins. Co. of Virginia*, 176 S.C. 100, 179 S.E. 680 (1935); 44 C.J.S. Insurance §352 (2007) ("A policy issued to a person who has no insurable interest in the life of the insured is void, from its inception, and is not rendered valid by a clause declaring it incontestable after the lapse of a specified period of time."); 44 Am. Jur. 2d Insurance §767 (2003)("An insurance policy which is invalid as being violative of public policy cannot be validated by the agreement of the parties that it shall be incontestable after a stated time."); K.A. Drescher, *Annotation: Insurance: Incontestable Clause As Excluding A Defense Based Upon Public Policy*, 170 A.L.R. 1040 (1947).

Indeed, the Rhode Island Supreme Court in *Mohr v. Prudential Ins. Co. of America*, 32 R.I. 177, 78 A. 554 (1910), found no error in a trial court's instruction on the lack of an insurable interest as a defense to payment in a case where the one-year incontestability clause period had lapsed.  *Id.* at 184, 78 A. at 557-58.

As discussed in Section B, *supra*, this annuity contract is void *ab initio* because there is a complete lack of insurable interest between the owners/beneficiaries and the person on who's life the wager is being placed – the annuitant.  Additionally, the contract is void *ab initio* because the annuitant, Mr. Garvey, was paid to sign the application (in violation of state law) and in ignorance of what he was signing.  *See* Section E, *infra*.

2.     A Clause that Deems a Policy Incontestable at its Inception is Contrary to Public Policy and Unenforceable.

Courts have split on the enforceability of incontestability clauses, such as the one at issue, that purport to render a policy incontestable from its inception.  See Couch on Insurance 3D §240:7 (2000); 16 Williston on Contracts §49-95 (4th ed. 2000).  The split of authorities reflects the tension between opposing polices that, one the one hand, promote freedom of contract and hold the parties to the terms of their agreement and, on the other hand, recognize that the proponent of a fraud should not be rewarded and that insurers must be allowed a reasonable time to detect fraudulent acts.

Recognizing the soundness of the latter policy, several courts have refused to enforce a contract provision that bars an insurer from raising fraud as a defense from the outset.  *See, e.g., Fishel v. Union Central Life Ins. Co.*, 270 N.Y.S. 734, 736 (City Ct. 1933)("[A] stipulation in a contract *providing for a reasonable limitation of time within which it may be contested* for fraud, is not…contrary to public policy.")(emphasis added.); *Stratton v. Service Life Ins. Co. of Lincoln*, 222 N.W. 332, 335 (Neb. 1928)("The general rule is that a provision in a contract of insurance limiting the time in which the insurer may take advantage of certain facts that might otherwise constitute a good defense to its liability on such contract precludes every defense to the policy other than the defenses excepted in the provision itself, including…even fraud where the time fixed by the contract is not unreasonably short.")(quoting 14 R.C.L. 1199, §380);

*Flanigan v. Federal Life Ins. Co.*, 83 N.E. 178 (Ill. 1907)("Such stipulations which give to the insurer a limited period for the purpose of testing the validity of the policy and ascertaining the truth of the representations made are valid and binding, provided the period fixed is sufficient to enable the insurer, by the exercise of proper diligence, to ascertain whether fraud has been practiced or not."); *Reagan v. Union Mutual Life Ins. Co.*, 76 N.E. 217, 218 (Mass. 1905)(incontestability clause that precludes insurer from raising fraud as a defense, effective at the inception of the policy "is against the policy of our law, and therefore void."); *Welch v. Union Central Life Ins. Co.,* 78 N.W. 853, 855 (Iowa 1899)(incontestability clause purporting to bar defenses at inception of coverage did not preclude insurer from introducing evidence of fraud).

In the only Rhode Island decision to address the issue, the Rhode Island Supreme Court in *Murray v. State Mutual Life Ins. Co*., 22 R.I. 524, 48 A. 800 (R.I. 1901), cited with approval the words of the Georgia Supreme Court:

> Where parties enter into a contract which from its nature affords an opportunity to one party to perpetrate a fraud upon another, and it is stipulated therein that the party who is liable to be defrauded shall have a specified time in which to make inquiry as to the acts and conduct of the other party, he is on notice, by the very terms of the contract itself, that fraud may be involved in it, and the duty is upon him to commence at once an investigation into the acts, conduct, and representations of the other party; **and if the time fixed is such that the information which would show that the fraud had been perpetrated could have been, bar the exercise of ordinary diligence, obtained**, then the parties are bound by their contract as to time, and after the lapse of that time fraud is no longer a defense.

48 A. at 801 (quoting *Massachusetts Benefit Life Ass'n v. Robinson*, 104 Ga. 256, 30 S.E. 918 (1898))(emphasis added). The lynchpin to the *Murray* court's finding that a two-year incontestability clause did not violate public policy was its recognition that the clause afforded the insurer adequate time to detect fraud, if fraud is indeed afoot. The incontestability clause in

the annuity contract at issue cannot survive the analysis in *Murray*. It should not be enforced in the circumstances of this action.[11]

3.      An Incontestability Clause, to the Extent Enforceable, Inures Only to the Benefit of the Insured or Beneficiary.

The incontestability provision, to the extent applicable or enforceable at all, inures only to the benefit of the insured or beneficiary. *See* 46 C.J.S. Insurance §1231 (2009); Couch on Insurance 3D, §§240:9, 240:10 (2000). Thus, Defendants other than Mr. Garvey and Ms. Rodrigues, not being parties to the contract and not being sued on the contract, have no standing to assert the incontestability clause as a defense.

4.      The Incontestability Clause Does Not Bar Claims that do not Challenge the Validity of the Policy.

By its terms, the incontestability clause only bars those claims in which plaintiff contests the validity of the policy. Even if the incontestability clause were given effect to the defenses raised by the annuitant or beneficiary, it has no effect on claims that presume a valid contract. *See Guarantee Trust Life Ins. Co. v. Wood*, 631 F. Supp. 15, 20-21 (N.D. Ga. 1984); *Love v. Prudential Ins. Co. of America*, 173 S.C. 433, 176 S.E. 333 (1934). Accordingly, the incontestability clause should have no impact on Counts III - X which do not contest the validity of the annuity policy.

**D.  Transamerica's Allegations of Fraud are Sufficiently Specific**

1.      The Standard Under Rule 9 For Alleging Fraud

"The clear weight of authority is that Rule 9 requires specification of the time, place and content of an alleged false representation, but not the circumstances or evidence from which

---

[11]  R.I. Gen. Laws §27-4-6.2 requires "all individual life insurance policies" to contain a two-year incontestability provision. Even if the Court were to adopt the statutory language as a default provision, Transamerica commenced this action well within two years of the annuity policy's effective date.

fraudulent intent could be inferred." *McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 228

(1st Cir. 1980). "This interpretation of Rule 9 comports with its language, harmonizes the rule

with Rule 8, which requires that averments in pleadings be concise and direct, and at the same

time fulfills a major purpose of Rule 9: to give adequate notice of the plaintiff's claim of fraud

or mistake . . . ." *Id.* at 228-29. "[T]he pleader usually is expected to specify the who, what,

where, and when of the allegedly false or fraudulent representation." *Alternative Sys. Concepts,*

*Inc. v. Synopsys*, 374 F.3d 23, 29 (1st Cir. 2004). The rule is designed to protect a defendant

from unfair surprise and so-called strike suits, as well as protect defendants from groundless

charges that may damage their reputations. *Driscoll v. Landmark Bank Sav.*, 758 F. Supp. 48, 52

(D. Mass. 1991). Finally, "the application of the rule may be relaxed as to matters peculiarly

within the opposing party's knowledge that the pleader is not privy to at the time the document is

being drafted." Wright and Miller, *Federal Practice and Procedure* § 1298 (3rd ed. 2009).

   Regarding the state of mind of the Defendants, the text of the rule itself establishes that

"[m]alice, intent, knowledge, and other conditions of mind of a person may be averred

generally." Fed. R. Civ. P. 9(b). The First Circuit has found that a "short and plain statement of

the claim" is sufficient to satisfy the "averred generally" standard. *Simcox v. San Juan Shipyard,*

*Inc.*, 754 F.2d 430, 439 (1st Cir. 1985).

   "What constitutes 'particularity' will necessarily differ with the facts of each case."

*Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (citation

omitted). Specifically, Rule 9(b) is "often applied more liberally to fraud by silence (sometimes

called 'fraudulent concealment') claims than it is applied to other fraud claims involving

affirmative misrepresentations or actions." *Capital Solutions, LLC v. Konica Minolta Bus. Sol.*

*U.S.A.*, 2009 WL 1635894, at *6 (D. Kan. June 11, 2009). This is because "a fraud by silence

claim does not involve an affirmative misrepresentation, it typically does not occur at a specific place or precise time nor does it usually involve specific persons." *Id.* In these circumstances, in order to satisfy Rule 9(b), a plaintiff must "plead with specificity the material facts that it claims the defendant wrongfully failed to disclose" and "the general time period during which the facts were withheld." *Id.*

Rhode Island recognizes two species of fraud: fraudulent misrepresentation and fraudulent concealment. *Guilbeault v. R.J. Reynolds Tobacco Co.*, 84 F. Supp. 2d 263, 268 (D.R.I. 2000); *Illinois State Trust Co. v. Conaty*, 104 F. Supp. 729, 734 (D.R.I. 1952); *Nat'l Credit Union Admin. Bd.*, 795 F. Supp. at 70 ("Fraud can be grounded in concealment."). To prevail on a claim for fraudulent misrepresentation, "a plaintiff must show: (1) a false or misleading statement of material fact that was (2) known by the defendant to be false and (3) made to deceive, (4) upon which the plaintiff relied to his detriment." *Guilbeault*, 84 F. Supp. 2d at 268; *see Nat'l Credit Union Admin. Bd. v. Regine*, 795 F. Supp. 59, 70 (D.R.I. 1992); *see also Women's Dev. Corp. v. City of Central Falls*, 764 A.2d 151, 160 (R.I. 2001); *Nisenzon v. Sadowski*, 689 A.2d 1037, 1046 n.11 (R.I. 1997). When the theory of fraud is based on the concealment of a material fact, as opposed to an affirmative misrepresentation, the plaintiff must demonstrate that the defendant had a duty to disclose the omitted fact. *See Guilbeault*, 84 F. Supp. 2d at 269; *Illinois State Trust Co.*, 104 F. Supp. at 734; *Home Loan & Invest. Assoc. v. Paterra*, 255 A.2d 165, 167-68 (R.I. 1969); *see generally* Restatement (Second) of Torts § 551(1) (1977); 37 Am. Jur. 2d Fraud and Deceit § 204 (2009).

