# EXHIBIT A

000596600611
3/10/05 12:1

# GENERAL AGENT AGREEMENT

LIFEMARK SECURITIES
# 16 1238365

THIS AGREEMENT is made and effective the ___14___ day of October_____, 1997 by and among Providian Securities Corporation ("PSC"), First Providian Life And Health Insurance Company ("FPLH"), the broker dealer ("BROKER DEALER") and insurance agencies ("AGENCIES") set forth on Schedule A attached hereto and incorporated herein by reference. PSC and BROKER DEALER are registered with the Securities and Exchange Commission (the "SEC") as broker/dealers under the Securities Exchange Act of 1934, as amended (the "EXCHANGE ACT"), and are members of the National Association of Securities Dealers, Inc. (the "NASD") in good standing. PSC has been appointed as the principal underwriter of the registered products (the "PLANS") of FPLH (FPLH and PSC are collectively referred to as "COMPANY").

WHEREAS, COMPANY offers various PLANS for sale to the public; and

WHEREAS, BROKER DEALER and AGENCIES (collectively referred to as "PRODUCERS") are duly life insurance licensed, securities registered and lawfully authorized to market and distribute the PLANS, as set forth herein.

NOW, THEREFORE, the parties agree as follows:

1. **APPOINTMENT**. COMPANY hereby appoints PRODUCERS to sell the PLANS listed (a) on each Schedule B attached hereto and incorporated herein by reference, and (b) on each Schedule B hereafter sent to PRODUCERS by COMPANY, which shall be deemed to be attached hereto and incorporated by reference, to the extent authorized by and only in the State of New York (the "State"). PRODUCERS must be duly life insurance licensed and authorized in the State before soliciting any PLAN in such State. No exclusive rights are granted to PRODUCERS. PRODUCERS accept this appointment as independent contractors, on the terms herein.

2. **AUTHORITY AND RESPONSIBILITY**. PRODUCERS are authorized and responsible in the State to (a) use and supervise PRODUCERS' own employees who are duly life insurance licensed, appointed and securities registered to sell the PLANS; (b) collect and submit purchase payments to COMPANY; (c) deliver the PLAN contract to the purchaser, unless the contract has been sent by COMPANY to the purchaser; (d) document each transaction, including the fact of delivery, and maintain any other documentation reasonably requested by COMPANY; (e) responsibly perform in good faith each authorized action hereunder in accordance with COMPANY'S administrative procedures and cooperate with COMPANY as required to provide service for the PLANS; (f) make a determination with respect to each purchaser of a PLAN that such purchaser's investment in the PLAN is suitable as to such purchaser based upon a thorough review of the current financial situation and needs of the purchaser (or purchasers, if joint) and notify COMPANY promptly upon its learning any circumstances that render such suitability information inaccurate; and (g) adopt, abide by and enforce the principles set forth in the Ethics Code attached hereto. No variation of this authority and responsibility shall be permitted except with COMPANY'S prior written consent.

3. **PROHIBITIONS**. PRODUCERS have no authority to, and shall not, (a) make any promise or incur any debt on behalf of COMPANY; (b) hold itself out as an employee or affiliate of COMPANY; (c) misrepresent, add, alter, waive, discharge or omit any provision of the PLANS,

