# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

TRANSAMERICA LIFE INSURANCE     :
COMPANY     :
    :
         **Plaintiff,**     :
    :
        v.     :    **C.A. NO. 09-471/S**
    :
JOSEPH CARAMADRE, RAYMOUR     :
RADHAKRISHNAN, ESTATE PLANNING     :
RESOURCES, INC., ESTELLA RODRIGUES, :
EDWARD MAGGIACOMO, JR.,     :
LIFEMARK SECURITIES CORP. and     :
PATRICK GARVEY,     :
    :
        **Defendants.**    :

## DEFENDANTS' CONSOLIDATED REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTIONS TO DISMISS

DATED: February 22, 2010

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ......................................................................... 1

ARGUMENT .............................................................................. 3

I.    RHODE ISLAND LAW DOES NOT IMPOSE AN
INSURABLE-INTEREST REQUIREMENT ON
ANNUITY CONTRACTS ..................................................... 3

    A.    Plaintiffs disregard Rhode Island statutory law
and misread Rhode Island common law in seeking
retroactively to re-designate their annuity contracts
of adhesion as life insurance policies............................ 3

        1.    Plaintiffs' reading of Rhode Island's insurable-
interest statute is erroneous and disregards its
plain and controlling meaning...................................... 4

        2.    Rhode Island case law expressly under-
mines the application of an insurable-
interest requirement to annuities, and the
Court should not rewrite the Rhode Island
common law to impose such a requirement
for the first time in these actions ................................. 7

    B.    Plaintiffs' annuity investment vehicles are
substantively different from life insurance ............... 13

        1.    The annuity contracts differ substantively
from life insurance polices as reflected in
the contracts' terms and in the manner in
which Plaintiffs designed, marketed, and
sold them ................................................................. 13

        2.    Judicial interpretations support the sub-
stantive distinction between annuities and
life insurance policies.................................................. 15

C.    The Court should estop Plaintiffs from attempting to convert their annuity contracts into life insurance policies in order to impose an insurable-interest requirement ...................................................... 16

II.   THE INCONTESTABILITY CLAUSES ARE VALID AND ENFORCEABLE.......................................................... 17

A.    This Court should enforce the incontestability clauses despite Plaintiffs' complaint that the clauses they drafted took immediate effect ............................... 17

B.    Even if these annuities were subject to an insurable-interest requirement, the Court should still enforce the incontestability clauses..................................... 19

III.  PLAINTIFFS FAIL TO ALLEGE ACTIONABLE FRAUD BASED ON THE ALLEGED NON-DISCLOSURES ......................... 20

A.    There was no duty to disclose the information at issue because Plaintiffs did not ask about these matters in their applications, and the law imposed no independent duty on Defendants to disclose such information ........................................................ 20

1.    There was no duty to disclose the alleged "imminent death" of the annuitants. And, in any event, how could Defendants have known whether the annuitants – some of whom are still alive – faced "imminent" death?.............................................................. 20

2.    There also was no duty to disclose the alleged lack of an insurable interest or any alleged payments to the annuitants................................ 25

3.    Plaintiffs' case law is either inapposite or it supports Defendants' position that there was no duty to disclose............................................. 27

4.    Plaintiffs did not justifiably rely and they have waived their argument that any alleged omissions were material .................................... 28

5. The independent status of the registered representatives, as well as the contents of the annuity applications, establish as a matter of law that the registered representatives had no duty to disclose, even assuming they possessed any knowledge on these issues ....................... 29

6. The signatures of the various annuitants and registered representatives did not constitute omissions or misrepresentations ..................................... 31

7. The annuitants' alleged lack of understanding about the annuities does not empower the Plaintiffs to void their contracts and does not constitute "fraud in factum" ............................................ 32

B. Plaintiffs' allegations, for the first time in their memoranda, of various "affirmative misrepresen-tations" do not support their fraud-based claims ...................... 35

C. The plaintiffs fail to meet the Rule (9) standard ....................... 37

IV. THE UNJUST ENRICHMENT AND CIVIL CONSPIRACY CLAIMS FAIL BECAUSE THEY DERIVE ENTIRELY FROM PLAINTIFFS' OTHER INVALID CLAIMS ...................................... 38

V. RHODE ISLAND'S ECONOMIC LOSS DOCTRINE BARS PLAINTIFFS' NEGLIGENCE CLAIMS BECAUSE PLAINTIFFS ARE COMMERCIAL ENTITIES WITH THE LEVERAGE TO ALLOCATE THEIR RISKS BY CONTRACT, AND THE RHODE ISLAND SUPREME COURT WOULD NOT CARVE OUT A NOVEL EXCEPTION TO THE DOCTRINE FOR THE PLAINTIFFS' BENEFIT ............. 39

CONCLUSION .................................................................................... 43

<u>**DEFENDANTS'[1] CONSOLIDATED REPLY MEMORANDUM IN FURTHER**</u>
<u>**SUPPORT OF THEIR MOTIONS TO DISMISS**</u>

<u>**INTRODUCTION**</u>

Plaintiffs are private, for-profit insurance companies that market annuities, a non-insurance investment vehicle. As sophisticated players in the financial markets, Plaintiffs are experts at analyzing consumer demand, devising products to exploit that demand, evaluating risks, projecting revenues and profits, and writing marketing materials, applications, and contracts. They market a multitude of financial products -- from annuities to life insurance -- to the public, thereby generating revenue and profits for their shareholders.[2] Presumably, Plaintiffs' decisions to market to the public the annuities at issue were the result of their own educated analysis.

---

[1] Defendants Joseph Caramadre, Raymour Radhakrishnan, Estate Planning Resources, Inc., ADM Associates, LLC, DK LLC, Edward Hanrahan, Estella Rodrigues, Conreal LLC, and Harrison Condit have filed this identical *Consolidated Reply Memorandum* in all seven related actions, C.A. Nos. 09-470/S; 09-471/S; 09-472/S; 09-473/S; 09-549/S; 09-502/S; and 09-564/S. For efficiency's sake, "Plaintiffs" is used throughout this memorandum to refer to both of the plaintiff corporations in these actions, Western Reserve Life Assurance Company of Ohio ("WRL") and Transamerica Life Insurance Company. "Defendants" refers to the defendants filing this *Consolidated Reply Memorandum*; other defendants in the seven related actions (who have also moved for dismissal) are referred to by name or description (e.g., "broker dealer companies" refers to The Leaders Group, Inc., Lifemark Securities Corp., and Fortune Financial Services, Inc.). "Independent brokers" or "registered representatives" refers to Edward Maggiacomo (a defendant in C.A. Nos. 09-471/S and 09-549/S), as well as to Edward Hanrahan (a defendant in C.A. Nos. 09-472/S, 09-473/S and 09-502/S) and to Harrison Condit (a defendant in C.A. Nos. 09-470/S and 09-564/S), both of whom are among those filing this memorandum. The parties who are not directly filing this *Consolidated Reply Memorandum* cross-reference, incorporate, and join in various arguments from this *Consolidated Reply Memorandum* as they indicate in their separately filed reply memoranda. The text and footnotes address relevant distinctions among the cases; the original memoranda in support of the various defendants' motions to dismiss more finely develop the alleged facts applicable to each action and specify, claim-by-claim which counts pertain to which defendants.

[2] Records from the Variable Annuity Research and Data Service ("VARDS," now the "Morningstar Annuity Research Center," or "MARC") reflect that the variable annuity market, specifically, is big business for the Plaintiffs. See Top 25 Variable Annuity Issuer Sales (2009), *available at* http://www.financial-planning.com/media/pdfs/FPSep09_TheData.pdf. In 2008, Aegon, the umbrella company of both Plaintiffs, ranked 14th in the nation for variable annuity sales, with a sales volume of approximately $3.3 billion in a national market of approximately $151 billion. The Court may take judicial notice of this data, which the Moving Defendants provide only by way of background, because it comes from the leading source on annuity sales data and its accuracy "cannot reasonably be questioned." See Getty Petroleum Mktg., Inc. v. Capital Terminal Co., 391 F.3d 312, 322 (1st Cir. 2004) (Lipez, J. concurring) (court may take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

The variable annuity contracts at issue here are classic adhesion contracts; they are preprinted, standardized, and offered to the investing public with no opportunity for negotiation of their terms. In crafting these investment vehicles, Plaintiffs sought no insurable-interest verification from the applicants (because these were not life insurance contracts and they did not require an insurable interest). They could have required applicants to have the designated annuitants submit to any health-vetting or relationship-disclosure process that they specified as a prerequisite to the Plaintiffs' issuance of the annuity contracts. But they chose not to do so. They could have required that the applicants submit medical information about the annuitants, including the type of exhaustive medical histories or certifications of good health that they demand from those who are insured in the life insurance context. But they chose not to do so. Similarly, one must presume that their decision to impose no requirement of any relationship among the Contract Owner, the Annuitant, and the Beneficiary, and to call for no information or impose no requirement regarding the health of these individuals, resulted from Plaintiffs' own sophisticated analysis. Plaintiffs made a conscious decision that their billions of variable annuity sales would be more profitable to them in the absence of any such requirements.[3]

The record before this Court clearly evidences that the contracts at issue are variable annuities and not life insurance. The marketing materials, applications, and the contracts themselves leave no room for confusion. On the face of these documents, there is no dispute of material fact. The documents speak for themselves. Furthermore, Rhode Island law does not require an insurable interest for annuity contracts, and Plaintiffs fail to cite a single case in any

---

[3] Their sophisticated and polished marketing materials clearly treat these annuities as "retirement" investments. Plaintiffs plainly knew that their customer base for the annuities they sell would consist primarily of an aging population with a lower life expectancy and a higher mortality rate than the general public, one suffering from the full range of human illnesses and impairments that this population experiences.

jurisdiction that stands for the proposition that annuities, such as the ones at issue here, are life insurance contracts subject to insurable-interest requirements.

Nevertheless, in order to obtain the relief sought in this action, Plaintiffs essentially ask this Court to either (1) engage in judicial legislation, radically altering state statutory and common law, or (2) rewrite Plaintiffs' own applications and contracts (erasing actual terms and incorporating new provisions), so that Plaintiffs can potentially recover sums that they deliberately risked when they priced, marketed, and sold these products, on their terms, as annuities rather than as insurance policies. The Court should decline Plaintiffs' invitation to rewrite their applications and adhesion contracts and ignore the applicable law. Instead, the Court should grant Defendants' motions to dismiss.

## ARGUMENT

I. **RHODE ISLAND LAW DOES NOT IMPOSE AN INSURABLE-INTEREST REQUIREMENT ON ANNUITY CONTRACTS.**

    A. **Plaintiffs disregard Rhode Island statutory law and misread Rhode Island common law in seeking retroactively to re-designate their annuity contracts of adhesion as life insurance policies.[4]**

Based upon a fatally flawed reading of Rhode Island's insurable-interest statute and the common law, Plaintiffs ask the Court to ignore the distinction between annuity contracts and life insurance policies and impose an insurable-interest requirement on the former.[5]

---

[4] Plaintiffs repeatedly and incorrectly refer to the applications and contracts at issue by the names of the designated annuitants. See, e.g., Consolidated Memo. in Response to Defendants' Motions to Dismiss, C.A. No. 09-471/S, at 4 (referring to the Rodrigues application as the "Garvey Application"). This disingenuously gives the impression that these applications and contracts were somehow annuitant-based when, in fact, the annuitants were neither the applicants for the contracts nor owner/investors who purchased the contracts, nor the beneficiaries of the contracts.