In this case, Transamerica's fraud claim is grounded in misrepresentations and concealment of facts by the Defendants. Transamerica has identified facts it claims were wrongly withheld and the general time period during which the facts were withheld. Amended

Complaint, ¶ 55-59.  The amended complaint alleges that Defendants failed to disclose information concerning the health and life expectancy of the proposed annuitant, Mr. Garvey, the lack of any pre-existing relationship between Mr. Garvey and the investor and Maggiacomo, and the fact that Mr. Garvey was paid for the use of his identity.  *Id.*  In addition, the amended complaint establishes that this information was withheld at the time the annuity application was submitted to Transamerica.  *Id.*, ¶ 56.  The amended complaint easily satisfies the "who, what, where and when" standard.  The defendants are fully aware of the claims against them, and the remaining details will be established as Transamerica moves forward with discovery.  "A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts."  *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 47 (D. Mass. 2001) (quoting *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir. 1999)).

 2. <u>The Amended Complaint States a Claim for Fraud Because it Alleges that Defendants Misrepresented Material Facts</u>

Fraud claims are not analyzed in a vacuum.  In determining whether a party has acted fraudulently, courts recognize that negotiating parties operate under certain reasonable and basic assumptions and expectations.  *Citizens Ins. Co. v. Barnes*, 124 So. 722, 723 (Fla. 1929) ("where parties contract upon a subject which is surrounded by statutory limitations and requirements, they are presumed to have entered into their engagements with reference to such statute, and the same enters into and becomes a part of the contract").  For example, a thief can not enforce a contract to sell stolen goods on the grounds that the purchaser never asked if the seller was a thief.  This is because negotiating parties implicitly represent that they have acted in compliance with the law.  *Golt v. Phillips*, 517 A.2d 328, 332 (Md. 1986) ("It makes no difference that

Appellees did not expressly state that the premises were properly licensed; such a basic prerequisite to any lease agreement is implied"); *Tucker v. Beazley*, 57 A.2d 191, 193 (D.C.App. 1948) ("when defendant represented that the total monthly rentals amounted to $297 plaintiffs were entitled to believe that such were *legal* rentals duly established under the District of Columbia Emergency Rent Act and the regulations promulgated thereunder").

Defendants made several affirmative misrepresentations in the Garvey Application. First, Rhode Island's statutory and common law prohibits the issuance of life insurance contracts in the absence of an insurable interest. *See* Section B, *supra.* This prohibition is acknowledged in a Code of Ethics, which is incorporated into the binding General Agent Agreement between Transamerica and Lifemark ("Agent Agreement," attached as Exhibit A to this memorandum) and provides that Transamerica's products should only be sold to meet its customers "insurable needs…." *See* Amended Complaint, ¶ 63. Additionally, the Agent Agreement prohibits Lifemark and its agents from "engage[ing] in speculation on human life in any way." *Id.* Defendants' failure to disclose the absence of an insurable interest constitutes an implicit representation that, in accordance with Rhode Island law, the Agent Agreement and the Code of Conduct, such an interest existed. *See Citizens Ins. Co.*, 124 So. at 723 (noting that parties are presumed to have entered agreements with reference to applicable statutory limitations).

Second, through the Agent Agreement, Lifemark represented that it and its agents would comply with state laws applicable to the solicitation of Transamerica's products. *See* Amended Complaint, ¶ 63. Rhode Island law prohibits the payment of kickbacks to entice applicants to apply for life insurance. R.I. Gen. Laws § 27-8-7. Here, however, Transamerica has alleged (and Defendants do not dispute) that Mr. Garvey was paid to sign the application. Amended Complaint, ¶ 27. Thus, because the Garvey Policy constitutes a form of life insurance, *see*

Section B, *supra*, the mere submission[12] of the application without disclosing this statutory violation constitutes an implicit – and false – affirmative representation that no such payment was made.

Third, the Agent Agreement specifies that Lifemark would not use, or permit the use of, sub-agents to sell Transamerica's products. *See* Amended Complaint, ¶ 64. By submitting the Garvey Application without disclosing the involvement of Caramadre or Radhakrishnan in the application process (*see* Amended Complaint, ¶¶ 24-28), it was implicitly represented to Transamerica that no unauthorized individuals had solicited the sale of the annuity.

Moreover, the Ethics Code reflects that Lifemark had an obligation to make sure that Transamerica's customers would be treated fairly and ethically. The amended complaint (¶ 39) alleges that Mr. Garvey was not fully informed of his role in the annuity. At a minimum, there is a question of fact as to whether it was fair or ethical to convince Mr. Garvey to become involved in the STAT scheme, which would allow unknown third parties to obtain a substantial profit upon his death. *Id.,* ¶¶ 16-39. Assuming, as the Court must, that the entanglement of Mr. Garvey into this scheme was not fair or ethical, the failure to disclose the complete and true nature of the transaction to Transamerica constitutes an implicit affirmative misrepresentation that that nothing unethical or unfair was afoot.

> 3. <u>The Amended Complaint States a Claim for Fraud in the Omission Because It Alleges that Defendants Withheld Certain Facts That They Had a Duty to Disclose.</u>

> > i. Defendants had a duty to disclose withheld facts because they were basic to the annuity policy.

---

[12] Although the application was submitted through Maggiacomo and/or Lifemark, *see* Amended Complaint at ¶ 34, Defendants are alleged to have worked together and conspiratorially to commit fraud. *Id.* at Count III.

Even if the Defendants' actions did not constitute implicit affirmative misrepresentations, their failure to speak may be deemed fraudulent because they had a duty to disclose information to Transamerica. Contrary to Defendants' contention, there are numerous situations where a duty to disclose may arise. Rhode Island law has recognized a duty to disclose when a statute imposes such a duty, *see Stebbins v. Wells*, 818 A.2d 711, 717-18 (R.I. 2003), and when the circumstances surrounding the relationship between the parties, taken as a whole, suggest that the defendant had a duty to speak. *See Home Loan*, 255 A.2d at 167-68 ("[T]he law should afford no privilege to plaintiff who, . . . *in the circumstances of this* case, owed a duty to speak out….") (emphasis added); *see also Nisenzon*, 689 A.2d at 1045-47 (examining facts to determine if there was a duty to disclose); *Cardiovascular & Thoracic Assoc., Inc. v. Fingleton*, 1995 WL 941470, at *3 (R.I. Super. Aug 23, 1995) (same). According to the Restatement (Second) of Torts, circumstances give rise to a duty to disclose on the part of one party to a transaction when there are:

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them;

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading;

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so;

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) *facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other*, because of the relationship between them, the customs of the trade or other objective circumstances, *would reasonably expect a disclosure of those facts.*

§ 551(2) (emphasis added); *see generally Home Loan*, 255 A.2d at 167-68 (referring to Restatement principles in the context of the duty disclose); *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 31 (1st Cir. 2009) (applying Massachusetts law and citing the Restatement's "basic facts" standard).

It is sufficient for purposes of a motion to dismiss that the amended complaint alleges Defendants withheld facts basic to the annuity contract that Transamerica reasonably expected Defendants to disclose. *See* Restatement (Second) of Torts §551(2)(e)(1977). For instance, the amended complaint alleges that Defendants failed to disclose that the annuity contracts were completed by annuitants who were terminally ill and about to die – some within a matter of days – and that Defendants paid the annuitants to sign the paperwork in contravention of Rhode Island law. Amended Complaint, ¶ 39. These facts are basic to the annuity contracts offered by Transamerica because they are "assumed by the parties as a basis for the transaction itself," "go[]" to the basis, or essence, of the transaction," and form "an important part of the substance of what is bargained for or dealt with."[13] Restatement (Second) of Torts § 551, cmt. j (1977).

The imminent death of the annuitant is a basic fact. In the context of life insurance there is a duty to disclose the imminent death of the proposed insured. *See* 6 Couch on Insurance 3D § 84:1, at 84-5 ("An application for a life insurance policy . . . would ordinarily impose a duty to disclose the imminent death of one of the proposed insureds."); *see also Columbian Nat'l Life*

---

[13] *See, e.g.*, *In re Apte*, 96 F.3d 1319, 1324 (9th Cir. 1996) (lessee had a duty to disclose the basic fact that the lessor would not accept the provision insisted upon by the sublessee); *Viking Yacht Co. v. Composites One LLC*, 496 F. Supp. 2d 462, 472 (D. N.J. 2007) (certain test results regarding cracking of product was a basic fact in the sale of that product); *Television Events & Marketing, Inc. v. Amcon Distributing Co.*, 488 F. Supp. 2d 1071, 1081 (D. Haw. 2006) (fact that one party's negotiator was also an agent for the other party was a basic fact); *In re Adelphia Communications Corp.*, 331 B.R. 93, 100-01 (S.D.N.Y. 2005) (fact that converter boxes were unnecessary was a basic fact to a rental agreement); *Jersild v. Aker*, 766 F. Supp. 713, 719-20 (E.D. Wis. 1991) (insolvency of a corporation is a basic fact in a sale of corporate stock).

*Ins. Co. v. Indus. Trust Co.*, 166 A. 809, 812 (R.I. 1933) ("If [the insured] had been in a dying condition when the contract was accepted by the insurer, it does not seem—either on principle or authority—that the insurer would be bound by the contract.").  Similarly, in the context of an annuity contract where the owner has paid an additional premium for a "Double Enhanced Death Benefit," the imminent death of the annuitant is a critical part of what is bargained for. Accordingly, Defendants had a duty to disclose this basic fact just as they would in the context of life insurance.

The fact that the annuitant was paid to sign the annuity application is a basic fact, because the legality of a transaction "goes to the basis, or essence, of the transaction."  Restatement (Second) of Torts § 551 cmt. j (1977).  Rhode Island law prohibits the issuance of any life insurance contract in the absence of an insurable interest, *see* Section B, *supra*, or if the insured (Mr. Garvey), was paid to sign the application.  R.I. Gen Laws § 27-8-7.  Defendants had a duty to disclose the basic fact that the annuity agreements, entered into in violation of state law, did not comport with Transamerica's reasonable expectations of legality.  *See Golt*, 517 A.2d at 332.

As described in Section D(2)(ii), *supra*, Lifemark had a contractual duty to disclose that it was acting contrary to its contractual obligations.  Thus, not only was the information concealed from Transamerica "basic to the transaction," but it also was required to have been disclosed because of the close relationship between Transamerica and Lifemark.  *See* Restatement (Second) of Torts § 551(2)(d) (1977).