1

the then current prospectuses for the PLANS or the underlying funds or confirmation statement or other COMPANY materials; (d) waive any forfeiture, extend the time of making any payments, or alter or substitute any of COMPANY'S forms; (e) use, or supply to a third party for use, any of COMPANY'S forms other than for purposes of this Agreement; (f) take any action which is likely to induce the surrender, transfer, exchange, cancellation or non-renewal of any PLANS; (g) pay or allow to be paid any inducement not specified in the contract for the PLANS; (h) cause any premium or consideration to be rebated, in any manner whatsoever, directly or indirectly; (i) give or offer to give, on COMPANY'S behalf, any advice or opinion regarding the taxation of any purchaser's or prospective purchaser's income or estate in connection with the sale or solicitation for sale of any PLAN; (j) sign or allow any person to sign a form or other document for another except pursuant to a proper power of attorney approved by COMPANY; (k) negotiate, deposit or co-mingle purchase payments; (l) enter into any contracts with sub-agents for the solicitation of PLANS or to share commissions with anyone not licensed and under contract with COMPANY; (m) engage in speculation of human life in any way; (n) solicit or take applications for PLANS in a state other than the purchaser's state of residence in order to circumvent the insurance laws of such purchaser's state of residence; or (o) take any other action beyond the scope of the authority granted under this Agreement.

4. **REPRESENTATIONS AND WARRANTIES**. PRODUCERS represent and warrant that they and each person or entity to whom it or FPLH pays commissions pursuant to this Agreement will have sound business reputations and backgrounds, will be duly licensed and appointed to represent COMPANY and securities registered in compliance with all applicable laws and regulations prior to and during the sale of any PLANS pursuant to this Agreement, will comply with applicable procedures, ethical principles, manuals and regulations of COMPANY and all other applicable laws and regulations. PRODUCERS represent and warrant that they have full power and authority to enter into this Agreement and to perform their obligations hereunder. COMPANY represents and warrants that all PLANS have been filed with and approved by the New York insurance department and that COMPANY is licensed to do business by the New York insurance department. Further, COMPANY represents and warrants that the PLANS have been filed and registered as appropriate with the SEC and NASD and are in compliance with the applicable regulations promulgated under the EXCHANGE ACT.

5. **COMMISSIONS AND CHARGEBACKS**. COMPANY shall pay PRODUCERS, for sales in the State, so long as it is properly insurance licensed, the commissions (the "Commissions") set forth on the applicable Schedule B for each purchase payment received and accepted by COMPANY due to PRODUCERS' sales efforts. PRODUCERS shall pay to COMPANY, or COMPANY may offset from Commissions due, the chargebacks (the "Chargebacks") set forth on the Schedule B. By submitting applications for PLANS listed in the Schedule Bs attached hereto, or by submitting applications for PLANS listed on future Schedule Bs, PRODUCERS affirm their acceptance of the Commissions and terms set forth therein. COMPANY reserves the right, upon thirty days' notice to PRODUCERS, to revise any Commissions or Chargebacks payable on PLANS issued, renewed, converted or exchanged in the future. No Commissions will be paid to PRODUCERS on PLANS which are surrendered or canceled and subsequently reinstated or rewritten.

6. **INDIVIDUAL AGENT COMMISSIONS**. PRODUCERS shall be solely liable for and shall promptly pay any and all amounts payable to any insurance licensed registered representative in connection with the sale of PLANS.

2

7. **INDEMNIFICATION**. Each party (herein "INDEMNIFIER") agrees to defend, indemnify and hold harmless the other party and its affiliated companies, officers, directors, employees and agents and each person who controls or has controlled such other parties within the meaning of the Securities Act of 1933, as amended, or the EXCHANGE ACT, with respect to any and all losses, damages, claims or expenses (including reasonable attorneys' fees) which any of the foregoing may incur arising from or in connection with INDEMNIFIER'S performance, non-performance and/or breach of any warranty, representation or other provision of this Agreement or any unlawful acts or practices by INDEMNIFIER involving the PLANS.

8. **APPROVAL OF ADVERTISING**. No sales promotion or other advertising or training materials ("Sales Materials") relating to the PLANS or COMPANY shall be used unless approved in writing by COMPANY prior to such use. No representations in connection with the sale or solicitation for sale of the PLANS, other than those contained in the currently effective registration statement and prospectus for each PLAN filed with the SEC, or in the approved Sales Materials, shall be made by PRODUCERS. Further, solicitations for sale of the PLANS shall be made only in the State. One hard copy of each piece of Sales Materials shall be supplied to COMPANY within ten days of first use. COMPANY reserves the right to audit PRODUCERS' Sales Materials files.