[5] In C.A. No. 09-470/S, but not in the other six actions, Plaintiff WRL argues that the annuity contract is also void because the annuitant, Mr. Pitocco, allegedly did not know of its issuance, and that this alleged lack of knowledge voids the policy under a special rule applicable to "polic[ies] of life insurance" that are void if "taken out" without the "knowledge or consent of the insured person." See Plaintiff's Consolidated Memo. in Opp. to Motions to Dismiss, C.A. No. 09-470/S, at 17 (citing 43 Am. Jur. 2d Insurance § 287). WRL cites to no Rhode Island case for this principle, and more to the point, cites to no case from any jurisdiction applying such a supposed rule to annuity contracts. Also, as previously argued, WRL fails adequately to allege the forgery that it now claims supports this

3

1. **Plaintiffs' reading of Rhode Island's insurable-interest statute is erroneous and disregards its plain and controlling meaning.**

In their initial memoranda, Defendants have already demonstrated at length how the Rhode Island statutory scheme distinguishes between annuity contracts and life insurance policies, and how the insurable-interest requirement applies, under the legislature's delineation, only to the latter. See, e.g., *Defendants' Memo. in Supp. of Mot. to Dismiss*, C.A. No. 09-472/S, at 28-31; *Defendant The Leaders Group Memo. in Supp. of Mot. to Dismiss,* C.A. No. 09-502/S, at 7-9. Contrary to the Plaintiffs' claim, the statute does not apply the insurable-interest requirement to annuity contracts, and the Court must give effect to its plain meaning.

Specifically, Section 27-4-27(a) only applies to "insurance contract[s,] upon the life or body of another individual " – i.e., to life insurance policies – and to apply it to annuities would neglect the obvious.[6] Furthermore, annuities specifically exclude life insurance policies and are defined as follows:

---

argument; indeed, it completely fails to identify any defendant as supposedly responsible for this alleged forgery. Moreover, the forgery allegation fails for the additional reason of lack of materiality and the presence of an incontestability clause. See *Defendants' Memo. in Supp. of Mot. to Dismiss*, C.A. No. 09-470/S, at 16, 25. Finally, as discussed infra, Part III(A)(6), the applications identified the annuitants merely as measuring lives for certain features of the annuity contracts. Their knowledge regarding the issuance of the annuities and the authenticity of their signatures were irrelevant and immaterial to the contracts, as their names were included in the applications solely for the purpose of disclosing to Plaintiffs that the annuitants were individuals different from the owners.

[6] Plaintiffs attempt to narrow the dispute to whether the contracts in question are "insurance contracts" based on their erroneous assertion that "[t]here is no dispute that" the various so-called "death benefits" are "based 'upon the life or body'" of the annuitants. See, e.g., *Consolidated Memo. in Response to Defendants' Motions to Dismiss*, C.A. No. 09-472/S, at 9. There is, indeed, a dispute. Plaintiffs' contention ignores the plain statutory meaning of Section 27-4-27(a), which is that it refers to life insurance policies (as well as, perhaps, accident/injury insurance policies), but not to all kinds of "insurance." More importantly, Plaintiffs disregard the terms, structure, and function of the annuity contracts that they designed and wrote (including the "death benefit" features). As explained herein, these features distinguish these annuities contracts in multiple respects from insurance generally and from life (and accident) insurance in particular. Moreover, the reference in the statutory definition of "life insurance" to "additional benefits," which Plaintiffs make much of, has nothing to do with features of an annuity contract, even if Plaintiffs chose to term those features "death benefits" in marketing their investment vehicles to the public. Rather, that definitional provision refers to "additional benefits *in the event of death by accident*." R.I. GEN. LAWS § 27-4-0.1(c) (emphasis added). Plainly, this is intended to refer to a provision *in a life insurance contract* that adds benefits to cover the exigencies of a particular *kind* of death, "death by accident." It has nothing whatsoever to do with annuities or even with those insurance policies not covered by the statute.

> "Annuities" means all agreements to make periodic payments for a certain period or where the making or continuance of all or some of a series of the payments, or the amount of any payment, depends on the continuance of human life, **except payments made in connection with a life insurance policy.** Amounts paid the insured to provide annuities and proceeds applied under optional modes of settlement or under dividend options may be allocated by the insurer to one or more separate accounts pursuant to provisions of the annuity contract.

R.I. GEN. LAWS § 27-4-0.1(a) (emphasis added). Conversely, the definition of life insurance neither includes, nor references, annuities. Id. at § 27-4-0.1(c).

It is axiomatic that where, as here, the language of a statute is clear and unambiguous, the court is required to interpret the statute literally and must give the words of the statute their plain and ordinary meaning. Liberty Mut. Ins. Co. v. Kaya, 947 A.2d 869, 872 (R.I. 2008); State v. Laroche, 925 A.2d 885, 888 (R.I. 2007). It is only when confronted with an ambiguous statutory provision that a court will examine the statutory intent and purposes behind the provision. Kaya, 947 A.2d at 872.

This Court cannot reasonably discern any ambiguity in the foregoing statutory provisions. Even assuming, *arguendo*, that these statutory provisions were ambiguous – which they are not – a review of other relevant Rhode Island statutes confirms that an insurable-interest requirement does not apply to annuities. Chapter 4's definitional section (§§ 27-4-0.1(a) and (c)) distinguishes between annuities and life insurance by expressly and separately delineating the two. Compare R.I. GEN. LAWS § 27-4-0.1(a) with R.I. GEN. LAWS § 27-4-0.1(c) (separate definitions for "annuities" and "life insurance"). These definitional distinctions are binding on the Court. See Kelly v. Marcantonio, 678 A.2d 873, 876 (R.I. 1996) ("When the General Assembly defines a word or phrase used in its enactment, that definition is binding upon [the] court."). The General Assembly could not have intended courts to construe life insurance and annuities interchangeably, because such a reading would render their separate definitions

meaningless. See Robertson Stephens, Inc. v. Chubb Corp., 473 F. Supp. 2d 265, 271 (D.R.I. 2007) (quoting Ruggiero v. City of Providence, 893 A.2d 235, 237-38 (R.I. 2006)) ("[T]his Court is bound to Rhode Island's long-applied 'canon of statutory interpretation which gives effect to all of a statute's provisions, with no sentence, clause or word construed as unmeaning or surplusage.'").

Also significant, very recent statutory law, the "Life Settlements Act,"[7] demonstrates that the Rhode Island General Assembly knows how to regulate so-called "stranger originated" transactions when it wants to, and that it *only* plans to regulate such transactions when *life insurance* is involved. See R.I. GEN. LAWS §§ 27-72-1, et seq.; id. § 27-72-2(9)(i)(A)(X) (emphasis added) (defining "fraudulent life settlement act[s]" to encompass practices involving "stranger originated *life insurance* (STOLI)"); id. § 27-72-2(26) (emphasis added) (defining "stranger-originated life insurance" or "STOLI" to be a "practice or plan to initiate a *life insurance policy* for the benefit of a third-party investor who, at the time of policy origination, has no insurable-interest in the insured. . . . "); id. § 27-72-14(a)(1) (prohibiting "fraudulent life settlement acts"). Nowhere in its many provisions does this statute even *mention* annuities. This again confirms the General Assembly's intent that insurable-interest requirements apply only to life insurance policies, but not to annuity contracts.[8]

Further, and as the next section discusses, the Rhode Island Supreme Court has expressly stated that annuities are not subject to invalidation on "public policy" grounds due to the lack of

---

[7] The bill became law without the Governor's signature on November 12, 2009. See http://www.rilin.state.ri.us/BillStatus09/S1-299.pdf at p. 61. The statute's requirements will take effect on July 1, 2010. R.I. GEN. LAWS § 27-72-18.

[8] Another Rhode Island statute requires an insurance company to provide an insurance applicant with copies of all of the medical reports that the company received about the applicant, whether or not the company decides to cover the applicant. See R.I. GEN. LAWS § 27-4-25. There is, of course, no such requirement for annuities, because medical reviews are not part of the annuity application process. This is but one more example of the General Assembly's recognition that annuity contracts differ in important ways from life insurance policies.

an insurable interest. See Cronin v. Vermont Life Ins. Co., 20 R.I. 570, 572 (R.I. 1898); Clark v. Allen, 11 R.I. 439, 444 (1877). It is, therefore, *Plaintiffs* who improperly seek to override the Rhode Island Supreme Court's understanding of the common law through a very broad reading of statutory law. This is impermissible under the principle, which Plaintiffs themselves have cited, that "legislative enactments will be construed to alter the common law only to the extent that the legislature has made that purpose clear." Knowles v. Ponton, 190 A.2d 4, 6 (R.I. 1963). The Rhode Island Supreme Court has also expressed this as the rule that "it will be presumed the legislature intended to make only such alteration in the common law as the language of the statute naturally and necessarily indicates." Hoffman v. Louis D. Miller & Co., 115 A.2d 689, 691 (R.I. 1955). Because § 27-4-27(a) does not "naturally necessarily indicate" that the insurable-interest requirement applies to annuities, this Court should not alter the common law to make it applicable to the annuity contracts in question.

2.     **Rhode Island case law expressly undermines the application of an insurable-interest requirement to annuities, and the Court should not rewrite the Rhode Island common law to impose such a requirement for the first time in these actions.**

Plaintiffs next assert that the common law voids the variable annuity contracts they issued. See, e.g., *Consolidated Memo. in Response to Defendants' Motions to Dismiss*, C.A. No. 09-471/S, at 14-17). This claim lacks merit.

Most importantly, the Rhode Island Supreme Court, in fashioning the common law regarding the insurable-interest requirement, has expressly distinguished between annuities and life insurance contracts, *and it has indicated that no insurable-interest requirement applies to annuities*. As the court stated in Cronin:

> [T]he element of chance enters into annuities, and the temptation to shorten life in order to hasten the possession of a remainder-man, after a life estate in real

property, is as strong as in the case of a beneficiary under a life [insurance] policy. *But these things have never been considered contrary to public policy.*

Cronin, 20 R.I. at 572 (emphasis added) (citing Clark, 11 R.I. at 444 ("There is in all these cases a speculation upon the chances of human life. But the transaction has never been held to be void on that account.")).

Cronin *contrasted* both annuities and life estates designating remaindermen, which are not void for public policy reasons due to the lack of an insurable interest, with *life insurance*, which *is* subject to an insurable-interest requirement, ultimately concluding that the life insurance policy in Cronin was valid because there was an insurable interest. Cronin's considered analysis, tracing the development of the doctrine from English law through Rhode Island common law, and drawing a clear line between life insurance and annuities, and other non-life insurance contracts and property arrangements involving life estates, remains good law in Rhode Island, and no court has ever second-guessed the Rhode Island Supreme Court's rationale for this distinction.[9]

---

[9] That the Court may construe the statements in Cronin and Clark with regard to annuities as *dicta* is of no moment. They are direct, clear, and uncontradicted guidance from the Rhode Island Supreme Court on the state law issue before this Court. As such, they must be considered and should be given great weight in (1) understanding how the Rhode Island Supreme Court apprehends the insurable-interest common law, and (2) predicting how the court would rule on this issue if squarely presented with it. See Wells v. Liddy, 186 F.3d 505, 528 (4th Cir. 1999) (holding that in forecasting state law, a federal court can consider, *inter alia*, "well considered dicta" of the state's highest court); see also Boston Reg'l Med. Ctr., Inc. v. Reynolds, 410 F.3d 100, 108 (1st Cir. 2005) (explaining that court was "required to make a prophecy" of state law (there, Massachusetts law) by "rely[ing] first on settled [state] law and build[ing] from there by reference to case law in other jurisdictions and to the policies enunciated in the [state] cases.").

Plaintiffs quote selectively from Cronin, omitting any reference to its statement that no insurable-interest requirement applies to annuities. See, e.g., *Consolidated Memo. in Response to Defendants' Motions to Dismiss*, C.A. No. 09-471/S, at 16. Perhaps attempting indirectly to respond to this aspect of Cronin, however, Plaintiffs concede that "[t]o the extent that Defendants contend that the insurable-interest requirement does not apply to traditional annuities, such a position may be reasonable." Id. at 16, n.8. They then elaborate that, "[a]fter all, in the absence of a death benefit, the beneficiary of a traditional annuity stands to gain continued annuity payments as long as the measuring life is alive. The essential annuity arrangement does not provide the same incentive for mischief that a separately purchased Double Enhanced Death Benefit provides." Id.