Moreover, the submission of the application with Mr. Garvey's signature conveyed the impression that he knew of the nature of the transaction and that the transaction was legal.  At a minimum, his signature was at least a "partial or ambiguous statement" of his knowledge of the terms of the annuity.  *See* Restatement (Second) of Torts § 551(2)(e).  Thus, in order to avoid

misleading Transamerica regarding Mr. Garvey's knowing and legal involvement in the arrangement, it was necessary for Defendants to speak up and explain the circumstances surrounding the application. *Id.*; *Tucker*, 57 A.2d at 193 ("Though [defendant] was telling the literal truth, he was really telling only a half-truth.").

Additionally, Maggiacomo specifically represented on the application that he had "made reasonable efforts to obtain information necessary…in making the annuity recommendation…." (Garvey Application, p. 12 of 12). Having told Transamerica about his alleged involvement in the application process, it was necessary for him to have disclosed the fact that he had absolutely no contact with Mr. Garvey. Otherwise, his statement to Transamerica was nothing more than a half-truth, upon which he was required to elaborate. *See* Restatement (Second) of Torts § 551(2)(e); *Tucker*, 57 A.2d at 193.

ii.     Defendants' duty to disclose was not relieved simply because Transamerica did not specifically inquire about the withheld facts.

The fact that Transamerica did not inquire about these issues is not fatal to the fraud claim alleged. Defendants assert that there is never a duty for an insured to disclose information if the insurer did not inquire about that information on the application. Caramadre Memorandum, pp. 10-15. As a statement of the law, it is wrong. While there is "*generally* . . . no duty where the application makes no specific inquires," this general rule "assume[s] that the insured or applicant does not have reason to know of the information's materiality apart from whether the insurer makes an inquiry." 6 Couch on Insurance 3D § 84:2, at 84-6 (emphasis added). If the insured does have reason to know of the information's materiality, the general rule would not apply. *Id.* Further undermining Defendants' overly broad statement of the law, the First Circuit construing Rhode Island law has held that the duty to disclose in the absence of inquiry varies depending on the type of insurance at issue. In *Commonwealth Land Title Ins. Co.*

*v. IDC Properties, Inc.*, an insured argued that there was "no obligation to disclose information to a prospective insurer unless specifically asked questions on the point." 547 F.3d 15, 22 (1st Cir. 2008). The First Circuit rejected this argument, noting that "[r]ules vary—even among different types of insurance—as to whether there is a duty to disclose material facts to an insurer absent a question." *Id.*; *see, e.g.*, *Albany Ins. Co. v. Wisniewski*, 579 F. Supp. 1004, 1014 (D. R.I. 1984) (noting that, in the context of marine insurance, "[t]he insured is bound, even absent inquiry, to reveal every fact within his knowledge which is material to the risk"). The court resolved the claim on other grounds, observing that "Rhode Island law may not provide a clear answer to that question as to policies of the kind here involved." *Id.* Accordingly, the First Circuit has made it clear that in Rhode Island there is no uniform rule that failure to inquire always precludes a finding of fraud.

The cases Defendants cite do not support their contentions. *Testa v. Norfolk & Dedham Mut. Fire Ins. Co.*, 764 A.2d 119 (R.I. 2001), cannot bear the weight that Defendants place on it. While the Court did find in *Testa* that, under the specific circumstances of that case, the insured had not made any misrepresentation regarding the garaging of his car in part because the insurer had not inquired as to that issue, *id.* at 121, the case cannot be read to stand for the broad proposition that failure to inquire *always* precludes a finding of a misrepresentation in the insurance context. *In re DiMartino*, 108 B.R. 394 (D.R.I. 1989), is no more conclusive. In that case, while the plaintiffs did not inquire as to the information allegedly concealed, they had either actual or constructive knowledge of the information. *Id.* at 400 (noting that the plaintiffs knew about one piece of information allegedly concealed from them and that another piece of information was specifically mentioned in documents available to the plaintiffs). Therefore, *In*

*re DiMartino* provides no more support for a uniform rule regarding the duty to disclose than does *Testa*.

Contrary to Defendants' contentions, the correct statement of the law is that "the law in some instances imposes a duty upon the insured to volunteer information, although not requested, and his or her failure so to do constitutes concealment." 6 Couch on Insurance 3D § 84:1, at 84-4; *see Putnam Res. v. Pateman*, 757 F. Supp. 157, 162 n.1 (D.R.I. 1991) (noting that "[f]raudulent concealment can make an insurance policy voidable even without inquiry concerning the concealed material facts by the insurer"). The fact that the Garvey Application did not specifically request the information withheld by Defendants did not obviate the Defendants' duty to disclose – and the failure to disclose is therefore actionable as fraud – for three reasons. First, Transamerica's reasonable expectations of Lifemark and Maggiacomo were set forth in the Agency Agreement and, thus, there was no need for Transamerica to re-tread the same ground every time an application was submitted. Second, Defendants had reason to know that the information they withheld was not only material to the transaction but was also basic thereto,[14] and no inquiry was needed to create a duty to disclose. *See* 6 Couch on Insurance 3D § 84:2, at 84-6 (noting duty to disclose if the applicant has reason to know of the information's materiality). Third, in light of the Double Enhanced Death Benefit, this is a type of contract where the general rule permitting nondisclosure does not apply, particularly with regard to the imminent death of the annuitants. *See* 6 Couch on Insurance 3D § 84:1, at 84-5 (noting that there is a duty to disclose the imminent death of a proposed insured in a life insurance contract); *Columbian Nat'l Life Ins. Co.*, 166 A. at 812.

---

[14] There can be no question but that the terminal illness of the proposed annuitants was not only a material, but the essential, component to Caramadre's scheme. Why else would he target only the terminally ill? *See* Complaint, Exhibit A, Flyer entitled "Program For The Terminally Ill."

In sum, as in *Paterra*, "the law should afford no privilege" to individuals "who . . . owed a duty to speak out and advise [the other party to the transaction] that what he apparently believed . . . was not in accord with the facts." *Paterra*, 255 A.2d at 168. The allegations in the complaint are sufficient to survive a motion to dismiss and Defendants have not shown that Transamerica's fraud claim fails as a matter of law. [15]

4.     The Amended Complaint States A Claim for Fraud Because It Alleges Justifiable Reliance on Material Misrepresentations and Omissions

Defendants' argument regarding justifiable reliance falls well short of showing that the amended complaint fails as a matter of law. The suggestion that Transamerica could not have justifiably relied on misrepresentations because Transamerica is a "sophisticated participant in the financial markets," and therefore presumably could have discovered the material omissions, is simply wrong. To so hold would be to prohibit all fraud claims by financial institutions against those who make material misrepresentations by omitting critical information. In turn, this would create an "open season" for opportunists and schemers such as Defendants to omit as much information as possible in their dealings with financial institutions in order to exploit those institutions' presumed ability to discover all material information at the inception of a contract. Further, Defendants' argument would essentially impose a *per se* requirement that, in the absence of an affirmative investigation, no fraud claim can be premised on a duty to disclose. This is illogical; every fraud case involving a duty to voluntarily disclose information arises specifically because the other party did not ask a particular question. To hold that there can

---

[15]  To the extent the Court deems Transamerica's allegations of fraud inadequate as a matter of law, Transamerica requests that the Court grant Transamerica leave to amend to plead with more specificity. The Court has permitted the Garvey deposition to proceed in connection with other matters. Transamerica anticipates more facts surrounding Caramadre's scheme will come to light in other depositions.

never be reasonable reliance without having posed a specific question or having conducted an independent investigation would effectively eliminate fraud claims based on material omissions.

Defendants' argument is not only contrary to sound reason, but is also contrary to established law. As the First Circuit has recognized, reliance may be presumed in fraud claims when the fraud claim is based on a material omission. *Wortley v. Camplin*, 333 F.3d 284, 295 (1st Cir. 2003) (citing *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001)). This is so even when the entity against whom the fraud is perpetrated is a sophisticated corporation. *See Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 747-78 (2d Cir. 1992) (noting presumption in an action by Litton Industries, a major corporation). This presumption is necessary because, when "the plaintiff is unaware of the omitted information, the record generally fails to provide a basis from which a finder of fact may evaluate how the plaintiff would have reacted if he or she had been aware of the withheld information." *Id.* at 748; *see also Capital Solutions, LLC v. Konica Minolta Bus. Sol. U.S.A.*, 2009 WL 1635894, at *6 (D. Kan. June 11, 2009) (noting the difficulties inherent in pleading with particularity the elements of fraud by omission).

Further, courts have found that reliance is also justifiable without an investigation. For instance, in *Janel World Trade, Ltd. v. World Logistics Svcs., Inc.*, the plaintiffs alleged common law fraud for failure to disclose a critical settlement agreement that would have affected their decision to purchase a company. 2009 WL 735072, at *1-4, 10 (S.D.N.Y. March 20, 2009). The court concluded that, "[e]ven if Plaintiffs' claims were based solely on omissions, when matters are held to be peculiarly within the defendant's knowledge, it is said that *the plaintiff may rely without prosecuting an investigation*, as he or she has no independent means of ascertaining the truth." *Id.* at *10 (emphasis added) (quotation marks and alterations omitted). Notably,

Defendants cite no Rhode Island or First Circuit cases stating that an insurer's failure to conduct an independent investigation of every application will always bar a fraud claim. Indeed, they cannot. As this Court has stated, "[f]raudulent concealment can make an insurance policy voidable even without inquiry concerning the concealed material facts by the insurer." *Pateman*, 757 F. Supp. at 162 n.1; *see, e.g.*, *Wisniewski*, 579 F. Supp. at 1014.

In this case, Transamerica properly alleged justifiable reliance. The amended complaint alleges that Transamerica relied on the representations made in the application in issuing the annuity. Amended Complaint, ¶¶ 37, 58. It also alleges that Transamerica was justified in doing so, given that the company must rely on a network of independent broker/dealers for the sale of the annuities. *Id.*, ¶20. The contract allegations of the complaint clearly outline the requirement imposed upon these broker/dealers. Transamerica reasonably expected that sub-agents would not be used, that annuitants would not receive kickbacks and that the products would be sold to satisfy clients' insurable interests. *Id.*, ¶¶ 62-66. It was justifiable for Transamerica to have relied on the expectation that the dealers/agents would comply with the contract and that, based on the agents' representations, there was nothing shady or illegal about the transaction. Accordingly, Defendants have not shown that the fraud claim must fail as a matter of law.[16] Rather, there are sufficient allegations to warrant further development of the facts underlying the fraud claim. *See Andrew Robinson Intern., Inc.*, 547 F.3d at 51.