9. **CONFIDENTIALITY**. Except as required by law, regulation, subpoena, court order or other lawful authority, all information communicated to one party by the other party relating to COMPANY or any PRODUCER, whether before the effective date or during the term of this Agreement, shall be received in strict confidence, shall be used by it and its employees, agents, attorneys or accountants, only for the purposes of this Agreement, and no such information shall be disclosed by the recipient party, its employees, agents, attorneys or accountants, without the prior written consent of the other party. Each party shall take all reasonable precautions to prevent the disclosure to outside parties of such information including, without limitation, the terms of this Agreement.

10. **TERMINATION**. This Agreement shall continue in force for one year from its effective date and thereafter shall be automatically renewed from year to year for one year periods; provided that COMPANY may terminate this Agreement immediately and without notice if any PRODUCER (a) materially breaches this Agreement, (b) ceases to be registered under the EXCHANGE ACT or a member in good standing of the NASD, (c) fails to comply with any licensing laws or any other law or regulation and/or (d) becomes insolvent, bankrupt or suffers some other financial impairment that may affect such PRODUCER'S or COMPANY'S performance of this Agreement. Any party may terminate this Agreement, in whole or with respect to a Schedule B, at any time, without cause, upon thirty days' written notice to the other party. Sections 3, 7 and 9 of this Agreement shall survive the termination of this Agreement to the maximum extent permitted by law. PRODUCERS shall settle all accounts with COMPANY and shall continue to be responsible for all applicable Chargebacks.

11. **MISCELLANEOUS PROVISIONS**.

   (a) This Agreement shall be governed as to its validity, interpretation and effect by the laws of the State of New York.

   (b) This Agreement, including Schedule A, each Schedule B, the Ethics Code and any Software Addendum, contains the entire understanding and agreement between the parties hereto with

3

respect to the subject matter hereof and with respect to sales of COMPANY'S PLANS which are variable annuities and supersedes all prior and/or contemporaneous discussions, agreements and understandings. PRODUCERS and COMPANY hereby acknowledge that they have not relied upon any representations other than the representations expressly contained within this Agreement. This Agreement may not be amended or supplemented except by a written agreement or Schedule B.

(c) This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and, to the extent permissible hereunder, assigns.

(d) COMPANY reserves the unconditional right to refuse to accept applications procured by PRODUCERS for failure to meet COMPANY'S underwriting or other standards. Furthermore, COMPANY reserves the unconditional right to modify any of the PLANS in any respect whatsoever or suspend the sale of any of the PLANS, in whole or in part, at any time without prior notice.

(e) Each party hereto grants to the other the right to audit its records relating to the terms and conditions of this Agreement upon reasonable notice during reasonable business hours in order to confirm compliance with this Agreement.

(f) This Agreement or any of the rights or obligations hereunder may not be assigned by any party without the prior written consent of the other party hereto.

(g) Nothing in this Agreement, nor any acts of the parties hereto, shall be deemed or construed by the parties hereto, or either of them, or any third party, to create the relationship of employer and employee, or a partnership or joint venture, or except to the extent expressly provided herein, principal and agent, between COMPANY and PRODUCERS.

(h) Any notice required to be given by one party to another shall be (i) personally delivered or (ii) mailed by registered or certified mail, postage prepaid, if to COMPANY, at 400 West Market Street, Louisville, Kentucky 40202, Attn: Jeff Lammers, and if to PRODUCERS, at the addresses set forth on Schedule A or different address as set forth in a written notice from one party to the other in compliance with this subsection (h).

4


000596600615
3/10/05 12:1

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be duly executed as of the date and year first set forth above.