Setting aside <u>Cronin</u>'s explanation that insurable-interest requirements do not apply to annuities, it is striking that Plaintiffs have failed to cite a single case from *any* jurisdiction in which a court has applied an insurable-interest requirement to an annuity contract under the common law.[10] In this context – with an express statement by the Rhode Island Supreme Court

---

Plaintiffs' argument that an insurable-interest requirement should apply to Plaintiffs' annuities, even though the Rhode Island Supreme Court does not apply it to anyone else's annuities, is unpersuasive on both the facts and the law for several reasons.

As a factual matter, Plaintiffs obscure the "incentive for mischief" in traditional annuities. The *standard* death benefits that Plaintiffs offer – *without* the purchase of any "enhanced" death benefits – already allow the beneficiary to collect the policy value or cash value of the policy upon the death of the annuitant (or, in an alternative formulation, a standard benefit equal to all premiums paid, less adjusted partial withdrawals). This creates an incentive for someone who (for whatever reason relating to the current balance of her portfolio or her current financial needs) prefers a large payout *now* to a smaller, gradual stream of income payments *later* to create such "mischief." See, e.g., *Amended Complaint*, C.A. No. 09-470/S, ¶ 10 (WRL annuity includes "a standard death benefit that is the greater of either the policy value or the cash value of the policy as of the reported death of the annuitant."); *Amended Complaint*, C.A. No. 09-471/S, ¶ 21 ("standard death benefit" of Transamerica annuity equals "the total of all premiums paid, less any adjusted partial withdrawals"). There is, therefore, no significant distinction between the annuities in this case and so-called "traditional" annuities that provide a "standard death benefit."

Plaintiffs' argument also disregards the Rhode Island Supreme Court's acknowledgement in <u>Cronin</u> and <u>Clark</u> of such "incentives for mischief" in standard annuity contracts and its determination, *even in the face of these incentives*, that the insurable-interest requirement does *not* extend beyond the life insurance context to "other branches of the law." See <u>Cronin</u>, 20 R.I. at 570 (policy reasons supporting insurable-interest requirement are "not applied to other branches of the law;" "[f]or example, the element of chance enters into annuities, and the temptation to shorten life in order to hasten the possession of a remainder-man, after a life estate in real property, is as strong as in the case of a beneficiary under a life policy. But these things have never been considered to be contrary to public policy."); <u>Clark</u>, 11 R.I. at 444 ("There is in all of these cases a speculation upon the chances of human life. But the transaction has never been held to be void on that account.").

Furthermore, the Rhode Island Supreme Court provided sound – indeed, classic – jurisprudential reasons for declining to expand the insurable-interest requirement, explaining that "Courts of justice . . . ought . . . to be cautious about making their own notions of public policy the criterion of legality, lest, under the semblance of declaring the law, they in fact usurp the function of legislation." <u>Id.</u> at 444-45. But that is precisely what Plaintiffs now ask this Court to do, in contravention of the Rhode Island Supreme Court's own understanding of the common law.

In the final analysis, the Rhode Island Supreme Court does not quibble over the finer points of an annuity contract – or any other non-life insurance contract or property arrangement – in order to determine whether an insurable-interest requirement applies. There simply is no insurable-interest requirement outside of the special context of life (and fire) insurance policies, because the Rhode Island Supreme Court is not willing to extend the common law in this fashion or usurp the legislative function by imposing such a requirement on "other branches of the law," even if there is an "element of chance" or a 'temptation to shorten life" that is "as strong as in the case of a beneficiary under a life policy." <u>Cronin</u>, 20 R.I. at 571-72.

[10] The Rhode Island common law insurable-interest cases to which Plaintiffs cite are not on point because they involved life insurance. For example, *Mohr v. Prudential Ins. Co. of America*, 78 A. 554 (R.I. 1911), involved a life insurance policy; not an annuity or some other contract. See <u>id.</u> at 555 (forcing company to pay life insurance to beneficiary who was the aunt of the insured). In addition to the fact that they expressly exclude annuities from any

*against* applying an insurable-interest requirement to annuities and *no* supportive law from any other jurisdictions to do otherwise – it would be a radical step to conclude that Rhode Island law would impose an insurable-interest requirement on annuities.

Plaintiffs cannot shoehorn their annuity contracts into the common law (or statutory) definition of "life insurance" for the first time in these actions just to suit their present purpose of inventing and then applying a non-existent insurable-interest requirement to annuities. The Rhode Island case on which Plaintiffs rely most heavily does not support the conversion of their annuity contracts into life insurance policies. Plaintiffs argue that <u>Sisson v. Prata Undertaking Co.</u>, 141 A. 76 (R.I. 1928), stands for the proposition that "[a] contract may constitute 'insurance' even if it is not labeled as such." *Consolidated Mem. in Response to Defendants' Motions to Dismiss*, C.A. No. 09-471, at 9. But that proposition has no application here. The <u>Sisson</u> burial insurance policy, unlike the annuity contracts at issue in these actions, was *structured* as a conventional insurance policy. The court explained that the burial contracts "are subject to the condition that the contract holder shall pay a certain sum, monthly or annually, in order to become entitled to the [much greater] benefits under the contract, and in case default is made in such payments the contract becomes void and the holder loses all rights and benefits thereunder." <u>Sisson</u>, 141 A. at 76. The "benefits" in <u>Sisson</u> included coverage of burial expenses or, in an alternative contract the company used, the dedication of a fixed amount to pay for such. <u>Id.</u> Thus, it was no stretch for the parties and the Court to conclude their contracts with these features were "insurance."

---

insurable-interest requirement, <u>Cronin</u> and <u>Clark</u> are distinguishable in that they applied an insurable-interest requirement to life insurance policies, not to annuity contracts. <u>Cronin</u>, 40 A. at 574 (enforcing life insurance policy payable to insured's aunt); <u>Clark</u>, 11 R.I. at 442 (enforcing a life insurance policy payable to the insured's brother-in-law).

Plaintiffs, however, did not structure their annuity contracts like life insurance, and the

annuities do not function as such. Among other distinctions described below, the annuities do

not involve a fixed series of premium payments culminating in a fixed payout at death. It

would, therefore, constitute a giant leap to convert the annuity contracts into life insurance

policies on the basis of a burial-insurance case in which the burial insurance functioned as

insurance in all but name.[11]

The public policy arguments that Plaintiffs advance do not apply and are insufficient to

support an expansion of Rhode Island's common law rule to encompass annuity contracts. The

insurable-interest requirement for life insurance policies is grounded on public policy,

recognizing that the lack of a pre-existing relationship between the owner of a life insurance

policy and the individual who the policy insures may give the owner a morbid interest in having

the insured die sooner to obtain the much greater policy proceeds. See Grigsby v. Russell, 222

U.S. 149, 154 (1911) ("A contract of insurance upon a life in which the insured has no interest is

a pure wager that gives the insured a sinister counter interest in having the life come to an end.").

But these annuities do not present the same risk. Double-Enhanced Death Benefits, which

---

[11] The only two other cases to which Plaintiffs cite for their argument that contracts not labeled as insurance can still be construed as such are patently distinguishable. See Lerner v. Lerner, 120 A.D.2d 243 (N.Y. App. Div. 1986); Att'y Gen. v. C.E. Osgood Co., 144 N.E. 371 (Mass. 1924). In holding that a preretirement death benefit of a pension plan constituted insurance, Lerner effectuated the intent of the parties to a separation agreement, which the court interpreted "to broadly include within the ambit of 'future insurance' any future benefit which might conceivably arise." See Lerner, 120 A.D.2d at 249 ("Perhaps the most compelling argument which can be made in support of the plaintiff's position is the fact that inclusion of the preretirement death benefit would most closely effectuate the purpose of the separation agreement . . . ."). Also of significance to the court, "[t]he pension plan involved . . . was itself funded through a group life insurance policy," id. at 248, and the court found that "the fact that the [Internal Revenue Code] treats the proceeds of preretirement death benefits funded by life insurance similarly to those of conventional life insurance policies . . . further advances the plaintiff's case." Id. at 249. Here, in stark contrast, the tax treatment is the reverse of what it was in Lerner: the contracts specified that they were to be construed as annuities for tax purposes, not as life insurance. The Plaintiffs' intent as they expressed it in their contracts of adhesion, as well as the Internal Revenue Code's different treatment of annuities and life insurance (see infra Part I(B)(1)), should control here, just as it did to opposite effect in Lerner. Osgood is also distinguishable. In Osgood, the court found that the furniture leases constituted "contracts of insurance," but it rested its decision on a Massachusetts statute that explicitly defined the term. See Osgood, 144 N.E. at 372 (citing Mass. Gen. Laws ch. 175, § 2).

Plaintiffs gladly sell to their customers for additional fees, only protect the value of the owners' investments. See, e.g., *Complaint*, C.A. No. 09-471, at Exhibit B, page 5 (Transamerica Annuity Prospectus); *Complaint*, C.A. 09-472, at Exhibit B, page 11 (WRL Annuity Prospectus). Unlike in the life insurance context, the sizes of the "death benefits" (Plaintiffs' term) are based not on a fixed amount that the Plaintiffs promise to pay out – whether sooner or later – when the annuitants die, but on the size of the investments and the shifting performance of the securities markets. See, e.g., *Complaint*, C.A. No. 09-471, at Exhibit E, page 26 (Transamerica Additional Death Benefit Rider); *Complaint*, C.A. No. 09-472, at Exhibit D, page 25 (WRL Enhanced Death Benefit Rider). In any event, Plaintiffs' public policy argument is hypocritical in the extreme. Plaintiffs themselves would not market these products as annuities to a retirement market of older individuals if Plaintiffs did not stand to reap more robust profits from the attenuated lifespan of their typical annuitants and the premium fees they draw from this market, all of which they accomplish by not selling these annuities as life insurance. Plaintiffs' public policy argument is also, in the end, utterly unpersuasive in light of Cronin's explicit rejection of this same public-policy argument as a basis for questioning or invalidating non-life insurance contracts such as annuities. See Cronin, 20 R.I. at 572.

Other dispositive reasons defeat Plaintiffs' claims. Plaintiffs' reading of the common law, even if it were accurate, would completely undermine the Rhode Island General Assembly's decision to distinguish between annuity contracts and life insurance policies. If Plaintiffs desire to change Rhode Island law, they should avail themselves of the legislative process to properly effectuate this result. Further, as discussed in the next sub-section (see infra Part I(B)), there are important substantive distinctions between annuity contracts and life insurance policies. Finally,

the Court should reject Plaintiffs' argument for a far-reaching amendment of Rhode Island common law principles in light of the Rhode Island common law on this point.[12]

## B. Plaintiffs' annuity investment vehicles are substantively different from life insurance.

It is Plaintiffs, not Defendants, who rely on formalism to collapse the legal distinction between annuities and life insurance policies. In fact, annuity contracts – including their so-called "death benefit" features – differ substantively, both structurally and functionally, in important ways from life insurance policies. In addition, case law, federal tax and securities law, and commentary by leading secondary authorities further confirm what the Plaintiffs' contracts and Rhode Island law already establish: for a variety of valid reasons, annuity contracts are not life insurance policies, and the law does not regard them as such. Converting these annuity contracts into life insurance policies would thus undermine not just Rhode Island law, but also genuine substantive distinctions between the two kinds of contracts. This would impact all parties to annuity contracts in Rhode Island and the annual $151 billion variable annuity business generally, and trigger potentially far-reaching tax implications and liabilities.

### 1. The annuity contracts differ substantively from life insurance policies as reflected in the contracts' terms and in the manner in which Plaintiffs designed, marketed, and sold them.

As Plaintiffs were well aware in designing them, these annuity contracts do not substantively resemble life insurance policies. Indeed, nowhere in the contract documents themselves do Plaintiffs even mention the word "insurance"; not in the contracts themselves, not

---

[12] Plaintiffs argue (unpersuasively, in this context) that the Court should exercise judicial restraint in applying the economic-loss doctrine to this case. See, e.g., Consolidated Mem. in Response to Defendants' Motions to Dismiss, C.A. No. 09-471, p. 53 (pleading for judicial restraint when it comes to applying the economic-loss doctrine). But it is here, with respect to insurable interest, that the Court should apply Plaintiffs' logic to deny their request to substantially modify Rhode Island common law, which has, to date, rejected any application of the insurable-interest requirement to annuities. See Cronin, 20 R.I. at 572.

in Plaintiffs' polished marketing materials, and not in the application forms that Plaintiffs generated and distributed.