### E. The Annuitant's Lack of Understanding Voids The Annuity

---

[16] Defendants' reliance on *Pharmacy Services, Inc. v. Swarovski North America, Ltd.*, 2006 WL 753055 (D.R.I. March 21, 2006), is inapposite. In that case, the plaintiff sued the defendant for failing to disclose at the time of contracting that it intended to terminate plaintiff as its dealer. The court granted summary judgment because the documents executed by the parties expressly permitted the defendant to terminate the contractual relationship. *Id.* at *4. Here, by contrast, Defendants avoided their contractual obligations. Certainly, such conduct was not in the express contemplation of Transamerica such that Transamerica could not reasonably rely on Defendants' representations.

The Garvey Policy is void and unenforceable because of fraud in the factum. *Rhode Island Depositors Econ. Prot. Corp. v. Bowen Court Assocs.*, 763 A.2d 1005, 1009 (R.I. 2001) (noting that fraud in the factum "renders the underlying contract void, not just voidable"). Fraud in the factum occurs when one party makes a "misrepresentation as to the nature of a writing that a person signs with neither knowledge nor reasonable opportunity to obtain knowledge of its character or essential terms." *Rhode Island Depositors Econ. Prot. Corp. v. Duguay*, 715 A.2d 1278, 1280 (R.I. 1998) (internal quotation marks omitted); *see generally* R.I. Gen. Laws § 6A-3-305 (summarizing the defense of fraud in the inducement with regard to payment of instruments). Accordingly, fraud in the factum exists if: 1) there was a misrepresentation, *Duguay*, 715 A.2d at 1280; 2) the contract was signed "without knowledge of its true nature or contents" or "without full knowledge of the character or essential terms," *Rhode Island Depositors Econ. Prot. Corp. v. Rignanese*, 714 A.2d 1190, 1196 (R.I. 1998) (internal quotation marks omitted); and 3) there was no reasonable opportunity to obtain knowledge of the true nature of the instrument, *Duguay*, 715 A.2d at 1280. *See generally FDIC v. Rusconi*, 808 F. Supp. 30, 40 (D. Me. 1992). On the last element, numerous factors may be taken into account, including age, education, the representations made and reasons to rely on them, the possibility of obtaining independent information, and the apparent necessity of acting without delay. *See Rignanese*, 714 A.2d at 1195; *see also Rusconi*, 808 F. Supp. at 40.

The facts as pled, which must be accepted as true and inferences therefrom construed in favor of Transamerica, make out each of the elements of fraud in the factum for purposes of a motion to dismiss. *See generally Capozza Tile Co., Inc. v. Joy*, 223 F. Supp. 2d 307, 317-19 (D. Me. 2002) (noting that there was sufficient evidence supporting the defense of fraud in the factum to avoid summary judgment). First, the complaint alleges that Defendants

misrepresented the nature of the documents presented to the annuitant.  Amended Complaint, ¶ 27.  Second, the annuitant was ignorant of the true nature, character, and essential terms of the contract.  *Id.*, ¶39; Garvey Declaration.  Finally, there was no reasonable opportunity to obtain knowledge regarding the contract.  Mr. Garvey was terminally ill and offered a significant sum of money to enter the contract; in essence, he was being offered the opportunity to meet a significant economic need in a time of great stress and difficulty.  *Id.*, ¶¶ 25-27.  Mr. Garvey faced considerable pressure to act without delay given his health and need for money.  Further, there was no ready source of independent information regarding the deal offered, given that all of the actors involved in the sale of the Garvey Policy were either complicit in or willing to overlook the unlawful nature of the dealings at issue.  *See generally Capozza Tile Co.*, at 319 (noting that lack of knowledge is excusable if the party "was not provided with a reasonable opportunity to obtain that knowledge before signing").  Under these circumstances neither Mr. Garvey nor the other putative annuitants ensnared in Caramadre's scheme could reasonably be expected to engage in the extensive investigation that would have been required to uncover Defendants' fraud.

This case presents facts that are even more egregious than the facts in *Operating Engineers Pension Trust v. Gilliam*, 737 F.2d 1501 (9th Cir. 1984), or *Capozza Tile Co.*, at 317-19, both of which involved a valid fraud in the factum defense.  In *Operating Engineers*, an individual named Gilliam told a union representative, Watson, that he wished to become a member of the union as an owner-operator.  Watson produced a number of forms for Gilliam, but did not inform him of the fact that one of the documents was a collective bargaining agreement.  *Id.* at 1503-04.  Gilliam signed the documents based on Watson's representations that the forms were those signed by owner-operators.  *Id.* at 1504.  The court held that Gilliam reasonably and

justifiably thought the documents were what Watson had represented them to be, and concluded that he did not create a binding collective bargaining agreement by signing the documents. *See id.* at 1505. Similarly, in *Capozza Tile Co.*, Capozza signed a one-page document – a signature page – without seeing the rest of the agreement. 223 F. Supp. 2d at 317-18. Rather, Capozza relied on the false assurances of the other party. *Id.* Even though Capozza could have requested a full copy of the agreement, the court concluded that there was a question of fact as to whether Capozza was provided with a reasonable opportunity to obtain knowledge regarding the agreement prior to signing. *Id.* at 318-19. Accordingly, the court found that there were sufficient allegations to survive summary judgment with regard to the defense of fraud in the factum. *Id.* at 319.

Given the facts of *Operating Engineers* and *Capozza Tile*, it is apparent that the Garvey Policy is void. The putative annuitant was far more vulnerable than the individuals in *Operating Engineers* or *Capozza Tile*. Defendants were engaging in a concerted attempt to deceive a vulnerable class of citizens, taking advantage of the difficult circumstances facing the putative annuitants to lure them through misrepresentations into signing a document without revealing its true nature. Mr. Garvey "reasonably and justifiably" relied on Defendants' representation that the documents were something entirely different than what they were. Under circumstances such as these, the rule that a party who signs a written agreement is generally bound by its terms regardless of whether he has read it, *Carlsten v. Oscar Gruss & Son, Inc.,* 853 A.2d 1191, 1195 (R.I. 2004), "is qualified by the principle that he who signs a document reasonably believing it is something quite different than it is cannot be bound to the terms of the document," *Operating Engineers*, 737 F.2d at 1504. Accordingly, the Garvey Policy is void and unenforceable. In this case, without knowledge of the essential nature of the contract signed, there was "no effective

manifestation of assent and no contract at all." Restatement (Second) of Contracts § 163 cmt. a (1981); *see Hart Engineering Co. v. FMC Corp.*, 593 F. Supp. 1471, 1478 (D.R.I. 1984) (noting that a meeting of the minds is a prerequisite to the formation of a contract).

### F. Transamerica's Allegations of Breach of Contract are Sufficiently Specific

Transamerica's breach of contract count, Count IV, sufficiently alleges the requisite elements of a cause of action for breach of contract. *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 193-95 (1st Cir. 1996); 17B C.J.S. Contracts § 640. To prevail on a claim for breach of contract, Transamerica must prove the existence of a binding contract, breach by Lifemark, and resulting damages. *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2nd Cir. 1994).[17]

The liberalized notice pleading standards apply to claims for breach of contract. *Bissessur v. Indiana University Bd. of Trustees*, 581 F.3d 599, 603 (7th Cir. 2009) (noting that "*Twombly* and its progeny do not change this fact"). "A defendant is owed 'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)); *Western Kentucky Coca-Cola Bottling Co., Inc. v. Red Bull North America, Inc.*, No. 1:08CV-56R, 2008 WL 2548095, *2 (W.D.Ky. 2008) (refusing to dismiss contract claim under the "fair notice" standard of *Twombly*). A complaint provides "fair notice" of the basis of the breach claim if it describes, for example, the relevant terms of the contract, the obligations that were imposed on the parties, the nature of the breach and damages attributable to the breach. *See Doyle,* 103 F.3d at 195; *Bissessur*, 581 F.3d at 603. In other words, a complaint should not be dismissed if it provides sufficient facts to put the defendant on notice of the basis for the contract claim. *Id.*; 17B C.J.S. Contracts § 651 ("[A]ll that is required is that the breach complained of be substantially set forth and that the adverse party be afforded reasonable notice

---

[17] The Agent Agreement contains a New York choice of law provision.

of the matter relied on against him or her.").  The complaint provides detailed notice of the basis

of Transamerica's breach of contract claim.

Transamerica has alleged that the Agent Agreement is a valid and binding agreement.

*See* Amended Complaint ¶ 61 (alleging that the parties entered the Agent Agreement in 1997 and

that it "govern[ed] the relationship, rights, and responsibilities of Transamerica and Lifemark")

and ¶¶ 62-66 (outlining the "obligations" that Lifemark breached).  Further, the amended

complaint carefully outlines the specific conduct that constitutes Lifemark's breach.

Transamerica's contract claim arises out of Lifemark's failure to supervise and train

Maggiacomo as it was required to do.  For example:

- The complaint alleges that Lifemark was obligated to supervise its agents, such as
  Maggiacomo, and make sure that only its licensed agents offered and sold
  Transamerica's products.  Amended Complaint ¶ 64; Agent Agreement, part 2.
  Radhakrishnan and Caramadre (who were not authorized to sell Transamerica's products)
  did the legwork to sell the Policies.  *Id.* ¶¶ 16-28.  Lifemark's failure to supervise
  Maggiacomo's activities and prevent him from coordinating to use unlicensed and
  inappropriate sub-agents to sell Transamerica's products constitutes a breach of
  Lifemark's duties under the Agent Agreement.  *Id.* ¶ 64.

- The complaint alleges that Lifemark is obligated to indemnify Transamerica for any
  claims, damages, expenses, liabilities and causes of action arising out of any of
  Lifemark's agent's (Maggiacomo) negligence, fraud and other improper/illegal acts in
  connection with the sale of Transamerica's products (i.e., the Policies).  Amended
  Complaint. ¶ 66; Agent Agreement, part 7.  The amended complaint alleges that one of
  Lifemark's agents, Maggiacomo, engaged in conduct sufficient to trigger Lifemark's duty

to indemnify.  *See* Amended Complaint. Counts I, III, IV, V,  VII -X.  Specifically,

Transamerica alleges that Maggiacomo's negligence (independently or in concert with

Radhakrishnan and Caramadre) led directly to the sale of the Policies.  *Id.* Count X.[18]

Transamerica further alleges that Maggiacomo's fraudulent and criminal conduct resulted

in the issuance of the annuity.  *See id.* Counts III & VII; Section D, *supra* (addressing the

adequacy of Transamerica's "fraud" pleading); Section K, *infra* (addressing the adequacy

of Transamerica's "criminal acts" pleading).  Transamerica also alleges that Maggiacomo

participated in a scheme that resulted in the payment of money to the Annuitants in return

for their agreement to sign the annuity applications.  *See, id.* Count IV; *see e.g.*, *id.* ¶¶ 24,

25. This scheme constitutes a direct violation of Rhode Island's anti-rebating statute, R.I.

Gen. Laws § 27-8-7 (prohibiting the payment of any consideration to a person as an

inducement to enter an insurance agreement), and the contractual prohibition against

paying individuals to enter contracts, Dealer Agreement, parts 3(g) and (h).