**FIRST PROVIDIAN LIFE AND HEALTH INSURANCE COMPANY**

By: _M J Sage_
Title: _VP_
Date: _10/14/97_

_LifeMark Securities Corp._
Print Name of **Broker Dealer** Above

By: _____
Title: _Vice President & CMO_
Date: _10-1-97_

**PROVIDIAN SECURITIES CORPORATION**

By: _Kimberly A. Stone_
Title: _Vice President_
Date: _10/8/97_

_____
Print Name of **Agency** Above

By: _____
Title: _____
Date: _____

_____
Print Name of **Agency** Above

By: _____
Title: _____
Date: _____

_____
Print Name of **Agency** Above

By: _____
Title: _____
Date: _____

5

## SCHEDULE A
## GENERAL AGENT BROKER DEALER Information for
### First Providian Life & Health Variable Annuity

Name of BROKER DEALER: LifeMark Securities Corp.

Address of BROKER DEALER: 8 Tobey Village Office Pk

Suite 3

Pittsford    Monroe    NY    14534
City    County    State    Zip

Contact Person at BROKER DEALER: Andrew J. Kalinowski or Lori Kellogg

Phone Number of Contact person at BROKER DEALER: 716-385-3130

## List of AGENCIES for
### First Providian Life & Health Variable Annuity
### General Agent Agreement
### (sole proprietors' Agencies should be included if applicable)

| Name, Tax Identification Number and Address for AGENCIES |
| --- |
| Name: LifeMark Securities |
| Tax ID: ~~16-120~~   16-1238345 |
| Address: |
| Name: |
| Tax ID: |
| Address: |
| Name: |
| Tax ID: |
| Address: |
| Name: |
| Tax ID: |
| Address: |

6

000596600617
3/10/05 12:1

# ETHICS CODE

First Providian Life and Health Insurance Company ("Company") has committed to the Principles of Ethical Market Conduct and Code of Life Insurance Ethical Market Conduct developed by the American Council of Life Insurance and endorsed by its Board of Directors. As part of the implementation of those principles and code, Company requires that its general agents ("GA") adopt, abide by and enforce the following Ethics Code:

1. GA will conduct business according to high standards of honesty and fairness and render that service to its customers which, in the same circumstances, it would apply to or demand for itself. To conduct its business according to high standards of honesty and fairness, GA and its agents will:

    A. Make reasonable efforts to determine the insurable needs or financial objectives of its customers based upon relevant information obtained from the customer and enter into transactions which assist the customer in meeting his or her insurable needs or financial objectives.
    B. Maintain compliance with applicable laws and regulations.
    C. In cooperation with consumers, regulators and others, affirmatively seek to improve the practices for sales and marketing of annuity PLANS.
    D. Reflected this Code of Ethics in company policies and practices.

2. GA will provide competent and customer-focused sales and service. To provide for competent sales and service of annuity PLANS, GA will make certain that:

    A. Its agents are of good character and business repute, and have appropriate qualifications and experience.
    B. Its agents are duly licensed or otherwise qualified under state law.
    C. Its agents are adequately trained to focus on customers' needs and objectives.
    D. Its agents have adequate knowledge of Company's PLANS and their operation.
    E. Its agents are trained in the need to comply with applicable insurance laws and regulations and the concepts in this Code of Ethics.
    F. Its agents participate in continuing education.

3. GA will engage in active and fair competition. To maintain and enhance competition in the marketplace, GA and its agents will:

    A. Maintain compliance with applicable state and federal laws fostering fair competition.
    B. Not replace existing life insurance policies and annuity contracts without first communicating to the customer, in a manner consistent with Ethics Principle 4 below, information that he or she needs in order to ascertain whether such replacement of existing policies or contracts may or may not be in his or her best interest.
    C. Refrain from disparaging competitors.