The annuity contracts also differ in terms of the application *process* that Plaintiffs created and applied to them. Plaintiffs sought no insurable-interest verification and did not request that annuitants submit to any kind of health-vetting or relationship-disclosure process as a prerequisite to Plaintiffs' issuance of the annuity contracts.

The contracts that the Plaintiffs designed also differ structurally and functionally from life insurance contracts in significant ways. Functionally, annuities are investment vehicles, designed to enhance the amount of money that their owners put into them. Insurance, on the other hand, is not. It is intended to compensate owners after they suffer a loss.

Structurally, a life insurance policy requires regular periodic premium payments in exchange for a fixed-sum payout upon death. But the annuity contracts Plaintiffs issue, including the so-called "death benefit" features, do not share this structure. First, the annuitant is not a party to the annuity contract. Second, the amounts that an investor contributes to the invested pool of funds depends on the investor's chosen amount and type of investment within each sub-account of the annuity, subject to any applicable fees; and the amount paid out as a death benefit, as touched on supra, is not a fixed lump-sum guaranteed by the Plaintiff upon the annuitant's death but, rather, an amount that depends on (1) the account value attributable to the results of the owners' investments in the sub-accounts created within the annuity and (2) conditions in the marketplace.

Moreover, each and every one of the Plaintiffs' annuity contracts explicitly identified the contracts as being *annuity* contracts and as being eligible for tax treatment under special provisions applicable only to annuity contracts:

**TAX QUALIFICATION**
This policy is intended to qualify as an annuity for federal income tax purposes.
The provisions of this policy are to be interpreted to maintain such qualification,
notwithstanding any other provisions to the contrary. . . .

See, e.g., C.A. No. 09-471/S, *Complaint*, at Exhibit E, p. 22. Indeed, the Internal Revenue Code

(the "IRC") treats life insurance and annuities quite differently. Compare 26 U.S.C. § 101(a)(1)

(tax treatment of benefits paid under a life insurance policy) with id. § 72(a)-(c) (tax treatment of

annuity payments). For instance, with life insurance, the IRC regards the entirety of death

benefit payments as tax-free. 26 U.S.C. § 101(a)(1). With annuities, it taxes as ordinary income

the portion of an annuity payment that constitutes growth, while excluding the portion that

represents the taxpayer's up-front investment or contribution to the annuity. 26 U.S.C. § 72(a)-

(c). In other words, the IRC treats annuities as investments. Id. This further establishes that

annuity contracts are not life insurance policies.

> **2.    Judicial interpretations support the substantive distinction between
> annuities and life insurance policies.**

Judicial interpretations also support the substantive distinction between annuity contracts

and life insurance policies. In In re: McClure v. McClure, Bankr. No. 98-14932 (Bankr. D.K.S.

Dec. 22, 1999) (*available at* http://www.assetprotectionbook.com/mcclure.pdf) for example, the

court found that an annuity contract did not qualify as "insurance" under Kansas law because the

premium was not based on the insured's age, health, or life expectancy, but rather on the amount

of the owner's investment. Id. at 5. The same substantive distinction applies to all of the

annuities at issue in this case. In Nationsbank of North Carolina, N.A. v. Variable Annuity Life

Insurance Co., 513 U.S. 251 (U.S. 1995), the United States Supreme Court considered the very

issue of whether annuities are properly classified as insurance. It upheld the Comptroller of

Currency's determination that "annuities are not insurance" within the meaning of the National

Bank Act, noting that "mortality risk is a less salient characteristic of [annuities]," id. at 262, and explaining that for an annuity customer, "an annuity is like putting money in a bank account, a debt instrument, or a mutual fund." Id. at 259. The fact that annuities are often sold by insurance companies, and are regulated by some state insurance codes, does not change the fact that annuities are not insurance. Id. at 261; see also Lee R. Russ & Thomas F. Segalia, Couch on Insurance § 1:22 (3d ed. 2000) (noting that Couch does not cover annuities in detail because they are not insurance; that annuities do not fall within the excluding provisions of the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015; and that the Securities Act's definition of security, 15 U.S.C. § 77b(1), can encompass certain flexible fund annuity contracts).

**C.      The Court should estop Plaintiffs from attempting to convert their annuity contracts into life insurance policies in order to impose an insurable-interest requirement.**

Even setting these considerations aside, the Court should estop the Plaintiffs, who deliberately marketed their annuities as investments and took care to ensure that the tax laws recognized them as such, from arguing they are something else after Defendants relied on those representations. See El Marocco Club, Inc. v. Richardson, 746 A.2d 1228, 1233-34 (R.I. 2000) (summarizing elements of estoppel). Plaintiffs should be estopped from now arguing otherwise because (1) they plainly represented in their marketing materials, their applications, and their annuity contracts that these were indeed annuities, as opposed to life insurance policies, and (2) there is no doubt that, on the alleged facts, it was Plaintiffs' presentation to the public of their annuity investment vehicles that prompted the investors to invest their funds in these products.

## II. THE INCONTESTABILITY CLAUSES ARE VALID AND ENFORCEABLE.

While seeking to rewrite Rhode Island law to *add* an insurable-interest requirement that does not exist, the Plaintiffs also aim to *remove* the incontestability clauses from their own adhesion contracts.

### A. This Court should enforce the incontestability clauses despite Plaintiffs' complaint that the clauses they drafted took immediate effect.

Plaintiffs assert, first, that the incontestability clauses are unenforceable because the incontestability period was, in essence, "too short." Plaintiffs' position is unpersuasive, given that they are the ones who drafted the clauses, chose the period of incontestability, and secured the benefits in the marketplace that a short contestability period conferred. Not surprisingly, the better-reasoned and more recent case law has rejected their position.

As Williston observes, "[l]ater cases usually concluded that the purpose of and public policy underlying the incontestability clause was to foreclose even the defense of fraud, and, therefore, that the beneficiary could recover even though the policy was made incontestable from the date of issuance." 16 Richard A. Lord, Willison on Contracts § 49.95 (4th ed. 2009).

Williston lists the multiple values and interests supporting the outcome in these cases:

1. The insurer drafted the clause, expecting to obtain additional competitive business through its use, and should be bound by it;

2. A sensible insurer should anticipate and discover fraud by its independent efforts before accepting the risk; if it unduly curtails its investigation, it does so at its own peril;

3. The insurer has an unlimited time before deciding to issue the policy to investigate a given risk; it can and should conduct its investigation before, rather than after, accepting the risk;

4. Early fraud is like late fraud or fraud lately discovered, and contracts induced by late fraud are sustained after the contestability period has elapsed; the time the fraud is discovered and asserted should not be controlling if the contract otherwise stipulates.

Id.; see, e.g., Pac. Mut. Life Ins. Co. v. Strange, 135 So. 477 (Ala. 1931) (holding that health insurance policy was incontestable on grounds of fraud because of enforceable incontestability clause which took effect upon policy issuance).

Contrary to Plaintiffs' position, the Rhode Island Supreme Court's early embrace of incontestability clauses, as well as the policies underpinning them, in Murray v. State Mutual Life Insurance Co., 48 A. 800, 800-01 (R.I. 1901), supports, rather than undermines, the Defendants' position that the incontestability clauses are enforceable, notwithstanding that they took immediate effect upon the Plaintiffs' issuance of the annuity contracts. Though Murray happened to involve a contract with a two-year contestability period, the court wrote broadly and at length about the general merit of incontestability clauses. It commented that abbreviating the time in which to challenge the enforceability of an insurance policy was "entirely reasonable," and that such clauses also work to the benefit of insurance companies because they operate as an "inducement to people to insure" and are "very effectual in accomplishing that object." Id. The presence of an incontestability clause means that "no advantage can be taken" of the applicant once the incontestability period elapses, that the applicant's "rights under the policy and the rights of those in whose favor it is drawn . . . become absolute," and that the beneficiary, "perhaps long after the death of all those who knew the facts relating to the transaction, will not be forced into a lawsuit to determine whether the policy ever had any legal force or validity." Id. These interests that the Rhode Island Supreme Court has identified will only be served if the Court enforces Plaintiffs' incontestability clauses as Plaintiffs crafted them in their adhesion contracts.

**B.      Even if these annuities were subject to an insurable-interest requirement, the Court should still enforce the incontestability clauses.**

As discussed above, Plaintiffs also argue that their incontestability clauses be cast aside because of the alleged lack of an insurable-interest relationship between the annuitants and the owner/beneficiaries.  The better-reasoned cases, however, have held that an insurance company cannot invalidate a contract on this basis once the incontestability period designated in the contract has elapsed.  See New England Mut. Life Ins. Co. v. Caruso, 535 N.E.2d 270, 271 (N.Y. 1989) ("[P]assage of the incontestability period bars the insurer thereafter from asserting the policyholder's lack of an insurable interest."); Bogacki v. Great-West Life Assur. Co., 234 N.W. 865, 865-66 (Mich. 1931).[13]  In rejecting an insurance company's argument that the lack of an insurable interest violated public policy and rendered the incontestability clause unenforceable, one court explained that there is a countervailing interest in that "'[i]nsurance companies should not be permitted with shut eyes to receive in silence the profits of their contracts, and to grow inarticulate only when called upon to pay.'"  Bogacki, 234 N.W. at 866 (quoting Harrison v. Provident Relief Ass'n, 126 S.E. 696, 674 (Va. 1925)).  The same logic applies here.[14]

---

[13] The Rhode Island Supreme Court did not rule otherwise in Mohr v. Prudential Insurance Co. of America, 78 A. at 557, in which the plaintiff prevailed over the defendant insurance company on a finding that either the plaintiff had an insurable interest or the insured himself owned the policy.  The defendant did "not present the question of whether or not, after the lapse of one year from the delivery of these policies, if all due premiums had been paid, the so-called incontestable clauses contained in the policies would prevent the defense of a lack of insurable interest in the beneficiary."  In other words, the court did not reach the issue.

[14] For the same basic policy reason, the Court should apply the clause to all of the fraud-based claims and to the pertinent defendants, as each fraud-based claim amounts to a challenge to the application process.  By issuing the annuity contracts, the Plaintiffs ratified the application process and relinquished their claim to revisit that process by "grow[ing] articulate only when called upon to pay." Id.

## III. PLAINTIFFS FAIL TO ALLEGE ACTIONABLE FRAUD BASED ON THE ALLEGED NON-DISCLOSURES.

### A. There was no duty to disclose the information at issue because Plaintiffs did not ask about these matters in their applications, and the law imposed no independent duty on Defendants to disclose such information.

#### 1. There was no duty to disclose the alleged "imminent death" of the annuitants. And, in any event, how could Defendants have known whether the annuitants – some of whom are still alive – faced "imminent" death?

Plaintiffs' central grievance in these actions focuses on the health condition of the annuitants. They argue in their memoranda that various defendants – including those defendants who were not even parties to the applications or the contracts – had a duty to disclose the "imminent death" of the annuitants, because "imminent death is a basic fact" for which there is a duty to disclose in every life insurance contract.

As an initial matter, there is no life insurance contract at issue in any of these cases. This is not mere formalism. Among the other distinctions between insurance policies and annuity contracts discussed above, the application process for insurance policies is very different than the application process for annuity contracts, and it is inappropriate to impose additional legal burdens that, according to Plaintiffs, may apply in other jurisdictions to life insurance policies.

More importantly, a careful unpacking of the case law demonstrates that it does not support the existence of any such "imminent death" duty of disclosure, *even in the standard life insurance context*, and the prevailing rule in the more analogous area of credit life insurance is that there is no such duty to disclose.

Neither Plaintiffs nor Couch provide any primary authority supporting the assertion that "ordinarily" disclosure of an insured's supposed imminent death is required as to life insurance applications. The case that Couch cites for this principle, National Life Insurance Co. v.