• The complaint alleges that Lifemark was obligated to follow and enforce the

Ethics Code.  Amended Complaint ¶ 63; Ethics Code.  The Ethics Code, like part 2 of the

Agent Agreement (prohibiting wagering on human life), reflects that Transamerica's

products, such as the Policies, should only be sold to meet its customers "insurable

needs."  *Id.*  Lifemark's failure to take any steps to monitor, train and supervise

Maggiacomo to make sure that he did not participate in a scheme that contravenes Rhode

---

[18] Defendants' assertion of the economic loss doctrine is irrelevant to the question of whether
Lifemark breached its duty to indemnify Transamerica for economic losses caused by
Maggiacomo's negligence.  First, as described in Section J, *infra*,  the economic loss doctrine
does not bar Transamerica's negligence claims.  Second, and more importantly, the doctrine only
provides that in certain situations, economic losses can not be *recovered* under a tort theory.  The
doctrine does not mean that a person can never be deemed to have *been* negligent, which is a
predicate for Lifemark's contractual duty to indemnify.

Island's insurable interest requirements constitutes a breach of Lifemark's contractual obligations. *Id.* ¶¶ 62 - 65 and Section B, *supra* (discussing the insurable interest requirement). In further violation of the Code, Lifemark failed to ensure that Transamerica's products were sold in accordance with Rhode Island's laws and regulations, including its anti-rebating and insurance fraud statutes. *See id.* Count IV; R.I. Gen Laws §§ 27-8-7 and 11-41-29; Amended Complaint ¶¶ 27, 28, 64, 65.

A review of the amended complaint reveals that Transamerica has fully and properly alleged the basis of its contract claim against Lifemark. Lifemark has knowledge of the Transamerica's position regarding the relevant terms and obligations imposed on Lifemark. It has knowledge of the nature of its conduct that Transamerica contends constitutes Lifemark's breach. And Transamerica has alleged precisely how it was damaged as a result of Lifemark's failure to honor its contractual commitments. *Id.* ¶¶ 67-68. Because the amended complaint provides "fair notice" of the basis of Transamerica's contract claim, Count IV should not be dismissed before Transamerica even has the opportunity to conduct discovery. *See Bissessur*, 581 F.3d at 603.

### G. Maggiacomo and Lifemark Breached Duties Owed To Transamerica

1. <u>Maggiacomo and Lifemark Owed Independent Duties to Transamerica</u>

Defendants Maggiacomo and Lifemark having accepted a $21,700.00 commission on the sale of the Garvey Policy, now claim they had no duty to investigate the sale, vet the application or report to Transamerica that the owner / beneficiary had no insurable interest in the annuitant and no intention of using the annuity in the manner intended. Maggiacomo's and Lifemark's attempts to disclaim their duties to Transamerica are unavailing. The Agent Agreement was signed, and Maggiacomo was retained, for the specific purpose of soliciting applications on

behal of Transamerica. The nature of Maggiacomo's and Lifemark's responsibilities gives rise to their role as "soliciting agents" for Transamerica and, thus, they were cloaked with the duties attendant to that role.

Immediately above Maggiacomo's signature on the annuity application is his representation and warranty to Transamerica:

I HAVE MADE REASONABLE EFFORTS TO OBTAIN INFORMATION CONCERNING THE CONSUMER'S FINANCIAL STATUS, TAX STATUS, INVESTMENT OBJECTIVES AND SUCH OTHER INFORMATION USED OR CONSIDERED TO BE REASONABLE IN MAKING THE ANNUITY RECOMMENDATION AND FIND THE ANNUITY BEING APPLIED FOR APPROPRIATE FOR HIS/HER NEEDS.

(Garvey Application, p. 12 of 12)

At a minimum the quoted language imposes a duty on Maggiacomo, and his employer, Lifemark, to investigate the suitability of this annuity for the proposed consumer and make a recommendation regarding whether the annuity is appropriate for his or her needs. And there is no dispute that Maggiacomo served as a "Registered Representative / Licensed Agent" employed by Lifemark. *See* Garvey Application, p. 10 of 10.

The Agent Agreement further contemplates that Lifemark's registered representatives will, for a commission to be paid by Transamerica, solicit applications and forward them to Transamerica for it to determine if the application should be accepted. Lifemark and its representatives also have a duty to receive and promptly forward all premium payments to Transamerica. *See*, *generally,* Agent Agreement.

One who acts in this capacity is a "soliciting agent."[19]  Couch on Insurance 3D §45:23 (2007); *Kenney Mfg. Co. v. Starkweather & Shepley, Inc.*, 643 A.2d 203, 209 (R.I. 1994). A

soliting agent is considered an agent of the insurer.[20]  *Id.*; *Ginocchio v. Am. Bankers Life Assur. Co. of Florida*, 889 F. Supp. 1078, 1082 n.4 (N.D. Ill. 1995); *Marie Deonier & Assoc. v. Paul Revere Life Ins. Co.*, 301 Mont. 347, 9 P.3d 622, 633-34 (2000); *Clements v. Ohio State Life Ins. Co.*, 514 N.E.2d 876, 881-82, 33 Ohio App. 3d 80, 84-85 (Ohio Ct. App. 1986)..  And the law imposes high duties of fidelity and loyalty on agents with respect to their principals:

> The relationship existing between an insurance company and its agents is fiduciary, and, generally speaking, it may be said that they must exercise good faith and reasonable diligence in discharging the duties and trusts owed their principal and imposed upon them by their agency, this being especially true when their instructions are not specific, but clothe them with discretion….  In all transactions affecting the subject matter of the agency, it is the duty of the agent to act with utmost good faith and loyalty.  In accepting the agency, the agent impliedly, if not expressly, undertakes to give his or her principal his or her best judgment and decisions.

Couch on Insurance 3D §54:2 (1996).

The annuity prospectus, appended to the complaint as Exhibit B, describes the intended use of the variable annuity contract clearly: "A variable annuity is a long-term financial vehicle designed for retirement."  In this case, one must ask how an annuity, sold using a terminally ill annuitant to an unrelated LLC, could possibly be suitable as a "long term financial vehicle designed for retirement purposes"?  How could an agent, properly trained and supervised, possibly recommend a "long term financial vehicle designed for retirement purposes" to an LLC, using an unrelated terminally ill annuitant?  The most likely answer, and the answer

---

[20]  Defendants claim that Maggiacomo acted as an agent for Ms. Rodrigues (Caramadre Memorandum at 20).  If their contention is to be credited at all, it creates an issue of fact that cannot be resolved on a motion to dismiss. *See, e.g., Bostic v. Dalton*, 158 S.W. 3d 347, 351 (Tenn. 2005)("[T]he existence of an agency relationship is a question of fact under the circumstances of a particular case…."); *Wallace v. Frontier Bank, N.A.*, 903 So. 2d 792, 801 (Ala. 2004)("A summary judgment on the issue of agency is generally inappropriate because agency is a question of fact….").  The Court must, at this juncture, draw all reasonable inferences in favor of Transamerica.  *See* Section IIA, *supra*.

Transamerica believes will be borne out in discovery is that Caramadre's long time colleague, friend and business partner Edward Maggiacomo, in fact made no investigation or *bona fide* recommendation that this annuity would be suitable for any legitimate use. He simply did not perform the duties he warranted in signing the application.

The Agent Agreement also imposes explicit duties on Maggiacomo's employer, Lifemark. Lifemark was obligated to:

- use and supervise its agents in selling Transamerica's products, such as annuity policies, *see* Amended Complaint ¶ 62; Agent Agreement, Part 2;

- ensure that [Transamerica's products] are offered, sold and serviced only by its agents, who will comply "with all applicable laws and regulations," not through third parties or sub-agents, *see id.* ¶¶ 63, 64; Agent Agreement, parts 3 and 4

- "indemnify and hold harmless . . . [Transamerica] with respect to any and all losses, damages, claims or expenses (including reasonable attorneys' fees) which [Transamerica] may incur arising from or in connection with [Lifemark's] performance, non-performance and/or breach of any warranty, representation or other provision of this Agreement or any unlawful acts or practices by [Lifemark] involving" the annuities, *see id.* ¶ 66; Agent Agreement, part 7;

- abide by and enforce the principles set forth in the Code of Ethics, which provides, among other things, that the sale of insurance products should be conducted "according to the high standards of honesty and fairness. . . ." The Code further provides that Lifemark should expend reasonable efforts to "determine the **insurable** needs or financial objectives of its customers." *Id.* ¶ 63 (emphasis added). The Code additionally provides that Transamerica's products

should be marketed and sold in compliance "with applicable laws and regulations," *id.*; and

- "maintain a system of supervision" over its agents to ensure compliance with the Ethics Code, *id.*

Transamerica has alleged, and the facts demonstrate, that Maggiacomo and Lifemark breached their duties to Transamerica. The facts suggest that Maggiacomo did not sell the annuity contract at all. He simply signed as instructed. The application was orchestrated, and the signatures collected, by Caramadre, Radhakrishnan and Estate Planning Resources, Inc. – none of whom are licensed to sell annuity products for Transamerica. Mr. Garvey was paid $5,000 to sign the application, in violation of R.I. Gen. Laws § 27-4-6. Maggiacomo provided Caramadre and Radhakrishnan with the application forms in violation of Part 3(e) of the Agent Agreement. Further, Maggiacomo failed to report Ms. Rodrigues's lack of insurable interest in Mr. Garvey, failed to report that the annuity was in fact being used in a manner completely inconsistent with its intended use, failed to report that the proposed annuitant signed the application with no knowledge or appreciation of what he was being asked to sign and failed to report that the solicitation of the application was done in violation of state law. Maggiacomo and his employer, Lifemark, received a handsome commission under Caramadre's scheme simply by agreeing to turn a blind eye to the transaction. They cannot now, with any degree of credibility, claim they owed no duty to Transamerica in connection with the solicitation and application of the Garvey Policy.