4.  GA will provide advertising and sales materials that comply with the PRODUCERS Agreement and that are clear as to purpose and honest and fair as to content. To comply with this principle, GA and its agents will make certain that:

    A.  Presentation of any material designed to lead to sales or solicitation of annuity PLANS is done in a manner consistent with the best interests of the customer. All such sales or solicitation communications should be based upon the principles of fair dealing and good faith, and will have a sound basis in fact.

    B.  Materials presented as part of a sale are comprehensible in light of the complexity of the PLAN being sold.

    C.  It maintains compliance with applicable laws and regulations related to advertising, unfair trade practices, sales illustrations and other similar provisions.

    D.  Illustrations of premiums and consideration, costs, values and benefits are accurate and fair, and contain appropriate disclosure of amount which are not guaranteed and those which are guaranteed in the policy or contract.

5.  GA will provide a means for fair and expeditious handling of customer complaints and disputes. To assist in the resolution of any complaints and disputes that may arise concerning market conduct, GA and its agents will:

    A.  Notify Company immediately of any customer complaints.

    B.  In cooperation with Company, assist in identifying, evaluating and handling complaints in compliance with applicable state law and regulations related to consumer complaint handling.

    C.  Make good faith efforts to resolve complaints and disputes without resorting to civil litigation.

6.  GA will maintain a system of supervision that is reasonably designed to achieve compliance with this Ethics Code. In so doing, GA will:

    A.  Establish and enforce policies and procedures reasonable designed to comply with this Ethics Code.

    B.  Implement an adequate system of supervision of the market activities of its agents in order to monitor their compliance with this Ethics Code and applicable laws and regulations.

    C.  Conduct compliance training sessions.

    D.  Audit and monitor agents' sales practices.

    E.  Provide each of its agents with a copy of this Ethics Code.

*gavany.doc(11/96)*

8

# SCHEDULE B

## List of PLANS AND COMMISSIONS for First Providian Life & Health Variable Annuity General Agent Agreement

The following modification has been made to your most current executed General Agent Agreement with First Providian Life and Health Insurance Company ("FPLH") and pertains to all purchase payments received and accepted. No payment will be used by the general agent to effect compensation in excess of the limits of section 213 of the New York Insurance Law for the sale of insurance.

**Products:**  Providian Marquee Flexible Premium Variable Annuity, Providian Prism Flexible Premium Variable Annuity

PRODUCERS may choose between Option 1 and Option 2 at the policy level. A PRODUCER will be deemed to have chosen Option 1 for a policy if he/she fails to choose either Option with the Application. After an Option has been selected (including Option 1 by default), no reversal will be permitted for that policy.

### OPTION 1 (NO TRAILS)

**Sales Commissions\*** (As a percentage of each purchase payment accepted by FPLH):

| First Policy Year: | Deferred 3.5%; Immediate 3% |
|---|---|
| Second and Third Policy Years: | Deferred 3.5%; Immediate 0% |
| Fourth and Fifth Policy Years: | Deferred 1.5%; Immediate 0% |
| Sixth and later Policy Years: | Deferred 1.0%; Immediate 0% |

A "Policy Year" is a period of 12 months starting with the effective date of a particular contract or any anniversary of that effective date.

**Expense Allowance Payments\*** (As a percentage of each purchase payment accepted by FPLH during the first Policy Year):

| | 5.75 | 6.0 | 6.25 |
|---|---|---|---|
| Initial Purchase Payments | $0-$49,999 | $50,000-$99,999 | $100,000+ |
| Deferred | 2.25% | 2.50% | 2.75% |
| Immediate | 0% | 0% | 0% |

Initial purchase payments are those made during the first Policy Year. Each purchase payment received and accepted by FPLH within the first Policy Year will determine the breakpoint used for that purchase payment (no rights of accumulation nor letters of intent). Payments received and accepted by FPLH after the first Policy Year will receive the applicable deferred additions payout shown above.