Harriott, 268 So. 2d 397 (Fla. Dist. Ct. App. 2d 1972), is an *anomalous* case from the *credit* life insurance context, in which the court imposed such a disclosure requirement. In fact, the majority of other jurisdictions who have considered the Florida rule adopted in Harriott have rejected it – and for good reasons. See, e.g., Mulvihill v. American Annuity Life Ins. Co., 328 N.W.2d 402, 402 (Mich. App. 1982).

In accordance with this characterization, an A.L.R. note more fully surveying the law regarding the disclosures required in the terminal illness / credit life insurance context, concludes as follows: "*Most of the courts which have ruled on this question have held that since the insured has no duty to disclose that he or she is suffering from a terminal illness in this situation, the insurer may not avoid the policy.*" 42 A.L.R.4th 158 (emphasis added).

As one court in this line explains:

> Absent an insurer's request for health information or statement of good health, a prospective insured is under no duty to volunteer it. Accordingly, we hold that plaintiff was under no obligation to disclose any knowledge of the impending death of his wife, the insured. The insurance company did not request the information, and plaintiff did not have the duty to volunteer it. If defendant wished to make a duty to disclose knowledge of terminal illnesses a condition of the policy, it should have included such a provision in the policy.

Mulvihill v. American Annuity Life Ins. Co., 328 N.W.2d 402, 402-03 (Mich. App. 1982) (internal quotation omitted).

In Federated Life Insurance Co. v. Citizens Bank & Trust Co., 593 S.W.2d 97, 99 (Ky.App. 1979), the court reached the same conclusion, holding that the insured's knowledge of his terminal illness when he procured the credit life insurance policies did *not* preclude recovery under the policies and, that public policy did not require the applicant to disclose his knowledge of his impending death. The court reasoned that:

> Insofar as appellant required no statement of health condition, examination or application, it should therefore bear the greater of the risks of the debtor, being of

unsound health at the time of issuance of the credit life policy. The policy of insurance issued in this case was absent a requirement as to the condition of health at the time of the delivery, absent a requirement for furnishing satisfactory evidence of insurability, and there is no policy provision affecting the validity of the policy in the event the insured was of unsound health at time the policy was issued.

Id.

And in Block v. Voyager Life Insurance Co., 303 S.E.2d 742 (Ga. 1983), the Georgia Supreme Court held that the "failure of the insured to supply information when no inquiry is made by the insurer or its agents and neither the certificate or master policy of insurance inform the insured that certain illnesses are not covered will not raise a defense of fraud or material misrepresentation in a suit on the policy." Id. at 745.

One common thread in these credit life insurance cases – as in cases drawn from the broader life insurance context – is that there is no duty to disclose health conditions, "if the policy contains no health exclusions and no inquiry is made by the insurer." Block, 303 S.E.2d at 745 (collecting cases); see also, e.g., Southard v. Occidental Life Ins. Co., 142 N.W.2d 844 (Wisc. 1966) (holding applicant had no duty to disclose quadriplegia on application for life insurance where insurance application did not inquire about the specific health issue but, rather, only inquired about various "illnesses"); Greensboro Nat'l Life Ins. Co. v. Southside Bank, 142 S.E.2d 551 (Va. 1965) (holding insurer could not avoid credit life insurance policy because plaintiff had failed to disclose that his wife was suffering from a terminal illness at the time the application for insurance was made, where the policy was issued without requiring or requesting any information about the health of the wife, and where the policy contained no condition, limitation, or exception with respect to her health).

This is consistent with the more general principles courts apply to determine the presence or lack of a duty to disclose. The existence and scope of any such duty depends, in the first

instance, on the insurance application and the terms of the insurance contract – i.e., what the insurance company actually asked for and demanded as a precondition to coverage:

> In determining whether disclosure is required in a given case, particular attention must be given to the terms of the application and the contract of insurance, and to whether the contract necessitates disclosure by the insured to the insurer or the insured has warranted a full and true disclosure.

Russ & Segalia, supra, § 84:1; see also id. § 84:11 ("It has long been established that, ordinarily, the insured is not required to make more than a general statement of facts, and is not expected to go into details about which the insurer manifests no interest and makes no inquiry . . . ."); 42 A.L.R.4th 158 ("When an insurer asks no information in regard to a certain matter, it is a fair assumption that it regards the matter as immaterial and the fact that an applicant for insurance does not volunteer certain information is not therefore a basis for avoiding a contract of insurance.").

Another salient principle that these cases embody is that insurance companies should bear the risk on this issue because they could easily have "remedied" the situation "by requiring the insured to make a statement that to the best of his knowledge he is not suffering from a terminal disease." Block, 303 S.E.2d at 745. Thus, here, a *single question* in the annuity applications would have provided Plaintiffs with access to the information they now belatedly complain about not knowing.

Though there is, in fact, no prevailing "imminent death" rule in even the standard life insurance context,[15] it bears observing that credit life insurance is *more* like an annuity contract

---

[15] The fact that neither Couch nor Plaintiffs cite to a life insurance case, and instead Couch cites to the anomalous Florida credit life insurance case in support of the purported "imminent death" rule in the broader life insurance context, see Russ & Segalia, supra, § 84:1, suggests two things. First, the issue does not commonly arise in the standard life insurance context because in issuing life insurance policies, as opposed to selling credit life insurance contracts, insurance companies *do* make relevant inquiries. Second, *there is no* "imminent death" rule in *any* insurance context, be it life insurance or credit life insurance. In short, Plaintiffs seek to elevate unsupported commentary in a treatise to an established principle of insurance law, applicable even beyond the insurance context. In light of the better-reasoned, actual case law in this area, the proper conclusion is that, in the absence of a relevant

than a standard policy of life insurance in that credit life insurance serves somewhat in the manner of an investment vehicle (allowing the policy holder to leverage the coverage obtained under the policy to fund and secure various purchases and debts). In addition, insurance companies market credit life insurance, as they do annuities, as a product that the public can purchase without disclosing health history or submitting to the kinds of health reviews attendant to the standard life insurance policy that insurers such as Plaintiffs also issue. Insurance companies no doubt factor this less rigorous application process into the cost of credit life insurance policies, just as they presumably factor it into the annuity market.[16] Thus, to the extent that "the type of insurance" is even "a relevant factor" in determining whether there was a duty to disclose "imminent death," there is no such duty to disclose in the annuity context, where *insurance was not even involved.*

Considering this persuasive guidance from the credit life insurance context and beyond, there was no duty to disclose the condition of the annuitants' health, even if it arose to Plaintiffs' standard of "imminent death," because the Plaintiffs did not ask, in any fashion, about the annuitants' health in the applications, and Plaintiffs required no health certifications in the contracts of adhesion that they drafted and sold to the public for a premium.

But even assuming, *arguendo*, that there was a duty to disclose the "imminent death" of annuitants, Plaintiffs cannot plausibly allege that Defendants knew that any annuitant's death was "imminent."[17] As Plaintiffs point out, a number of the annuitants remain alive to this day;

---

health inquiry, courts should not allow insurance companies to invalidate on the basis of non-disclosed health conditions *any* life insurance policies – or any other contracts – that they have issued.

[16] The legislature has recognized the distinction between life insurance and credit life insurance by dedicating a specific statute in the insurance statutory framework to credit life insurance. See R.I. GEN. LAWS §§ 27-30-1, et seq.

[17] "im·mi·nent . . . 1 : ready to take place; *esp* : hanging threateningly over one's head . . . ." Webster's New Collegiate Dictionary 568 (1979).

and, as Plaintiffs characterize the "scheme," it depended on annuitants *not* dying imminently so that one or more of the Defendants and/or the Investors could potentially earn market gains from the annuity contracts.[18] The inapplicable and unsupported "imminent death" rule that Plaintiffs propose does not even fit the alleged facts.

### 2. There also was no duty to disclose the alleged lack of an insurable interest or any alleged payments to the annuitants.

Just as there was no "duty to disclose" with regard to the health condition of the annuitants, there was also no "duty to disclose" with regard to the various other matters about which the Plaintiffs complain, none of which were the subject of any inquiry in their applications. It is well settled that mere nondisclosure is not actionable as fraud. See, e.g., Smith v. O'Connell, 997 F. Supp. 226, 238 (D.R.I. 1998), aff'd sub nom. Kelly v. Marcantonio, 187 F.3d 192 (1st Cir. 1999).

Plaintiffs have failed to identify any relevant legal authority on which an affirmative duty to disclose such matters might rest. See, e.g., Schofield v. French, 36 F. Supp. 2d 481, 488 (D.R.I. 1999), aff'd 215 F.3d 1312 (1st Cir. 2000) (dismissing fraud claim based on concealment where there was no duty to disclose); Smith, 997 F. Supp. at 238 (same); Royal Bus Group, Inc. v. Realist, Inc., 933 F.2d 1056, 1064 (1st Cir. 1991) ("[T]here can be no actionable claim of fraud for failure to disclose in the absence of a duty to disclose").

Plaintiffs' cases rest on a remarkable proposition. As sophisticated insurance companies and self-professed victims of their own devices, they seek a seismic legal shift designed to obfuscate their responsibility and place the blame on the Defendants for Plaintiffs' alleged

---

[18] For example, according to the *Consolidated Memorandum in Response to Defendants' Motions to Dismiss* in C.A. No. 09-472/S, the "scheme" required that the annuitants die "not too long *or too short* after contract formation." Id. at 4 (emphasis added). Annuitants such as Charles Buckman could not have faced "imminent death" given that a group of the annuitants remain alive to this day, including Buckman, sixteen months after the policy issued. Id. at 11.

economic hardship resulting from their own self-constructed investment vehicles, as embodied in the applications and adhesion contracts that they drafted. There was no duty to disclose the (alleged) lack of an insurable interest, both because no insurable interest was required (because these were not life insurance contracts) and also because the existence *vel non* of an insurable interest had no bearing on the rights, obligations, or duties of either party to the contract – it was not even material, let alone "a basic fact" of the contract. The lack of any questions about the annuitants' relationships to the owners or beneficiaries on the applications confirms that this issue was of no moment to the Plaintiffs. By accepting the insurance applications – some of which, as Plaintiffs point out, disclosed LLC's as the investors[19] – without any "insurable interest" information, Plaintiffs waived any claim that this issue was material to their decisions to issue the annuities.

The same is also true for the alleged payments to the annuitants, as averred in a number of the complaints.[20] Any such payments did not violate Rhode Island law for the reasons already detailed in the initial memoranda.[21] Also, the purpose of Section 27-4-6, "to guard the public against purchasing life insurance on the strength of oral representations of coverage not to be embodied in the policy," Overton v. Washington Nat'l Ins. Co., 106 R.I. 387, 395 (R.I. 1970)), does not apply. Plaintiffs do not allege oral representations of life insurance coverage and, as per

---

[19] See, e.g., *Consolidated Memo. in Response to Motions to Dismiss* in C.A. No. 09-473/S at p. 48.

[20] Plaintiffs allege the compensation of annuitants in the following actions: C.A. No. 470/S; C.A. No. 09-471/S; C.A. No. 09-472/S; and C.A. No. 09-473/S. Plaintiffs do not allege compensation of the annuitant in C.A. No. 09-470/S. In two other actions, C.A. No. 09-549/S and C.A. No. 09-564/S, Plaintiffs allege compensation, but only in the alternative.

[21] Specifically, (1) the Rhode Island statute on which Plaintiffs rely pertains to only life insurance policies, not annuity contracts; and (2) the prohibition on payments applies only to insurance *producers*, such as the *Plaintiffs*, who are selling life insurance policies to the public, but not to owners, investors, and their representatives, such as Defendants. See R.I. GEN. LAWS§ 27-8-7 ("life insurance corporation[s] doing business in the state" and "insurance producer[s] of the corporation" prohibited from making payments not specified in the policy as inducement to purchase life insurance).

the terms of Plaintiffs' contracts, the annuitants serve only as measuring lives, not as purchasers of "life insurance." And neither the annuity applications nor the contracts themselves inquired about or placed any prohibition on such payments – again illustrating that payments to annuitants were not material to, let alone "a basic fact" of the contracts.