2.  Lifemark is Vicariously Liable for The Actions of its Agents

It is undisputable that Lifemark can be liable for false or misleading misrepresentations or omissions made by its agents: "a principal may be vicariously liable for the acts of its agent

pertaining to breach of contract, fraud, conversion and certain violations of RICO." *Carlsten v.*
*The Widecom Group, Inc.*, P.C. No. 97-1425, 2003 WL 21688263, at *11 (R.I. Super. July 1,
2003). *See also Savers Property and Cas. Ins. Co. v. Admiral Ins. Agency, Inc.*, 61 Mass. App.
Ct. 158, 807 N.E.2d 842, 850 (Mass. App. Ct. 2004) ("A principal may be held liable for the
tortious conduct of its agent, even where the principal has no knowledge of the agent's
fraudulent scheme."). To establish that a principal is vicariously liable for the acts of its agent,
"the agent must have acted with actual authority, apparent authority or within the agent's
inherent powers." *Carlsten*, 2003 WL 21688263, at *11. Lifemark does not dispute that
Maggiacomo was acting within his actual or apparent authority in submitting the Garvey
application. Rather, Lifemark argues that the amended complaint "fails to aver the who, what,
where, and when of [Lifemark's] false or misleading misrepresentations or omissions."
Lifemark Memorandum at 10. As previously noted, because of the practical difficulties in
pleading fraud by silence caused by the nature of the act, the required threshold is lowered under
Rule 9(b), and a plaintiff must only "plead with specificity the material facts that it claims the
defendant wrongfully failed to disclose" along with "the general time period during which the
facts were withheld." *Capital Solutions,* 2009 WL 1635894, at *6. These basic facts have been
established in the Amended Complaint.

Assuming, *arguendo*, that other members of Lifemark did not know about the misleading
misrepresentations and material omissions contained in the application, it is nonetheless
vicariously liable for the acts of its agent, Maggiacomo. *See New England Acc. Corp. v.*
*American Mfrs. Mut. Ins. Co.*, 373 Mass. 594, 368 N.E.2d 1385 (1977). *New England*
*Acceptance* involved an action to recover $35,718.76 paid by the plaintiff, an insurance premium
finance company, to two insurance agents, the brothers Ducott. The question before the court

was whether the defendant companies, which knew nothing of the Ducotts' frauds and revoked their agency agreements after learning of them, were similarly liable to the plaintiff for its losses.

The court found that the defendant insurance companies were liable as a matter of law as principals for the conduct of their agents, even though they did not know of the agents' fraudulent scheme. *Id.* at 1387. The court cited to the rationale explained by Judge Armstrong in the underlying case. *Id.* In the earlier decision, Judge Armstrong found that the agents were acting within the scope of their agency when they "perpetrated their sequence of frauds upon the plaintiff." *New England Acc. Corp. v. American Mfrs. Mut. Ins. Co.*, 4 Mass. App. Ct. 172, 344 N.E.2d 208, 214 (1976). Judge Armstrong continued, stating: "Having put the [agents] in a position to commit the fraud while apparently acting for the companies, the companies are liable to the plaintiff for the losses sustained thereby." *Id.* Finally, "[s]uch liability attaches without regard to whether the companies received any benefit from the transactions and regardless of the fact that the Ducotts were acting entirely for their own purposes in selling the fraudulent notes."[21] *Id.* In this case, even if Lifemark was not aware of Maggiacomo's ongoing participation in Caramadre's scheme, it is still vicariously liable for all damages suffered by Transamerica.

### H. Transamerica Has Adequately Alleged A Breach of the Duty of Good Faith and Fair Dealing

Lifemark contends that the Amended Complaint fails to sufficiently allege a breach of the duty of good faith and fair dealings because there are inadequate allegations of an underlying

---

[21] Judge Armstrong explained the decision in part by noting that Ducott brothers were the duly licensed insurance agents of the defendant companies, which had applied for such licenses from the Commissioner of Insurance and which had "vouched for the character of the Ducotts in so doing." *Id.* at 210.

breach of contract. Lifemark memo, p. 7-8. As discussed in section F, however, Transamerica has stated a claim for breach.

Moreover, Transamerica's bad faith claim focuses on the manner of Lifemark's performance. The secretive conduct of Lifemark's agent, Maggiacomo, constitutes a breach of a Lifemark's duty of good faith. "Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty." Restatement (Second) of Contracts § 205 cmt. D.

## I. The Amended Complaint States a Claim For Unjust Enrichment

In order to recover for unjust enrichment, a plaintiff must prove three elements: "(1) a benefit must be conferred upon the defendant by the plaintiff, (2) there must be appreciation by the defendant of such benefit, and (3) there must be an acceptance of such benefit in such circumstances that it would be inequitable for a defendant to retain the benefit without paying the value thereof." *Bouchard v. Price*, 694 A.2d 670, 673 (R.I. 1997) (internal quotation marks omitted); *see APG, Inc. v. MCI Telecommunications Corp.*, 436 F.3d 294, 305 (1st Cir. 2006); *Narragansett Elec. Co. v. Carbone*, 898 A.2d 87, 99 (R.I. 2006). Of these elements, "[t]he most significant . . . is that the enrichment to the defendant be unjust." *R & B Elec. Co., Inc. v. Amco Const. Co., Inc.*, 471 A.2d 1351, 1356 (R.I. 1984).

All three elements have been shown here. It is undisputed that Lifemark / Maggiacomo received a benefit, which was fully appreciated, when the commissions for the sale of the annuities were paid. Amended Complaint, ¶ 38. Additionally, the amended complaint states that retention of this significant benefit would be inequitable. *Id.*, ¶ 85. It would be inequitable for Lifemark / Maggiacomo to retain the commissions for the annuity policies because, as discussed

in Section B and D *supra*, the policies are void and were fraudulently obtained.  Further, even if there were no fraud, Lifemark / Maggiacomo breached their obligations to Transamerica and it would be inequitable to permit them to retain the commissions obtained as a result of that breach.  *See Hasbro, Inc. v. Mikohn Gaming Corp.*, C.A. No. 05-106/S, 2006 WL 2035501, 8 (D.R.I. 2006) (declining to dismiss a claim for unjust enrichment because "the Rhode Island Supreme Court has approved of parties proceeding to trial with alternate claims for breach of contract and unjust enrichment").  In short, it would be "'contrary to equity and good conscience for [Defendants] to retain a benefit that has come to [them] at the expense of another.'"  *R.I. Bd. of Corr. Officers v. Rhode Island*, 264 F. Supp. 2d 87, 105 (D.R.I. 2003) (quoting *Merchants Mut. Ins. Co. v. Newport Hosp.*, 272 A.2d 329, 332 (R.I. 1971)).

### J. The Economic Loss Doctrine Does Not Bar The Tort Claims Alleged

Contrary to Defendants' contention, the economic loss doctrine does not preclude a negligence cause of action in this case.  As a general matter, "[t]he economic loss doctrine provides that 'a plaintiff is precluded from recovering purely economic losses in a negligence cause of action.'"  *Franklin Grove Corp. v. Drexel*, 936 A.2d 1272, 1275 (R.I. 2007) (quoting *Boston Invest. Prop. # 1 State v. E.W. Burman, Inc.*, 658 A.2d 515, 517 (R.I. 1995)); *see Gail Frances, Inc. v. Alaska Diesel Electric, Inc.*, 62 F. Supp. 2d 511, 517 (D.R.I. 1999).   This general rule is premised on the notion that some commercial transactions are more appropriately dealt with through the law of contract rather than the law of tort.  *Drexel*, 936 A.2d at 1275; *see E.W. Burman*, 658 A.2d at 517-18.  However, Rhode Island has never extended the economic loss doctrine to the context of service contracts, *Robertson Stephens, Inc. v. Chubb Corp.*, 473 F. Supp. 2d 265, 280 n.10 (D.R.I. 2007), and has expressly "recognized some limitations" to the economic loss doctrine, *Drexel*, 936 A.2d at 1276.  The economic loss doctrine does not bar the

negligence claim in this case because it arises in the service contract context and, alternatively, because the claim falls within an exception to the economic loss doctrine.

1.     <u>The Economic Loss Doctrine Does Not Apply To Service Contracts Because Rhode Island Has Never Extended, and Is Unlikely to Extend, the Doctrine Beyond the Construction and Product Liability Contexts</u>.

As this Court recently recognized, "[i]t is unclear whether, under Rhode Island law, the economic-loss rule would extend to service providers." *Robertson Stephens, Inc.*, at 280 n.10. Neither the Rhode Island Supreme Court nor this Court has ever applied Rhode Island's economic loss doctrine outside the context of product liability or construction. *See Drexel*, 936 A.2d at 1273-74, 1277-78 (applying the economic loss doctrine to bar a claim against a construction contractor); *E.W. Burman, Inc.*, 658 A.2d at 518 (same); *Hart Eng'g Co. v. FMC Corp.*, 593 F. Supp. 1471 (D.R.I. 1984) (applying Rhode Island law to bar a negligence claim for a defective product). This Court should not adopt for the first time[22] a far-reaching expansion of the economic loss doctrine in the absence of controlling Rhode Island law applying the doctrine outside its original context.[23] *See Veilleux v. Nat'l Broadcasting Co.*, 206 F.3d 92, 131 (1st Cir.

---

[22] This Court did not apply Rhode Island's economic loss doctrine in *Robertson Stephens, Inc.*, but rather expressly noted that it was not applying the doctrine. 473 F. Supp. 2d at 280 n.10.

[23] One unpublished Rhode Island Superior Court decision applied the economic loss doctrine outside the product liability and construction contexts. *Triton Realty Ltd. P'ship v. Almeida*, 2006 WL 2089255, at *1-3 (R.I. Super. July 25, 2006) (unpublished) (applying the economic loss doctrine in the context of a claim by a realty company against an insurance brokerage corporation for negligent failure to add the realty company as an insured). However, such an unpublished opinion "does not rise to the level of persuasive, let alone binding, precedential authority" and should not provide the basis for this Court's "interpretation of existing [Rhode Island] law." *Dayton v. Peck, Stow and Wilcox Co.*, 739 F.2d 690, 694 n.5 (1st Cir. 1984). This is particularly true given that the court in *Triton Realty* failed to expressly consider whether the economic loss doctrine applies to service contracts. In contrast, the Rhode Island Superior Court opinion that did expressly consider this question ultimately did not apply the economic loss doctrine, concluding that the defendant bank owed a duty to the plaintiff – its client – that was "independent" of any contract and could therefore be liable in negligence for purely economic damages. *Ciccone v. Pitassi*, 2004 WL 2075120, at *6-7 (R.I. Super. Aug. 13, 2004)

2000) (expressing reluctance, as a federal court, to expand a state law doctrine); *Dayton v. Peck, Stow and Wilcox Co.*, 739 F.2d 690, 694-95 (1st Cir. 1984) (noting that a federal court sitting in diversity jurisdiction should "apply the law of the forum as [the court] infer[s] it presently to be, not as it might come to be").