**\*Three-fourths of the percentages shown above for Sales Commissions and Expense Allowance payments is payable for policies issued on annuitants aged 76-80. One-half of the percentages shown above for Sales Commissions and Expense Allowance Payments is payable for policies issued on annuitants aged 81-85.**

### OPTION 2 (TRAILS)

**Up-Front Payments\***
Sales Commissions (As a percentage of each purchase payment accepted by FPLH):

| First Policy Year: | Deferred 3.5%; Immediate 3% | 4.75 |
|---|---|---|
| Second and Third Policy Years: | Deferred 2.5%; Immediate 0% | |
| Fourth and Fifth Policy Years: | Deferred 1.0%; Immediate 0% | |
| Sixth and later Policy Years: | Deferred 0.0%; Immediate 0% | |

Expense Allowance Payments (As a percentage of each purchase payment accepted by FPLH during the first Policy Year):

    First Policy Year:                    Deferred 1.25; Immediate 0%

*Three-fourths of the percentages shown above for Sales Commissions and Expense Allowance Payments is payable for policies issued on annuitants aged 76-80. One-half of the percentages shown above for Sales Commissions and Expense Allowance Payments is payable for policies issued on annuitants aged 81-85.

<u>Trails</u>

Sales Commissions (As a percentage of the monthly average accumulated value, as calculated in FPLH's discretion - payable each month beginning with the second Policy Year)

    Second through the Sixth Policy Years:    Deferred 0.14% (annualized); Immediate 0%
    Seventh and later Policy Years:      Deferred 0.40% (annualized); Immediate 0%

Expense Allowance Payments (As a percentage of the monthly average accumulated value, as calculated in FPLH's discretion - payable each month beginning with the second Policy Year)

    Second through Sixth Policy Years:     Deferred 0.11% (annualized); Immediate 0%
    Seventh and later Policy Years:      Deferred 0%; Immediate 0%

Chargebacks (As a percentage of Commissions and Expense Allowance Payments Paid):

All commissions and expense allowance payments paid to PRODUCERS shall be subject to a 100% chargeback for cancellations during the free look period and for surrenders or cancellations that occur during the first 6 months following the contract effective date and a 50% chargeback for surrenders or cancellations that occur during the second 6 months following the contract effective date. All commissions and expense allowance payments paid to PRODUCERS for policies issued on annuitants aged 81-85 shall be subject to a 100% chargeback for withdrawals due to the annuitant death during the first Policy Year. Full or partial annuitizations that occur on or before the first anniversary of the contract effective date will result in chargebacks of any compensation paid which was higher than if the portion annuitized had been sold as a single premium immediate annuity ("SPIA"). Such chargebacks will be calculated in FPLH's reasonable discretion by apportioning the total compensation paid in excess of the SPIA compensation rate applicable at the time(s) of the sale among the MGA and applicable GA in proportion to their agreed upon compensation split for such first year with respect to the particular Product being sold.

States: This authority is granted in the State of New York, so long as the general agent is appropriately licensed and appointed.

                                              schvgn1b.doc(3/97)



The undersigned agency(s) wishes to become a party to the General Agent Agreement by and between Peoples Benefit Life Insurance Company (formerly Providian Life and Health Insurance Company) and Lifemark Securities Corp., Tax I.D. Number 16-1238365, including any schedules and addenda thereto as if it were an original general agency signatory thereto as of the date set forth below. It hereby accepts all of the conditions of that Agreement and agrees to be bound by its terms as they apply to general agents of the Company

Corporate Agency Name and Federal Tax I.D. Number:

(OK)

**Lifemark Distributors Corp.**
Agency Name

16 - 1238365
Tax I.D. Number

Dated: 9/13/99

By: _Vincent Adcock_

Title _President_

Accepted:

**Peoples Benefit Life Insurance Company**

By: _Daniel Archuleta_

Title: VP

Dated: 9/14/99

**AFSG Securities Corporation**

By: _Lisa A. Wachmedoy_

Title: VP

Dated: 9/14/99