### 3. Plaintiffs' case law is either inapposite or it supports Defendants' position that there was no duty to disclose.

Plaintiffs rely for their "duty to disclose" argument on cases that do not support their position and are inapposite.[22] Most prominently, they cite <u>Columbian National Life Insurance Co. v. Industrial Trust Co.</u>, 166 A. 809, 812 (R.I. 1933), for the proposition that "[i]f the [insured] had been in a dying condition when the contract was accepted by the insurer, it does not seem – either on principle or authority – that the insurer would be bound by the contract." But that case – which, again, involved an insurance contract, not an annuity – had nothing to do with a duty to disclose on an application that did not inquire into the issue of the applicant's health condition. To the contrary, this is a case, applying Massachusetts law, about an insured applicant's ongoing duty to disclose his deteriorating health when he fell seriously ill shortly after submitting an application for reinstatement of his life insurance policy. An obvious and crucial distinction from this case is that on the application for reinstatement, the insured party explicitly warranted that he was in "sound health" and "that he had not been ill or consulted a physician since he was last examined by the company." <u>Id.</u> at 810-11. None of these defendants – or the annuitants – made any such representations, and the Plaintiffs nowhere asked anything about the health of anyone involved in the annuity contracts.

---

[22] At the same time, Plaintiffs unjustifiably discount <u>Testa v. Norfolk & Dedham Mut. Fire Ins. Co.</u>, 764 A.2d 119 (R.I. 2001), a Rhode Island case in which the court held that there was no duty to disclose the garaging of a car where the insurer did not ask about the issue, and <u>In re DiMartino</u>, 108 B.R. 394, 400 (D.R.I. 1989), in which the court held that, even setting aside the fact that the plaintiffs had either actual of constructive knowledge of the information, there was no liability for misrepresentation *also* because neither plaintiff "ever questioned" the defendant's involvement on both sides of the real estate transaction "nor asked for any details regarding his role in the construction of the building."

Plaintiffs also cite to <u>Cardiovascular & Thoracic Assoc., Inc. v. Fingleton</u>, C.A. No. 95-1322, 1995 R.I. Super. LEXIS 26 (Aug. 23, 1995), but that case directly undercuts their position. In <u>Fingleton</u>, the Superior Court justice explicitly rested the court's holding that a physician had a duty to disclose a prior malpractice situation on findings that (1) the other physician "specifically asked about" any "malpractice situation" during a job interview, and (2) "[t]he business relationship between the two physicians would be an extremely close association" because they would be part of a joint medical practice. <u>Id.</u> at * 7. The case demonstrates the limited kind of circumstances – a close business relationship and a relevant inquiry – in which there may be a duty to disclose under Rhode Island law. It implicitly confirms that there is no duty to disclose in an arms-length adhesion contract situation in which there were no relevant inquiries.[23]

### 4. Plaintiffs did not justifiably rely and they have waived their argument that any alleged omissions were material.

Plaintiffs' "justifiable reliance" and "materiality" arguments also miss the mark. Plaintiffs contend that "reliance may be presumed in fraud claims when the fraud claim is based on a material omission." But the Second Circuit case upon which they rely, <u>Litton Industries, Inc. v. Lehman Brothers Kuhn Loeb Inc.</u>, 967 F. 2d 742 (2d Cir. 1992), explained that this principle sometimes applies to a securities fraud claim brought under federal law, Rule 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5, 17 C.F.R. 240.10b-5. <u>Id.</u> at 747-48. The court explicitly contrasted this statutory/regulatory rule to the common law rule, which does

---

[23] Plaintiffs also rely, excessively, on <u>dicta</u> in a footnote from <u>Putnam Resources v. Pateman</u>, 757 F. Supp. 157 (D.R.I. 1991), to the effect that "fraudulent concealment" may make an insurance contract "voidable . . . even without inquiry." <u>Id.</u> at 162 n.1. The New York case that Judge Boyle cited for this principle, <u>Lighton v. Madison-Onondaga Mutual Fire Insurance Co.</u>, 106 A.D.2d 892 (N.Y. App. 1984), was from the distinguishable context of a fire insurance case; there, the applicant for fire insurance failed to disclose a suspicious, recent fire on the premises. It is not persuasive in the annuity context, and the credit life insurance cases and Rhode Island "no duty to disclose" cases offer better guidance.

*not* presume reliance. Id. Moreover, the case did not involve an annuity contract of adhesion but the very different context of an insider-trading stock transaction.

Plaintiffs strenuously argue that no investigation on their part was required, but at minimal cost they could have easily investigated and obtained the information they now claim Defendants fraudulently failed to disclose. More to the point, even if the law required no "investigation" on their part, their reliance was unjustifiable and they cannot establish materiality *because they made no inquiry in the applications as to these issues* and they therefore *waived* any objections to the adequacy of the answers; nor can they argue about the materiality of any issues about which they did not inquire after they accepted the completed applications and then issued the annuity contracts with incontestability clauses. See Block, 303 S.E.2d at 745 (quoting Ga. Farm Bureau Mut. Ins. Co. v. First Fed. & Assoc., 262 S.E.2d 147, 149 (1979)) ("'An insurance company can not assert that a factor is material to the risk about which it has neither made inquiry or appraised its prospective insured.'").

> **5.** **The independent status of the registered representatives, as well as the contents of the annuity applications, establish as a matter of law that the registered representatives had no duty to disclose, even assuming they possessed any knowledge on these issues.**

For the reasons provided in the Defendants' various initial memoranda, see, e.g., *Memo. in Supp. of Mot. to Dismiss*, C.A. No. 09-572/S at 18-21, the registered representatives were *not*, as Plaintiffs would have it, the Plaintiffs' agents with special duties to disclose. *Even if they were* the Plaintiffs' agents for some purposes, they had no agency role with respect to vetting annuitants for the insurers. Furthermore, the registered representatives were independent brokers whose duties at the application stage ran only to the applicants, who in all cases were the owners of the contracts. See 11 Eric Mills Holmes, Holmes' Appleman on Insurance 2d § 68.6 (1999)

(if there is no "agency relationship" between the sales representative and the insurance company, the former has no "duty . . . to disclose information regarding the insurance applicant.").

Indeed, in General Accident Insurance Co. of America v. American National Fireproofing, Inc., 716 A.2d 751 (R.I. 1998), the Rhode Island Supreme Court made clear that at the application stage, an agent represents the applicant, not the company. Id. at 756-57. Furthermore, "[i]n instances in which an insurance agent represents several companies and has the freedom to choose the company with which he would place an insurance policy, *the individual was the agent of the insured and not the insurer.*" Id. at 757 (emphasis added). The registered representatives and independent brokers here exercised exactly this discretion on behalf of the annuity applicants and therefore, as a matter of law, they did *not* represent the Plaintiffs. At the same time, they lacked the binding authority from the Plaintiffs that, in the insurance context at least, is a prerequisite to establishing that one is an agent of an insurance company. See Russ & Segalia, supra, § 45:8, 45-12 (individual with "no binding authority" is not an "agent" for the insured but instead an independent "broker" for the deal). The contract documents – which, once more, the Plaintiffs seek selectively to erase – simply confirm that these representatives were "independent." Given that the allegations fail to establish that the registered representatives were agents of the Plaintiffs and that the documentation "clearly shows" that they in fact represented the investors, they had no duty to disclose to the insurers for the additional reason of the lack of an agency relationship. See Russ & Segalia, supra, § 45:9 (no jury question on agency issue where "the evidence clearly shows a broker is the agent of the insured, . . . [as] a matter of law").[24]

---

[24] Plaintiffs do not respond to Defendants' arguments, in the applicable initial memoranda, that even if the independent brokers did have such a duty, there is no basis for applying that duty to the other Defendants, such as Mr. Caramadre, Mr. Radhakrishnan, or the organizations they represented, in these actions under a civil conspiracy

### 6. The signatures of the various annuitants and registered representatives did not constitute omissions or misrepresentations.

The signatures of the annuitants and the various registered representatives on the applications did not constitute nondisclosures, "half-truths," or misrepresentations of any kind, and Plaintiffs may not avoid their obligations under the contracts by asserting that the annuitants did not understand the terms and conditions of the annuity contracts. Plaintiffs again seek to rewrite their applications and contracts to conveniently add a host of nonexistent meanings, certifications, and representations. But the annuitants' signatures did not certify anything. Rather, they merely indicated to the Plaintiffs that the designated annuitants were in fact persons different from the owners of the policies.[25] The independent brokers simply signed (for the benefit and protection of the *owners*, not the *Plaintiffs*)[26] underneath language regarding the suitability of the investment for the *investors*. They did not certify each and every circumstance surrounding the application process that Plaintiffs now seek to undermine.[27]

---

or any other theory. See, e.g., *Memo. in Supp. of Mot. to Dismiss* in C.A. No. 09-472/S, at 21, n.9; *Memo. in Supp. of Mot. to Dismiss* in C.A. No. 09-470/S, at 20, n.9.

[25] The annuity application in the related action of <u>Nationwide Life Insurance Co. v. Steiner</u>, C.A. No. 09-235, currently on file with this Court, further highlights this fact. That application dispensed even with a signature line for the annuitant, and Nationwide accepted the representation that the annuitant was a real person different from the owner. In the cases at bar, Plaintiffs chose to require a signature of the annuitant on the application as evidence of that same fact, but not because there were any relevant "certifications" to be demanded of the annuitants or any of the Defendants.

[26] Because the language on the various annuity applications to the effect that the investments were "reasonable" for the investor/owners was plainly included for the benefit of the owner/investors and not for the benefit for Plaintiffs, the independent brokers' signatures underneath these statements provides *no* basis for Plaintiffs to bring fraud claims, or any other claims, against the independent brokers or anyone else. Plaintiffs have failed to allege (and how could they?) that these alleged "representations" regarding the reasonableness of the investment for the investor-owners caused *Plaintiffs* to rely detrimentally – let alone reasonably – or that these "representations" were material to *Plaintiffs*. The language on the applications cannot form the basis of Plaintiffs' fraud claims because it was of no interest to the Plaintiffs; it had nothing to do with them, their financial interests, or needs, or the benefits they hoped to extract for themselves from their annuity contracts of adhesion.

[27] As argued in the initial memoranda, Plaintiffs also fail to allege adequately any knowledge on the part of the agents. For reasons stated separately in the broker-dealer companies' reply memoranda, Plaintiffs arguments that these companies had a contractual duty to disclose are also erroneous.

### 7. The annuitants' alleged lack of understanding about the annuities does not empower the Plaintiffs to void their contracts and does not constitute "fraud in factum."

Plaintiffs' argument, with respect to some of the complaints,[28] that the annuitants' alleged "lack of understanding voids the annuities" on a theory of "fraud in factum" is unpersuasive.