This Court should be especially reluctant to expand Rhode Island's economic loss doctrine in light of the substantial disagreement among courts regarding the proper extent of the doctrine. While some courts have extended the doctrine to service contracts, *see, e.g.*, *Grynberg v. Agri Tech, Inc.*, 10 P.3d 1267 (Colo. 2000), others have expressly refused to do so, *see, e.g.*, *Ins. Co. of N. Am. v. Cease Elec. Inc.*, 688 N.W.2d 462 (Wis. 2004). According to *Cease Electric*, extending the economic loss doctrine to service contracts would not further the goals of the doctrine, namely: 1) maintenance of the distinction between tort and contract law; 2) protection of parties' freedom to allocate economic risk by contract; and 3) encouragement of the party best situated to assess the risk of economic to allocate that risk. *Cease Elec.*, 688 N.W.2d at 470. First, contract law is not better suited to deal with negligently provided services because, unlike sales of goods, there is no comprehensive body of statutory law, such as the U.C.C., that provides built-in warranty provisions. *Id.* at 469-70. There is, accordingly, no well-developed body of contract law that would be undermined by the application of tort law in the service context. *Id.* Second, there is no need to protect the parties' freedom to allocate economic risk by contract in the services context because parties to service contracts rarely pre-negotiate such risks. *Id.* at 470-71. Finally, the presupposition that the parties are in an equal bargaining position to deal with the allocation of risk in service contracts is often faulty. *Id.* at 471. In the

---

(unpublished). Accordingly, this Court properly acknowledged the fact that Rhode Island had never extended the economic loss doctrine to the services context after both of these decisions issued. *Robertson Stephens, Inc.*, 473 F. Supp. 2d at 280 n.10.

absence of a compelling reason to extend the doctrine, it is unsurprising that many courts have expressly limited the doctrine to U.C.C. sale-of-goods cases. *See AKV Auto Transport, Inc. v. Syosset Truck Sales, Inc.*, 806 N.Y.S.2d 254, 255-56 (N.Y.A.D. 2005); *Diamond Surface, Inc. v. State Cement Plant Comm'n*, 583 N.W.2d 155, 161 (S.D. 1998); *Runde v. Vigus Realty, Inc.*, 617 N.E.2d 572, 575 (Ind. App. 1993); *Niebarger v. Univ. Coops, Inc.*, 486 N.W.2d 612, 618-22 (Mich. 1992); *McCarthy Well Co. v. St. Peter Creamery, Inc.*, 410 N.W.2d 312, 314-15 (Minn. 1987).

Not only have many states refused to extend the economic loss doctrine to service contracts, but Rhode Island's case law suggests that it would likely join these states in restricting the scope of the doctrine. The Rhode Island Supreme Court's economic loss cases are consistent with the approach in *Cease Electric*. In *Drexel*, the Court noted that the primary rationale for the economic loss doctrine is that "commercial transactions are more appropriately suited to resolution through the law of contract, than through the law of tort." *Drexel*, 936 A.2d at 1275. Accordingly, it observed that "'it is appropriate for sophisticated commercial entities to utilize contract law to protect themselves from economic damages.'" *Id.* (quoting *E.W. Burman*, 658 A.2d at 517). In other words, the court has relied upon the first two "goals" of the doctrine identified by *Cease Electric* as its motivating principles in applying the doctrine – protecting the distinction between contract and tort and protecting the freedom to allocate risk. Because neither of these goals would be furthered by applying the doctrine to the service context, *Cease Elec.*, 688 N.W.2d at 469-71, it follows that the Rhode Island Supreme Court would refuse to extend the economic loss doctrine beyond its prior applications. Indeed, it has already refused to apply the economic loss doctrine when doing so would not further the third "goal" identified by *Cease Electric* – efficient allocation of risk – because the parties are of unequal bargaining power. *See*

*Rousseau v. K.N. Constr., Inc.*, 727 A.2d 190, 193 (R.I. 1999) (refusing to apply the economic loss doctrine to consumer transactions because of the disparity in bargaining power between the parties).

Accordingly, this Court should not radically extend the scope of the economic loss doctrine under Rhode Island law by applying it to negligence claims arising in the context of service contracts. Such an extension would be inconsistent with the reasoning adopted by the Rhode Island Supreme Court in *Drexel*, 936 A.2d at 1275-76, and *E.W. Burman*, 658 A.2d at 517-18. Because this case involves a service contract rather than a contract for the sale of goods or construction, the economic loss doctrine does not apply and the complaint states a valid claim for negligence.

2.    <u>The Economic Loss Doctrine Does Not Apply When There Is a Duty of Care Independent of Contractual Duties.</u>

This Court can and should recognize that the complaint states a valid claim for negligence because the economic loss doctrine does not apply to service contracts. However, even if this Court concludes that the economic loss doctrine does apply to service contracts, the complaint still states a valid claim for negligence. Rhode Island courts have "recognized some limitations" on the economic loss doctrine. *Drexel*, 936 A.2d at 1276. For instance, the economic loss doctrine is limited to commercial transactions, and does not apply to consumer transactions. *See id.*; *Rousseau*, 727 A.2d at 193. Further, the economic loss doctrine will not apply if there is a close economic relationship that gives rise to a duty independent of the duties imposed by contract. *See Richmond Square Capital Corp. v. Mittleman*, 773 A.2d 882, 886-87 (R.I. 2001) (recognizing that attorneys may be liable for the economic losses of their clients); *Estate of Braswell v. People's Credit Union*, 602 A.2d 510, 512 (R.I. 1992) (recognizing that, under the tort of negligent misrepresentation, those who provide information for the reliance of

others may be liable for economic losses); *Forte Bros. Inc. v. Nat'l Amusements, Inc.*, 525 A.2d 1301, 1302-03 (R.I. 1987) (recognizing that an architect may be liable to a general contractor for economic losses because of their close "economic relationship and community of interest"). It is this latter exception which permits a negligence claim here.

This exception for duties that are independent of the contract follows from the rationale underlying the economic loss doctrine. Because the economic loss doctrine functions to preserve the integrity of contracts by preventing tort law from subsuming contract law, *see Drexel*, 936 A.2d at 1275-76 (noting that contract principles are best suited for resolving claims that could be addressed in an agreement); *see also Indemnity Ins. Co. v. Am. Aviation, Inc.*, 891 So.2d 532, 537 (Fla. 2004) (same), there is no need to apply the economic loss doctrine to bar claims that stem from an independent duty to protect against economic harm. *See Am. Aviation, Inc.*, 891 So.2d at 537 ("The economic loss rule has not eliminated causes of action based upon torts independent of the contractual breach even though there exists a breach of contract action. Where a contract exists, a tort action will lie for either intentional or negligent acts considered to be independent from the acts that breached the contract." (internal quotation marks omitted)). Indeed, barring claims for such special duties would endanger well-accepted torts recognized in Rhode Island – such as negligent misrepresentation[24] – that are designed specifically to remedy purely economic losses.

As the amended complaint alleges, Maggiacomo and Lifemark owed a duty to Transamerica and it was reasonably foreseeable that Transamerica would suffer financial harm.

---

[24] The prediction in *Gail Frances, Inc.*, 62 F. Supp.2d at 518, that Rhode Island's economic loss doctrine bars negligent misrepresentation claims cannot extend beyond product liability cases in light of the many cases recognizing negligent misrepresentation as a valid action subsequent to Rhode Island's adoption of the economic loss doctrine. *See, e.g.*, *Zarella v. Minn. Mut. Life Ins. Co.*, 824 A.2d 1249, 1257 (R.I. 2003); *Kennett v. Marquis*, 798 A.2d 416, 419 (R.I. 2002).

Indeed, the indemnification provision of the Agent Agreement specifically recognizes that the negligence of Lifemark and its agents, such as Maggiacomo, could cause economic harm to Transamerica. Maggiacomo and Lifemark owed a duty of care to Transamerica because they acted as "soliciting agents" for Transamerica in the sale of Transamerica's annuity products. It was also readily foreseeable that a breach of this duty would inflict financial losses on Transamerica because of the close economic relationship between the parties – given that Transamerica must depend on Defendants for the sale of its products. The close economic relationship of the parties is similar to the other relationships that have been held to be sufficient to support liability for purely economic losses. For instance, in *Dowling v. Narragansett Capital Corp.*, this Court held that an accounting firm owed a duty of care to protect certain third parties from economic losses. 735 F. Supp. 1105, 1125 (D. R.I. 1990). In that case, given that the accounting firm was hired to complete a particular assessment that was clearly intended to guide the third parties who relied on the assessment, this Court concluded that the accounting firm had a duty to exercise reasonable care in preparing that assessment. *Id.* Similarly, in this case, the Defendants were engaged to perform a particular job and it was readily foreseeable that Transamerica would rely on the Defendants in the performance of that job. In fact, the relation is even closer than the relation in *Dowling*, given the state-mandated reliance of an annuity company on its brokers. Accordingly, the nature of the close economic relationship between the parties in this case creates a duty of care independent of any duties imposed by contract and thereby places this negligence claim squarely within an exception to the economic loss doctrine.[25]

---

[25] The decision in *Robertson Stephens, Inc.* is not to the contrary. In that case, this Court dismissed an analogy to *Forte Brothers* and refused to recognize a duty of care as between an independent claims administrator and an insured. *Id.* at 268, 277-80. This Court refused to

**K.**    **Transamerica Adequately Alleged that the Defendants Committed Criminal Insurance Fraud in Violation of R.I. Gen. Laws § 11-41-29**

Transamerica alleges that Caramadre, Radhakrishnan, Estate Planning Resources, Lifemark and Maggiacomo prepared, assisted, abetted or solicited the preparation and submission of the Garvey annuity application. Amended Complaint ¶ 76. These defendants submitted this application with the intent to deceive Transamerica and with the knowledge that the information on the application and the omission of basic information from the application were false and misleading. *Id.*

As described in detail above, Transamerica has established that the intentional concealment of material facts is the equivalent of presenting false information, thereby confirming that the actions of these Defendants were in violation of § 11-41-29. In addition, as explained in Section B(1)(i), *supra*, a contract may be considered "insurance" even if it is not labeled as such. *Sisson*, 141 A. at 77. Likewise, an annuity policy which includes a "Double Enhanced Death Benefit" constitutes an "insurance contract upon the life or body of another" under Rhode Island law. While the Defendants attempt to label the annuity policy as "not insurance," Transamerica has shown that such a rigid reading of Rhode Island law is unwarranted and demonstrated that the policy behind § 11-41-29 applies with equal force to the facts at hand.