One obvious reason why Plaintiffs' "fraud in factum" has no bearing on any of these actions is that the annuitants simply were not "parties" to the contracts at issue. These were contracts between the investors who paid into the policies and the companies that offered them. The Plaintiffs' contracts included the annuitants only as measuring lives for the temporal extent of triggering certain contract features, but not as contracting "parties." See supra Part III(A)(6) (explaining that annuitants did not "certify" anything, and their signatures merely indicated that the designated annuitants were individuals other than the investor/owners). The annuitants' understanding (or lack thereof) about the various features of Plaintiffs' annuity contracts is completely immaterial in that it has no bearing on any of the terms or obligations of the contracts. Indeed, the following statement that Plaintiffs included near the bottom of the cover page of each and every annuity contract at issue in these actions is about as clear as it gets on this point: *"This is a legal contract between the policyowner and the Company."* See, e.g., C.A. No. 09-502/S, *Complaint* at Exhibit D (emphasis added). Conspicuously absent is any assertion that

---

[28] Specifically, C.A. No. 09-471/S and C.A. No. 09-473/S. Plaintiffs do not allege inadequate annuitant knowledge in C.A. No. 09-472/S and C.A. No. 09-502/S. In a third set of cases, C.A. No. 09-549/S and C.A. No. 09-564/S, Plaintiffs allege inadequate annuitant knowledge, but only *in the alternative*. In these latter two actions, Plaintiffs also alternatively allege that the annuitants' signatures were forged (by whom, we are left to guess). In still another iteration in those same complaints, Plaintiffs allege the annuitants *did* sign, but they were compensated for doing so. The multiple alternative allegations in C.A. No. 09-549/S and C.A. No. 09-564/S further establish that Plaintiffs simply lack a factual basis for stating any claim as to any of these alternative theories, let alone under the stricter standards of Rule 9(b). Moreover, Plaintiffs' urging in their memoranda that the court "need only look to closely related actions," *Consolidated Memo. in Response to Defendants' Motions to Dismiss* (C.A. No. 09-564/S), 49, to plug these gaps in its Complaints is an entirely inappropriate substitute for meeting the pleading standards imposed by the federal rules. Indeed, Plaintiffs can cite no case for the principle that cross-referencing allegations of another complaint with respect to another transaction can cure a complaint that fails to state a claim about the transaction in dispute. Furthermore, the alternative forgery allegations in these two complaints – as well as the forgery allegations in C.A. No. 09-470/S – fail to state a claim under the Rule 9(b) standard for the additional reasons already explained in the corresponding initial memoranda on file with the Court.

it is a contract with the annuitant. In addition to this reason and the other reasons already stated in the initial memoranda,[29] the "lack of [annuitants'] understanding" assertion also does not support a fraud claim against these Defendants because the Plaintiffs fail to allege sufficient facts to support the elements of a fraud in factum claim, even if the annuitants are somehow construed as having been contracting "parties." Fraud in factum is a "misrepresentation as to the nature of a writing that a person signs with neither knowledge nor reasonable opportunity to obtain knowledge of its character or essential terms." R.I. Depositors Econ. Prot. Corp. v. Duguay, 715 A.2d 1278, 1280 (R.I. 1998) (citing Black's Law Dictionary 661 (6th ed. 1990) (citing U.C.C. § 3-305(2))). The doctrine referenced in Duguay corresponds to the entirely different situation where the party *challenging* the contract's enforceability alleges that *it* was defrauded into signing the contract and seeks to avoid its obligations on this basis.[30] It does not pertain to an insurance company that claims an individual, who has voiced no challenge to the contract (and who, again, was not a "party" to the contract), did not fully understand the insurer's complex contract. Indeed, to apply "fraud in factum" in this context would turn on its head the rule that contractual ambiguities are to be construed against the drafter of an adhesion contract. See Elliott Leases Cars, Inc. v. Quigley, 373 A.2d 810, 813-14 (R.I. 1977). The logical application of the rule the Plaintiffs now advance is that insurance companies can force their customers, in

---

[29] Notably, Plaintiffs fail to respond to Defendants' arguments in the pertinent actions that Plaintiffs cannot avoid their obligations under their contracts because (1) a party is charged, as a matter of law, with sufficient knowledge and understanding of what he signed, and (2) the annuitants, the individuals allegedly subject to "fraud in factum," are not even challenging the annuities, and there is no dispute that the Plaintiffs understood the terms of their own contracts of adhesion. See, e.g., *Mem. of Law in Support of Mot. to Dismiss* in C.A. No. 09-473/S, at 22. Indeed, as detailed further herein, the annuitants are not even parties to the annuity contracts, but merely measuring lives with respect to certain features of the contracts.

[30] The language Plaintiffs cite, to the effect that "*he who signs a document* reasonably believing it is something quite different than it is cannot be bound to the terms of the document," supports this view. Operating Eng'rs Pension Trust v. Gilliam, 737 F.2d 1501, 1504 (9th Cir. 1984) (emphasis added) (explaining that one who signs a promissory note reasonably believing he was only giving his autograph is not bound by the note while also recognizing the general principle that a "party who signs a written agreement generally is bound by its terms, even though he neither reads it not considers the legal consequences of signing it.").

the insurance context no less than in the annuity context, to submit to an onerous, post-hoc examination about their understanding of the contract as a predicate to affording them the coverage for which they contracted and paid. The insured did not understand the policy? Great, no coverage.

The fraud in factum allegations also fail, because the Plaintiffs do not allege that any of the Defendants misrepresented the nature of the Plaintiffs' annuities. To take a representative example, in C.A. No. 09-473/S, WRL's *Consolidated Memorandum* (at p. 38) relies on ¶ 26 of WRL's Amended Complaint to establish that WRL has alleged a misrepresentation, but all ¶ 26 alleges is that Mr. Radhakrishnan "did not explain" the annuity's terms. *Amended Complaint*, C.A. No. 09-473/S, ¶ 26. Even assuming this allegation to be true, it is insufficient to establish a misrepresentation.

Plaintiffs also fail to allege that the annuitants lacked any "reasonable opportunity to obtain knowledge of" the "character or essential terms" of the annuity contracts. To take another representative example, in its *Consolidated Memorandum* in C.A. No. 09-473/S (at p. 38 (citing *Amended Complaint* at ¶ 24-26)), WRL relies solely on its allegation that Mr. Veveiros was terminally ill to establish that he lacked any "reasonable opportunity" to take in the "character or essential terms" of the annuity.[31] But terminal illness is not sufficient to establish as a matter of

---

[31] WRL cites to several paragraphs, ¶¶ 24-26, but only ¶ 24, which references Mr. Veveiros's alleged terminal illness, is relevant to the factual characterizations WRL makes in its memorandum. In fact, *no* paragraphs in WRL's Amended Complaint state the "facts" that WRL improperly folds into its *Consolidated Memorandum* to the effect that Mr. Veveiros was being "offered the opportunity to meet a significant economic need" at a "time of great stress and difficulty" or that he faced "considerable pressure to act without delay." Even if Plaintiffs had properly alleged these "facts," they would not establish that Mr. Veveiros lacked a "reasonable opportunity" to review the document that he signed.

law that one lacks the opportunity and capacity to review, to the extent desired, an application or any other document placed before one for signature.[32]

### B. Plaintiffs' allegations, for the first time in their memoranda, of various "affirmative misrepresentations" do not support their fraud-based claims.

In their memoranda, Plaintiffs attempt to insert various "implied affirmative misrepresentations" into the annuity applications and contracts. With the broadest of brushes, Plaintiffs allege that, despite the annuity applications' silence on these issues, *each* of the Defendants falsely asserted in the applications (1) all of the terms stated in the Plaintiff's written agreements with the broker-dealer companies, (2) all of the terms of the Code of Ethics that those contracts reference, (3) that the owner/investors had an insurable interest in the annuitants, and (4) that no one compensated the annuitants. These allegations are problematic for multiple reasons.

First, these arguments raise new Rule 9(b) problems, because the Plaintiffs did not plead such "implied affirmative misrepresentations" in their complaints[33] and, even where they do touch on these allegations in their memoranda, they utterly fail to break out and delineate *who* allegedly made each of these representations in the applications and under what circumstances. Plaintiffs do not meet even the Rule 8 standard, because the complaints fail to provide adequate notice with a "short and plain statement" of these grounds for their claims in this respect. See FED. R. CIV. P. 8(a)(1).

Second, neither the applications nor the contracts themselves included any such misrepresentations, and the Court should not insert them by implication. With regard to the first

---

[32] Again, to hold otherwise would create perverse incentives for insurance companies to challenge the validity of policies that they issued to terminally ill consumers when their beneficiaries submit claims.

[33] In C.A. No. 09-473/S, for example, Plaintiff WRL merely alleges that the applications "did not disclose" such information. *Amended Complaint* ¶¶ 45, 47. As already demonstrated, there was no duty to disclose.

two items – the broker-dealer agreements and the Codes of Conduct – Plaintiffs' challenges to the annuity applications are utterly baseless because the annuity applications made no reference whatsoever to either document, let alone did they incorporate their terms.[34]

The applications also did not include fraudulent statements about an insurable interest and/or any payments provided to the annuitants. As already demonstrated, Rhode Island law does not apply an insurable-interest requirement to annuity contracts, and it does not prohibit any payments to annuitants. Moreover, Plaintiffs do not allege that Defendants knew that an insurable-interest requirement applied or that any payments to annuitants were prohibited under Rhode Island law. Given the novelty of Plaintiffs' legal interpretation, how could they?

This gap in Plaintiffs' allegations is significant because common law fraud requires, among other things, that the defendant *knew* (i.e., believed) the statements in question were false. Zaino v. Zaino, 818 A.2d 630, 638 (R.I. 2003) (internal citations and quotations omitted) (emphasis added) ("To establish a *prima facie* case of common law fraud in Rhode Island the plaintiff must prove that the defendant *knowingly* made a false representation intending thereby to induce plaintiff to rely thereon, and that the plaintiff justifiably relied thereon to his or her damage."). Thus, the case on which Plaintiffs rely most heavily is distinguishable in that it involved a claim under the Maryland Consumer Protection Act, a statute which does *not* require proof of knowing falsehood; in a radical departure from the common law, there is no scienter requirement under the MCPA and a mere falsehood is enough. Golt v.Phillips, 517 A.2d 328, 332 (Md. 1986) (landlord liable even if he did not know that he was not allowed to lease

---

[34] Moreover, most of the Defendants in these actions – Mr. Caramadre, for example – were not even parties to the annuity applications and contracts *let alone* to the broker-dealer agreements and the Codes of Ethics that Plaintiffs seek to interpolate into their bare application forms.

premises without a license because scienter not required for statutory claim of deceit under MCPA).[35]

Third, as with Plaintiffs' other fraud allegations, Plaintiffs waived these claims by marketing annuities as a non-insurance investment option, by issuing annuity applications that contained no insurable-interest or health disclosure requirements and no prohibition on paying annuitants, by accepting applications that contained no statement on any of these subjects, by issuing policies based on this annuity application process, and by paying the death-benefit claims for years on most of the contracts they issued.[36]

## C.  Plaintiffs fail to meet the Rule 9(b) standard.

Plaintiffs in each complaint fail to meet the Rule 9(b) standard for the reasons detailed in the corresponding initial memoranda.[37]  Plaintiffs should not be allowed to skate over the numerous and substantial gaps in their allegations under the rule they now advance that the Rule 9(b) standard should be "applied more liberally" to a "fraud by silence" case.  However liberally Rule 9(b) may, in theory, apply, courts – including the Kansas court upon which the Plaintiffs rely – have not hesitated to reject fraud-by-silence allegations as inadequate under Rule 9(b). See Capital Solutions, LLC v. Konica Minolta Bus. Solutions USA, Inc., 2009 WL 1635894, *6

---

[35] The court's undeveloped secondary argument, that "ignorance is no excuse for the law," cannot sensibly be applied to a common law fraud claim either, and for the same reason.  Knowledge of the falsity of the representation – no less with regard to the current state of the law than with regard to any facts – is required under a Rhode Island common law fraud claim.  Put another way, whether or not the annuity contracts are invalid under Plaintiffs' (erroneous) new interpretation of the law, none of the Defendants committed fraud by failing to know of and believe in Plaintiff's legal theory at the time of contracting.  C.f. Carmody v. R.I. Conflict of Interest Comm'n, 509 A.2d 453, 460 (R.I. 1986) ("declin[ing] to embrace fully" the maxim that "ignorance of the law is no excuse" "because it oversimplifies the difficulties that may be encountered in interpreting the statutes and regulations governing contemporary society in its manifold activities.  Many of these statutes are highly complex and are sometimes ambiguous.").

[36] In C.A. Nos. 09-502/S; 09-549/S; and 09-564/S, Plaintiffs have paid the owners the benefits owed to them under the annuity contracts in full satisfaction of their claims.

[37] This includes the reason that to be fraudulent, a statement has to be material.  Plaintiffs have failed to allege materiality, along with the other elements of fraud, to any extent, let alone with sufficient specificity.