**L.**    **Transamerica has Alleged Sufficient Facts to Support its Claim of Civil Conspiracy**

The amended complaint makes all the necessary allegations to establish the existence of a civil conspiracy. "Civil conspiracy is … a means of establishing joint liability for tortious

---

recognize such a duty because of the disparity that would result if an independent administrator owed a duty to an insured that the insurer did not. *Id.* at 280 & n.10. There is no such disparity precluding a finding that there was an independent duty in this case.

conduct." *Id.* Civil conspiracy "requires proof that: (1) there was an agreement between two or more parties and (2) the purpose of the agreement was to accomplish an unlawful objective or to accomplish a lawful objective by unlawful means." *Smith v. O'Connell*, 997 F.Supp. 226, 241 (D.R.I. 1998). It is not necessary for an alleged conspirator to have "knowledge of all details or phases of a conspiracy [, but only] that [he] knew the essential nature of the conspiracy." *U.S. v. Cooper*, 203 F.3d 1279, 1286 (11th Cir. 2000) (quoting *United States v. Payne,* 750 F.2d 844, 859 (11th Cir.1985)).

Defendants contend that they can not be held accountable under a conspiracy theory because the Amended Complaint fails to properly plead a valid underlying intentional tort theory, which is a necessary to establish conspiracy liability. *Guilbeault v. RJ Reynolds Tobacco, Co.*, 84 F. Supp. 2d 263, 268 (D.R.I. 2000). As described above, however, the Amended Complaint contains proper allegations of fraud and criminal insurance fraud, both of which qualify as valid underlying intentional tort theories. The Amended Complaint further alleges that defendants coordinated with each other to accomplish their improper objective. Amended Complaint, ¶ 82. Thus, the Amended Complaint sets forth a valid claim for conspiracy and Defendants can not avoid liability for the actions of their co-conspirators.

### M. Neither Abstention nor Certified Questions are Appropriate in this Case

1. The Facts of This Case Do Not Support *Burford* Abstention

Maggiacomo argues that abstention is proper in this case under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), and *New Orleans Public Service, Inc. v. Council of New Orleans (NOPSI)*, 491 U.S. 350 (1989). In these cases, the Supreme Court concluded that "a federal court should abstain from hearing a case that involved 'difficult questions of state law bearing on policy problems of substantial public import,' or where federal intrusion may prove 'disruptive of state

efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 473 (1st Cir. 2009) (quoting *NOPSI*, 491 U.S. at 361). The First Circuit has concluded that this abstention doctrine should be construed narrowly: "*Burford* abstention must only apply in 'unusual circumstances,' when federal review risks having the district court become the 'regulatory decision-making center.'" *Id.* at 474 (quoting *Bath Mem'l Hosp. v. Maine Health Care Fin. Comm'n*, 853 F.2d 1007, 1012-13 (1st Cir. 1988)). Accordingly, "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Allstate Ins. Co. v. Sabbagh*, 603 F.2d 228, 230 (1st Cir. 1979); *see also Bath Mem'l Hosp.*, 853 F.2d at 1013.

This case does not implicate the "fundamental concern" of *Burford*, namely that federal courts might "bypass[] a state administrative scheme and resolv[e] issues of state law and policy that are committed in the first instance to expert administrative resolution." *Irizarry*, 587 F.3d at 474 (quoting *Public Service Co. of N.H. v. Patch*, 167 F.3d 15, 24 (1st Cir. 1998)); *see NOPSI*, 391 U.S. at 362 ("*Burford* is concerned with protecting complex state administrative processes from undue federal influence."). Unlike the cases cited by Maggiacomo, this case does not involve state policy determinations but rather a legal question regarding the construction of state law. *Cf. Dunn v. Cometa*, 238 F.3d 38, 42 & n.3 (1st Cir. 2001) (involving state policy decisions regarding the "legal framework to be applied" in the family context, rather than "abstract legal questions"). Nor does this case involve a primarily regulatory or administrative matter;[26] rather, it involves ordinary claims sounding in tort and contract the likes of which this Court handles on a regular basis. *Cf. Armistead v. C & M Transp., Inc.*, 49 F.3d 43, 48 n.4 (1st Cir. 1995) (noting

---

[26] Maggiacomo's citation to *American Deposit Corp. v. Schacht*, 887 F. Supp. 1066 (N.D. Ill. 1995), does not help his argument. In that case, the court declined to apply *Burford* abstention. *Id.* at 1074.

in dicta that *Burford* abstention might apply because the state had "concentrate[ed] all claims in an exclusive administrative process"); *Sabbagh*, 603 F.2d at 233 (noting that "federal court intervention would disrupt the [state] regulatory scheme" dealing with automobile insurance rates); *Liberty Mutual Ins. Co. v. Paradis*, 764 F. Supp. 13 (D.R.I. 1991) (involving a dispute over required payment of cost of living adjustments under the state Workers' Compensation Act); *Buchanan v. Doody*, 571 F. Supp. 1206, 1208 (D. Mass. 1983) (noting that the unemployment compensation benefits issue implicated a "complex state regulatory regime").

Accordingly, there is no justification for applying abstention principles to this case. This case presents no "unusual circumstances" at all, *Bath Mem'l Hosp.*, 853 F.2d at 1012-13, but is rather an ordinary diversity case involving state law. Applying abstention doctrines here would suggest that abstention should be the norm, as opposed to a rare exception, in diversity jurisdiction cases. *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996) ("*Burford* represents an extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it.").

2.  This Case Provides No Justification to Apply the Primary Jurisdiction Doctrine.

Nor should this Court apply the primary jurisdiction doctrine. That doctrine serves to "coordinat[e] administrative and judicial machinery" and "promote uniformity and take advantage of agencies' special expertise." *Corvello v. New England Gas Co.*, 532 F. Supp. 2d 396, 403 (D.R.I. 2008) (quoting *Pejepscot Indus. Park, Inc. v. Maine Cent. R.R. Co.*, 215 F.3d 195, 205 (1st Cir. 2000). Accordingly, the doctrine only applies if "enforcement of the claim [before the court] requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Id.* (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956)). The issues in this case have not been set apart in this

fashion.  Indeed, Plaintiff is unaware of any pending administrative proceedings; no Rhode

Island agency has issued notice of rulemaking or undertaken adjudicative proceedings.  There is

simply no administrative proceeding to which this Court could defer.

3.      This Case Does Not Present Questions that Should Be Certified to State Court.

The First Circuit has indicated that federal courts should be "reluctant to burden the

[state] [c]ourt with certification, and the litigants with the attendant delay."  *Pyle v. South Hadley*

*Sch. Committee*, 55 F.3d 20, 22 (1st Cir. 1995) (certifying only because construction of state

statute would "dictate[e] state-wide policy to local school officials"); *see L. Cohen & Co. v. Dun*

*& Bradstreet*, 629 F. Supp. 1419, 1423 n.2 (D. Conn. 1986) (noting burden on state courts).  This

reluctance to certify is consistent with the approach applied by federal courts generally.  As the

Fifth Circuit has noted, federal courts "use much judgment, restraint and discretion in certifying.

[They] do not abdicate."  *Barnes v. Atl. & Pac. Life Ins. Co.*, 514 F.2d 704, 705 n.4 (5th Cir.

1975); *see Ormsbee Dev. Co. v. Grace*, 668 F.2d 1140, 1149 (10th Cir. 1982) (noting that

certification "is to be utilized with restraint and distinction").

Certification is not necessary even "in the absence of a definitive ruling by the highest

state court" as long as there is sufficient guidance in state law.  *Fischer v. Bar Harbor Banking*

*and Trust Co.*, 857 F.2d 4, 7 (1st Cir. 1998); *see State of Florida ex rel. Shevin v. Exxon*

*Corporation*, 526 F.2d 266, 274-275 (5th Cir. 1976) (noting the "most important" factor in the

certification decision is "the existence of sufficient sources of state law . . . to allow a principled

rather than conjectural conclusion").  "[A] federal court may consider analogous decisions,

considered dicta, scholarly works, and any other reliable data tending convincingly to show how

the highest court in the state would decide the issue at hand."  *Fischer*, 857 F.2d at 7.  In this

case, the Court should not certify any questions to state court because, as this memorandum

demonstrates, there is adequate guidance in state law for this Court to resolve the issues presented to it. *Cf. Buchanan*, 571 F. Supp. at 1208 (certifying questions to the state court because there was "scant guidance for a decision by th[e] Court").

Further, application of reasonably clear law to particular pleadings or facts is not a proper basis for certification. *See Hugel v. Milberg, Weiss, Bershad, Hynes & Lerach, LLP*, 175 F.3d 14, 18 (1st Cir. 1999) (noting that application of a reasonably clear standard to particular facts is "within the range of discretion entrusted to [the federal courts]"); *see also Marbucco Corp. v. Suffolk Constr. Co.*, 165 F.3d 103, 105 (1st Cir. 1999). The law itself is reasonably clear in this case; the question before this Court is simply how that law should be applied to these facts. Deciding this case calls not for a declaration of new principles of Rhode Island law, but simply for the decision of an individual case. Accordingly, the kinds of questions Maggiacomo would have certified to the state court are simply not the kinds of substantially doubtful questions that warrant the significant burdens that certification imposes on parties and the state courts. *See, e.g., Manchester Sch. Dist. v. Crisman*, 306 F.3d 1, 14 (1st Cir. 2002).

## CONCLUSION

For the above reasons, Defendants' motions to dismiss should be denied.

Respectfully submitted,

/s/ Brooks R. Magratten
Brooks R. Magratten, Esq., No. 3585
David E. Barry, Esq., *pro hac vice admitted*
Michael J. Daly, Esq. No. 6729
PIERCE ATWOOD LLP
 Attorneys for Plaintiff
10 Weybosset St., Suite 400
Providence, RI 02903
(401) 588-5113 [Tel.]
(401) 588-5166 [Fax]
bmagratten@pierceatwood.com
February 1, 2010          mdaly@pierceatwood.com

## CERTIFICATE OF SERVICE

I certify that the within Consolidated memorandum was electronically filed with the clerk of the court on February 1, 2010 and that such document is available for viewing and downloading from the Court's ECF system.  Service by electronic means has been effectuated on all counsel of record.

/s/ Michael J. Daly