(D. Kan. June 11, 2009) (denying motion to amend pleadings upon finding that amended

pleadings would be subject to dismissal under Rule 9(b) because fraud-by-silence claim lacked

requisite specificity as to the nature of the fraud (the "what") and the time period (the "when"));

Bishop v. Shell Oil Co., 2008 WL 57833, **1-2 (E.D. La. January 3, 2008) (granting Rule 9(b)

motion for more definite statement as to fraud-by-silence claim). In Bishop, the court granted

the Rule 9(b) motion for reasons applicable to this case. The court wrote that "even assuming"

that a "somewhat more relaxed pleading standard" applied, the plaintiff's complaint failed Rule

9(b) because, among other things, the plaintiff's "allegations inappropriately lump all of the

defendants together" in that they did not "allege the specific wrongful conduct of each defendant,

how that conduct injured [the plaintiff], or [the plaintiff's] relationship to each defendant."

Bishop, 2008 WL 57833 at *1. The same principles should apply to Plaintiffs' allegations.

Also, as in Bishop, Plaintiffs have no basis for avoiding Rule 9(b) by alleging the relevant details

are "unknown" or "unavailable" to them. The Plaintiffs could and should have further

investigated and developed their allegations before bringing their libelous accusations of fraud.

## IV.   THE UNJUST ENRICHMENT AND CIVIL CONSPIRACY CLAIMS FAIL BECAUSE THEY DERIVE ENTIRELY FROM PLAINTIFFS' OTHER INVALID CLAIMS.

As previously argued, the unjust enrichment, criminal insurance fraud, and civil

conspiracy claims are invalid because they derive from Plaintiffs' other invalid claims. In

addition, as previously argued, Plaintiffs' claims of "civil liability for criminal offenses" fail

because the insurance fraud statute, R.I. GEN. LAWS § 11-41-29, similar to current Rhode Island

common law, requires a "written statement" containing "false information." A mere omission,

even if material, is not enough. Moreover, the statute applies only to applications for insurance

policies. See id. It does not apply to applications for annuity contracts.

**V. RHODE ISLAND'S ECONOMIC LOSS DOCTRINE BARS PLAINTIFFS' NEGLIGENCE CLAIMS BECAUSE PLAINTIFFS ARE COMMERCIAL ENTITIES WITH THE LEVERAGE TO ALLOCATE THEIR RISKS BY CONTRACT, AND THE RHODE ISLAND SUPREME COURT WOULD NOT CARVE OUT A NOVEL EXCEPTION TO THE DOCTRINE FOR THE PLAINTIFFS' BENEFIT.**

Plaintiffs attempt to dodge the economic loss doctrine, which bars their negligence claims, by taking shelter under a so-called "services contract" exception that Rhode Island law does not recognize and would not import, and because of special "duties" that the broker-dealer companies and the independent brokers allegedly owed them. Both arguments fail for the same reason: the Rhode Island Supreme Court has articulated and applied the economic loss doctrine broadly. Moreover, to the extent it has allowed for the recovery of purely economic losses under a negligence theory, it has always been in the inapplicable policy interest of correcting for unequal bargaining power by providing added legal protections to "little guys" (consumers, clients, and contractors) against the negligence of "big guys" (credit unions, attorneys, and supervising architects, respectively). It does so for reasons (irrelevant here) having to do with providing additional legal protections to weaker parties who do not have the leverage to allocate their risks adequately by contract. Rhode Island courts would not apply any such exception to these Plaintiffs, who are not only commercial entities – a category that the court, again and again, has emphasized is subject to the doctrine's strictures – but also large, sophisticated commercial entities, the prototypical "big guys" in these types of business relationships.

The Court can and should dismiss Plaintiffs' negligence claims, without exercising the powers of "prophecy" that the Court is authorized to wield in predicting state law,[38] because

---

[38] See Gilmore v. Citigroup, Inc., 535 F.3d 45, 63 (1st Cir. 2008) (certification inappropriate where state law is "sufficiently clear . . . to allow a federal court to predict its course" (internal quotation and citation omitted)); see, e.g., Reynolds, 410 F.3d at 108 (court "required to make a prophecy" of Massachusetts state law by "rely[ing] first on settled Massachusetts law and build[ing] from there by reference to case law in other jurisdictions and to the policies enunciated in the Massachusetts cases.").

current Rhode Island law on the economic loss doctrine bars the claims. The Rhode Island Supreme Court has embraced the economic loss doctrine wholeheartedly, and has never endorsed a "services contract" or a "special duty" exception. As Plaintiffs have pointed out, the court has explained that "[t]he economic loss doctrine provides that a 'plaintiff is precluded from recovering purely economic losses in a negligence cause of action.'" Franklin Grove Capital Corp. v. Drexel, 936 A. 2d 1272, 1275 (R.I. 2007) (quoting Boston Invest. Prop. #1 State v. E.W. Burman, Inc., 658 A.2d 515, 517 (R.I. 1995)). The court's policy rationale for the doctrine – that "commercial transactions are more appropriately suited to resolution through the law of contract, than through the law of tort," Drexel, 936 A.2d at 1276 – is fully applicable here. At the same time, the Rhode Island Supreme Court's recognition of "some limitations" to the doctrine has been based on the wholly *in*applicable rationale that the court has a "tradition of 'providing increased protection and an opportunity for recovery in cases [involving *consumers*].'" id. (emphasis added) (quoting Rousseau v. K.N. Constr., Inc., 727 A.2d 190, 193 (R.I. 1999)). Moreover, this tradition of protecting consumers stands in contrast to the court's tradition of applying the economic loss rule to commercial entities, even unsophisticated ones. See Drexel, 936 A.2d at 1276 (explaining "the economic loss doctrine . . . applies to entities acting in a business capacity," not just "'sophisticated' commercial entities").[39]

This Rhode Island case law suggests strongly that the economic loss doctrine applies to Plaintiffs' negligence claims because Plaintiffs are commercial entities, the claims involve commercial transactions, and the Plaintiffs possessed more than sufficient leverage to allocate

---

[39] It is also clear that the relevant inquiry is not whether a consumer or non-commercial party was somehow involved in the transaction but whether the plaintiff attempting to bring the negligence claim is a commercial entity. See, e.g., id. at n.4 ("The [property owner's] status is irrelevant. The relevant inquiry centers not around whether the original vendor of the property was a commercial entity, but rather whether Franklin Grove, the complaining party and the party against whom the commercial loss doctrine is applied, was a commercial entity or a consumer.").

their risks via their adhesion contracts. Plaintiffs' position, in contrast, runs firmly against the grain of state law. The Rhode Island Supreme Court has recognized no "services contract" or free-ranging "duty" exception to the doctrine, and there is very little chance that it would do so in the context of an insurance company's claims against independent brokers and broker-dealer companies. The cases Plaintiffs cite do not establish any such exceptions.

Two of the cases upon which they rely for their contention that special duties apply that would bring them outside the bounds of the doctrine antedate the Rhode Island Supreme Court's adoption of the doctrine.[40] See Estate of Braswell v. People's Credit Union, 602 A.2d 510 (R.I. 1992); Forte Bros. v. Nat'l Amusements, 525 A.2d 1301 (R.I. 1987). The cases do not mention the economic loss doctrine. Furthermore, they harmonize readily within the only recognized exception to the doctrine (the "consumer" exception) in that the parties allowed to seek economic losses in those cases – a credit union's customer and a contractor subject to the control of a supervising architect – were in weaker bargaining positions and thus needed added legal protections. See, e.g., Braswell, 602 A.2d at 513-14 (allowing recovery for economic losses under negligent misrepresentation theory by credit union's customer against credit union); Forte Bros., 525 A.2d at 1303 (quoting United States v. Rogers & Rogers, 161 F. Supp. 132, 136 (S.D. Cal. 1958)) (allowing contractor to recover economic losses from supervising architect under negligence theory based on rationale that "'altogether too much control over the contractor necessarily rests in the hands of the supervising architect for him to not be placed under a duty imposed by law . . . .'"); see also Chubb Corp., 473 F. Supp. 2d at 278 (noting that "Rhode Island courts have been reluctant to extend Forte Bros. beyond the chainlink fences of a construction site" and that "Rhode Island's subsequent adoption of the economic-loss rule, which generally

---

[40] The Rhode Island Supreme Court first adopted the economic loss doctrine in 1995, in Boston Investment Property #1 State v. E.W. Burman, Inc., 658 A.2d at 517.

precludes the recovery of purely financial or economic losses in negligence, further distance[d]"
the case from having any relevance). The more recent case upon which the Plaintiffs rely,

Richmond Square Capital Corp. v. Mittleman, 773 A.2d 882 (R.I. 2001), also does not mention

the economic loss doctrine and, as in the other cases, involved a claim by a weaker party (a

client) against a stronger party (an attorney) with greater bargaining power and professional

duties that are the long-running subject of malpractice actions based on negligence.[41]

     In short, nothing in Rhode Island law suggests that a Rhode Island court would decline to

apply its broad version of the economic-loss doctrine to the Plaintiffs' negligence claims. To the

contrary, state law counsels this Court to follow the established policy of applying the doctrine to

commercial entities and to apply it to the Plaintiffs, as *sophisticated* commercial entities which

"have or could have" allocated their risks via contract. See Boston Inv. Property #1 State, 658

A.2d at 517 (quoting Spring Motors Distribs., Inc. v. Ford Motor Co., 489 A.2d 660, 672 (N.J.

1985) (emphasis in original)) (adopting economic loss doctrine in Rhode Island while explaining

that "[i]t is important to note that the parties involved in the matter before us are commercial

entities" and that "*[c]ontract principles . . . are generally more appropriate for determining*

---

[41] Indeed, though the Rhode Island Supreme Court has not adopted the categorical "services contract" exception that Plaintiffs favor and that other courts have rejected, see, e.g., Grynberg v. Agri Tech, Inc., 10 P.3d 1267 (Colo. 2000), it bears observing that Rhode Island's practice can, in fact, be squared with the so-called "services contract" exception as applied in jurisdictions that have adopted it, while still applying the economic loss doctrine to bar Plaintiffs' negligence claims. For example, Illinois has applied an exception to the economic loss doctrine in the context of a client's claim against an attorney, another instance where added protections for the weaker party may be warranted and "historical precedent," as opposed to "logic," establishes the availability of a negligence remedy at tort. See Collins v. Reynard, 607 N.E.2d 1185, 1186 (Ill. 1992) (applying exception to economic loss rule allowing for client to bring negligence or breach of contract claim against attorney based "on historical precedent rather than logic" while explicitly limiting holding to field of attorney malpractice). Even the Wisconsin case upon which Plaintiffs rely involved the quaint circumstance of an egg farmer suing an electrician. See Ins. Co. of N. America. v. Cease Elec. Inc., 688 N.W.2d 462 (Wisc. 2004) (egg farmer's claim against electrician installing ventilation upgrade system in plaintiff's barn not barred by economic loss doctrine). And, contrary to Plaintiffs' contentions, the rationales cited by the Wisconsin court, id. at 470, in declining to apply the doctrine in that context do not apply here. Applying the doctrine here (1) helps to maintain the distinction between tort and contract law by creating incentives for parties to bargain over the economic risks attendant to investment vehicles such as Plaintiffs' annuity contracts, (2) protects the parties' freedom to contract effectively over such risks in setting up their business arrangements for the sale of such products, and (3) encourages the Plaintiffs, as the parties that designed the annuities and were best situated to assess and allocate the risk of loss, to do so in their contracts.

*claims for consequential damage that the parties have or could have addressed in their*

*agreement.*").

## CONCLUSION

For these reasons and those set forth in the Defendants' previous memoranda in support

of their motions to dismiss the complaints, the Defendants respectfully ask this Court to dismiss

the complaints in their entirety.

<div style="margin-left: 40%;">

JOSEPH CARAMADRE, RAYMOUR
RADHAKRISHNAN, ESTATE PLANNING
RESOURCES, and ESTELLA RODRIGUES

By their Attorneys,


*/s/ Robert G. Flanders, Jr.*
Robert G. Flanders, Jr. (No. 1785)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
Tel: (401) 274-2000
Fax: (401) 277-9600

</div>

DATED: February 22, 2010


## CERTIFICATION

I hereby certify that on February 22, 2010, a copy of the foregoing was filed
electronically and served by mail on anyone unable to accept electronic filing. Notice of this
filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated
on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF
System.

<div style="margin-left: 40%;">

*/s/ Robert G. Flanders, Jr.*

</div>